**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL ASSOCIATION FOR
HOME CARE & HOSPICE,

*Plaintiff*,

v.

Civil Action No. 1:23-cv-01942-TNM

XAVIER BECERRA,
*In His Official Capacity as Secretary*
*of Health and Human Services*,

*Defendant*.

**PLAINTIFF NATIONAL ASSOCIATION FOR HOME CARE & HOSPICE'S**
**MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 4

      A.     Statutory Framework and History .......................................................... 4

      B.     Regulatory Background ............................................................................ 8

      C.     The Rulemaking and Final Rule ............................................................ 10

      D.     The Final Rule Causes Significant Harm ................................................ 14

STANDARD OF REVIEW .................................................................................................. 15

ARGUMENT ..................................................................................................................... 16

I.     The Final Rule Violates Congress's Command to Determine the Impact on Expenditures Resulting from Differences Between Assumed and Actual Behavior Changes. ............................................................................................................... 16

II.    The Final Rule Violates Congress's Budget Neutrality Requirement. ............................ 24

III.   The Final Rule Violates Congress's Command to Remove Therapy Thresholds as a Factor that Influences Payment. .................................................................................. 28

CONCLUSION ................................................................................................................... 31

# TABLE OF AUTHORITIES

**Cases**

*Adirondack Med. Ctr. v. Sebelius*,
    29 F. Supp. 3d 25 (D.D.C. 2014) ........................................................ 26

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
    934 F.3d 649 (D.C. Cir. 2019) ....................................................... 15, 16

*Am. Hosp. Ass'n v. Becerra*,
    596 U.S. 724 (2022) ...................................................................... 24, 28

*Atl. City Elec. Co.*,
    295 F.3d 1 (D.C. Cir. 2002) ............................................................... 24

*Bracco Diagnostics, Inc. v. Shalala*,
    963 F. Supp. 20 (D.D.C. 1997) .......................................................... 24

*Burke v. Coggins*,
    521 F. Supp. 3d 31 (D.D.C. 2021) ....................................................... 4

*Burrage v. United States*,
    571 U.S. 204 (2014) ........................................................................... 28

*Cape Cod Hosp. v. Sebelius*,
    630 F.3d 203 (D.C. Cir. 2011) ........................................................... 25

*Cayuga Nation v. United States*,
    594 F. Supp. 3d 64 (D.D.C. 2022) ..................................................... 31

*Commissioner v. Lundy*,
    516 U.S. 235 (1996) ........................................................................... 28

*DHS v. Regents of Univ. of Cal.*,
    140 S. Ct. 1891 (2020) ....................................................................... 26

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*,
    300 F. Supp. 2d 32 (D.D.C. 2004) ..................................................... 24

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ........................................................................... 20

*FEC v. Cruz*,
    596 U.S. 289 (2022) ........................................................................... 24

*Howard v. Pritzker*,
    775 F.3d 430 (D.C. Cir. 2015) ........................................................... 30

*Kakar v. U.S. Citizenship & Immigr. Servs.*,
   29 F.4th 129 (2d Cir. 2022) .................................................................. 31

*La. Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986) .......................................................................... 24

*Landmark Hosp. v. Azar*,
   442 F. Supp. 3d 327 (D.D.C. 2020) ........................................................ 27

*Michigan v. EPA*,
   576 U.S. 743 (2015) .......................................................................... 26

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
   463 U.S. 29 (1983) ............................................................... 20, 27, 30

*Nat'l Fed'n of Indep. Bus. v. OSHA (NFIB)*,
   595 U.S. 109 (2022) ...................................................................... 24, 31

*Perez v. Mortgage Bankers Ass'n*,
   575 U.S. 92 (2015) ............................................................................ 26

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) .......................................................................... 29

*Roberts v. United States*,
   883 F. Supp. 2d 56 (D.D.C. 2012) ......................................................... 15

*Russello v. United States*,
   464 U.S. 16 (1983) ............................................................................ 26

*Sierra Club v. Mainella*,
   459 F. Supp. 2d 76 (D.D.C. 2006) ......................................................... 15

*United Steel v. Mine Safety & Health Admin.*,
   925 F.3d 1279 (D.C. Cir. 2019) ............................................................ 15

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) ..................................................................... 27, 28

*Varity Corp. v. Howe*,
   516 U.S. 489 (1996) .......................................................................... 29

*Westar Energy, Inc. v. FERC*,
   473 F.3d 1239 (D.C. Cir. 2007) ............................................................ 23

**Statutes**

5 U.S.C. § 706(2) ........................................................................................... 1, 4, 15

42 U.S.C. § 1395 ........................................................................................................ 4

42 U.S.C. § 1395fff *et seq* ......................................................................................... 4

42 U.S.C. § 1395fff(a) ............................................................................................... 4

42 U.S.C. § 1395fff(b)(2)(A) ..................................................................................... 5

42 U.S.C. § 1395fff(b)(2)(B) ..................................................................................... 7

42 U.S.C. § 1395fff(b)(3)(A)(i) ................................................................................ 5

42 U.S.C. § 1395fff(b)(3)(A)(iv) ...................................................................... *passim*

42 U.S.C. § 1395fff(b)(3)(B) ..................................................................................... 5

42 U.S.C. § 1395fff(b)(3)(D) ........................................................................... *passim*

42 U.S.C. § 1395fff(b)(4)(A) ..................................................................................... 5

42 U.S.C. § 1395fff(b)(4)(B)(ii) ................................................................. 7, 22, 29, 30

**Regulations**

42 C.F.R. § 405.1063 ............................................................................................... 15

83 Fed. Reg. 56,406 (Nov. 13, 2018) ........................................................... 6, 8, 9, 18

84 Fed. Reg. 60,478 (Nov. 8, 2019) ................................................................. *passim*

86 Fed. Reg. 42,424 (Aug. 4, 2021) ................................................................... 22, 23

87 Fed. Reg. 37,600 (June 23, 2022) ...................................................... 10, 11, 23, 25

87 Fed. Reg. 47,502 (Aug. 3, 2022) ........................................................................ 23

87 Fed. Reg. 66,790 (Nov. 4, 2022) ................................................................. *passim*

**Other Authorities**

CMS,
    No. 10969, Medicare & Home Health Care (Aug. 2023) .......................................... 4

MedPAC,
    Report to Congress: Medicare Payment Policy (Mar. 2011) .................................... 6

MedPAC,
   Report to Congress: Medicare Payment Policy (Mar. 2016)......................................................... 6

S. Rep. No. 112-24 (2011) ............................................................................................................. 6

SimiTree,
   *Home Health Agencies Face Financial Burden of Proposed CMS Payment Cut*,
   Relias.com (Aug. 15, 2022), https://tinyurl.com/4emm5xnw ...................................................... 2

## INTRODUCTION

This case implicates a bedrock principle of administrative law: executive agencies must comply with statutory commands and may not exceed the authority delegated to them by Congress. If an agency oversteps those bounds or acts unreasonably, the judiciary must enforce the law and vacate the agency's action. *See* 5 U.S.C. § 706(2). That obligation is especially important where, as here, Congress understood the temptation for an agency to act in its own budgetary self-interest and expressly prohibited the agency from cutting payment amounts so as to protect certain healthcare providers and the elderly and disabled patients who depend on their care.

In the Bipartisan Budget Act of 2018, Congress provided the Centers for Medicare & Medicaid Services ("CMS") with specific statutory instructions for calculating payments to home health care agencies. *First*, Congress directed CMS to eliminate the use of therapy thresholds. Seeking to create incentives for providing high-quality and not high-quantity care, Congress required that payments no longer be tied to how much (or how little) therapy any home health agency might provide to patients. *Second*, Congress directed CMS to ensure that its shift to a new payment methodology—and any changes in behavior that might result from that shift—would not cause an increase or decrease in overall expenditures. Congress understood that changing the payment methodology would likely affect behavior, and it directed CMS to predict what changes in behavior would occur and then to adjust payments to ensure that overall expenditures to home health agencies would not change as a result of those new behaviors (maintaining what is referred to as "budget neutrality"). *Third*, Congress instructed CMS to measure each year the difference between assumed behavior changes and actual behavior changes on expenditures and to adjust for that difference. In short, Congress required CMS to look back each year and check whether it had accurately predicted the impact of behavior changes on expenditures and to correct for any inaccuracies.

Taking the statute as a whole, Congress thus mandated that CMS change the payment model for home health care services and ensure that expenditures under the new model would remain consistent with what CMS would have paid absent any model change. Congress designed this budget-neutral framework to ensure that CMS would stop basing payments on the quantity of therapy provided by home health agencies, while also preventing CMS from taking advantage of the change in payment methodology to reduce overall expenditures. Congress understood CMS's temptation to reduce payments in service of its own short-term budget goals, but also recognized that allowing the agency to do so would harm patients and deprive home health agencies of an appropriate level of reimbursement for the essential services they provide.

Congress's statutory instructions are thus clear: CMS is not authorized to reduce expenditures and should instead redistribute expenditures to better compensate home health agencies for the services they provide. These instructions are important. As commentators have noted, home health agencies face "myriad challenges" and decreasing overall payments could cause many of them to "shutter[] their doors, thus significantly impacting the most vulnerable members of our society by removing the option to receive care in their homes." SimiTree, *Home Health Agencies Face Financial Burden of Proposed CMS Payment Cut*, Relias.com (Aug. 15, 2022), https://tinyurl.com/4emm5xnw; *see also* AR791-92 (No Place Like Home, Inc. Comment Letter on Proposed Rule to Calendar Year 2023 Home Health Prospective Payment System Rate Update (Aug. 11, 2022)) ("We are gravely concerned that imposing an unprecedented payment cut in this environment would severely restrict access to home health services by shuttering many agencies who could not afford to continue providing care."); *cf.* Declaration of Carrie Edwards ¶¶ 9-13; Declaration of Ken Albert ¶¶ 6, 9-14.

2

CMS has disregarded Congress's instructions and overstepped all three of the statutory limits that Congress imposed. On November 4, 2022, the agency issued a final rule purporting to implement the behavior-adjustment provisions of the Bipartisan Budget Act of 2018. *See* AR1 (87 Fed. Reg. 66,790 (Nov. 4, 2022)). But the rule defies the Act's commands. Contrary to Congress's directions, the rule does not measure the effect of any assumed or actual behavior changes, much less calculate the difference of their impact on overall expenditures. Although Congress instructed CMS to redistribute aggregate expenditures and to hold its change budget neutral, the rule slashes overall expenditures, reducing them based on behavior changes made in response to the methodology change that have not caused any increase in expenditures. Moreover, despite Congress's command to CMS to remove therapy services as a factor in determining payment rates, the final rule continues to tie expenditures to the amount of therapy provided—calculating how much the agency would pay under the old model if it could re-impose that model retroactively.

The rule flies in the face not only of specific statutory commands but also of the entire statutory framework. The Bipartisan Budget Act of 2018 requires CMS to equalize expenditures to what otherwise would have been spent under the old model. In broad terms, the statute directs CMS to determine (1) what it would have paid had a new model not been introduced and (2) what it pays now. Behavior changes triggered by the new model have no bearing on the first calculation: It makes no sense to look at what happened when the new model was introduced to determine how much would have been paid if the new model had ***not*** been introduced. That is why Congress directed CMS to consider behavior change only with respect to what CMS pays under the new model. Although CMS has recognized exactly this point in the past, it has now chosen without any reasoned justification to rebuff both common sense and the statute's plain language in service of

its own budget goals and at the expense of patients. The Court should not countenance such an approach.

When a federal agency disregards Congress's clear commands, "[c]ourts must 'hold unlawful and set aside agency action.'" *Burke v. Coggins*, 521 F. Supp. 3d 31, 37 (D.D.C. 2021) (McFadden, J.) (quoting 5 U.S.C. § 706(2)(A)-(C)). Because CMS has acted in such a manner here, the final rule is unlawful and should be set aside.

## BACKGROUND

### A.     Statutory Framework and History

Pursuant to title XVIII of the Social Security Act, Medicare provides insurance for qualifying elderly patients and the disabled, including for services provided by home health care agencies. 42 U.S.C. § 1395. Home health care agencies constitute a vital part of our nation's health care system. They provide patients with essential services in their personal residences rather than in traditional healthcare settings. As explained by CMS, "[h]ome health care is usually less expensive, more convenient, and as effective as care you get in a hospital or skilled nursing facility."[1] When patients are covered by Medicare and the services are considered reasonable and necessary, CMS pays for the services.

The Medicare statute sets forth the methodology governing how Medicare pays for home health services. *See* 42 U.S.C. § 1395fff *et seq*. Before 2000, Medicare reimbursed home health agencies for services rendered based on the reasonable cost of the services provided. In federal fiscal year 2001, however, Congress directed CMS to implement a *prospective* payment plan— commonly referred to as the Home Health PPS. *See id.* § 1395fff(a). Similar to other prospective

---

[1] CMS, No. 10969, Medicare & Home Health Care, at 4 (Aug. 2023), *available at* https://www.medicare.gov/publications/10969-medicare-and-home-health-care.pdf.

4

payment plans, Congress designed the plan to control Medicare costs—and promote more efficient and cost-effective practices—by reimbursing home health care providers at a predetermined fixed rate for an episode of care regardless of the costs actually incurred in providing that care.

To implement this plan, Congress directed CMS to define an appropriate unit of service—including the number, type, and duration of clinical visits provided within that unit. *Id.* § 1395fff(b)(2)(A). (In response, CMS defined the unit as a 60-day period of care.) Congress further instructed CMS to calculate a "standard prospective payment amount" for the unit of service to be based on the aggregate costs incurred by home health agencies as reflected in their most recently audited cost reports at that time. *Id.* § 1395fff(b)(3)(A)(i). And, finally, Congress directed the agency to make the standard payment amount "budget neutral"—that is, to compute the standard rate so that the aggregate amount of Medicare payments made under the new prospective payment system would be the same as what Medicare would have paid for the same set of services under the previous reasonable-cost system. *Id.*

By statute, CMS revises this standard payment rate each year to account for a variety of factors, including any increase in the costs of goods and services, productivity adjustments, and other adjustments Congress has made from time to time. *Id.* § 1395fff(b)(3)(B). Payment for an actual unit of home health services under the Home Health PPS is adjusted by (1) a "case mix adjustment factor" (which are clinical characteristic that explain the variation in cost between different episodes of care) and (2) a further adjustment to account for the geographic differences in wages and wage-related costs in the area of the country in which the home health agency is located. *Id.* § 1395fff(b)(4)(A). One important case mix adjustment factor that CMS identified as relevant was the amount of therapy provided during an episode of care.

Until 2020, the amount of therapy provided during an episode of care played a critical role in the calculation of payment. But focusing on the quantity of therapy sessions to set payment levels faced mounting criticism. In 2011, the Senate Committee on Finance issued a staff report finding that three of the "four largest publicly traded home health companies … encouraged therapists to target the most profitable number of therapy visits, even when patient need alone may not have justified such patterns." S. Rep. No. 112-24, at 1 (2011), *available at* https://www. finance.senate.gov/imo/media/doc/Home_Health_Report_Final4.pdf. In a report to Congress, the Medicare Payment Advisory Commission ("MedPAC") criticized the therapy payment model and urged CMS to revise its system to "no longer use the number of therapy visits as a payment factor." MedPAC, Report to Congress: Medicare Payment Policy, at 196 (Mar. 2011), https://www.medpac.gov/wp-content/uploads/import_data/scrape_files/docs/default-source/reports/Mar11_EntireReport.pdf. The current system, MedPAC concluded, created "significant incentives to favor therapy patients, avoid high-cost nontherapy patients, and base the number of therapy visits on payment incentives instead of patient characteristics." *Id.* According to MedPAC, "[a] revised system would reduce or eliminate these problems and encourage agencies to focus on beneficiary characteristics when setting plans of care." *Id.* Later reports continued to flag this issue for Congress. *See* MedPAC, Report to Congress: Medicare Payment Policy, at 211 (Mar. 2016), https://www.medpac.gov/wp-content/uploads/2021/10/march-2016-report-to-the-congress-medicare-payment-policy.pdf; *cf.* 83 Fed. Reg. 56,406, 56,485 (Nov. 13, 2018) ("agree[ing] that the therapy thresholds have created an incentive to overprovide therapy services that are not in alignment with patient characteristics and care needs").

Confronted with these and other concerns, Congress changed the payment system in the Bipartisan Budget Act of 2018 in three major ways:

First, Congress adopted the position espoused by the MedPAC reports and removed therapy thresholds from the payment calculation effective in 2020. *See* 42 U.S.C. § 1395fff(b)(4)(B)(ii) ("[T]he Secretary shall eliminate the use of therapy thresholds … in case mix adjustment factors established under clause (i) for calculating payments under the prospective payment system … ."). Congress also replaced the 60-day episode of care with a 30-day episode of care as the unit of service for payment. *See* 42 U.S.C. § 1395fff(b)(2)(B).

Second, just as Congress did when it first established the Home Health PPS in 2000, it instructed CMS to calculate a new standard payment amount in a budget neutral manner, "such that the estimated aggregate amount of expenditures" after the statutory changes "is equal to the estimated aggregate amount of expenditures that otherwise would have been made" without the changes. *Id.* § 1395fff(b)(3)(A)(iv). To achieve true budget neutrality, Congress directed CMS to ensure that adjustments were made to account for changes in behavior induced by the new payment system that might result in increased or decreased expenditures. Specifically, Congress mandated that CMS "make assumptions about behavior changes that could occur as a result of" the unit change—and, equally importantly, the switch away from therapy-based payment—and to incorporate those assumptions into the initial payment calculation to ensure budget neutrality. *See id.* § 1395fff(b)(3)(A)(iv). Making those assumptions would help to protect home health care agencies and the patients who depend on their care: total Medicare expenditures under the new system would be the same under the new model as they would if the new model had never been implemented. *Id.*

Third, Congress was aware that predicting the future is difficult, and it did not want home health care agencies to be harmed if CMS's predictions turned out to be wrong. So Congress directed CMS to take another step to ensure that the new payment model would remain budget

neutral. Congress required CMS, for calendar years 2020 through 2026, to look back and check the accuracy of the agency's predictions on how behavior changes would affect expenditures under the new payment model. Congress thus instructed CMS to determine the difference between the effect on estimated aggregate expenditures of assumed behavior changes (as initially predicted) and the effect of actual behavior changes (as later observed) and then to make both forward and backward looking adjustments to the standard payment to offset for any unpredicted increase or decrease in expenditures. *See* 42 U.S.C. § 1395fff(b)(3)(D)(i)–(iii). Congress could not have been more clear about its budget-neutrality mandate: CMS must ensure that home health agencies receive the "aggregate amount of expenditures that *otherwise* would have been made" if the statutory changes to the payment model had not been enacted. *Id.* § 1395fff(b)(3)(A)(iv) (emphasis added).

## B. Regulatory Background

During two separate rulemakings in 2018 and 2019, CMS began implementing the changes mandated by the Bipartisan Budget Act of 2018. CMS eliminated the use of therapy service threshold and finalized a new case-mix classification—named the Patient Driven Groupings Model ("PDGM")—that relies on clinical characteristics and other patient information to determine categories of cases for payment. *See generally* 83 Fed. Reg. 56,406.

CMS also calculated a new standard payment amount for a 30-day episode of care and implemented the forward-looking budget neutrality requirement in 42 U.S.C. § 1395fff(b)(3)(A)(iv). *See id.* at 56,454-55. To estimate the "aggregate amount of expenditures … that *otherwise* would have been made" if the statutory changes had not been enacted, *see id.* at 56,458 (emphasis added)*,* CMS calculated "the total, aggregate amount of expenditures that would occur under the [pre-Bipartisan Budget Act] case-mix adjustment methodology … and the 60-day episode unit of payment" at $16.6 billion. *See* 84 Fed. Reg. 60,478, 60,512 (Nov. 8, 2019). CMS

8

then calculated what the 30-day payment amount would need to be to achieve that target, aggregate amount without adjusting for behavior assumptions, reaching a 30-day budget neutral standard amount of $1,908.18 per 30-day unit of service. *Id.* at 60,513.

CMS next made assumptions about behavior changes that would affect expenditures under the new model and, to account for those changes, modified the 30-day budget neutral amount under the new model. *Id.*; *see also* 83 Fed Reg at 56,461. CMS predicted that home health agencies would change their documentation and coding practices under the new model to place the highest paying diagnosis code as the principal diagnosis code, leading to higher payment. CMS assumed that home health agencies would identify more comorbidities in their diagnoses, which would also increase payment. And CMS also assumed that home health agencies would provide 1 to 2 extra visits to receive a full 30-day payment, rather than receiving "per visit" payment for a shorter period of care. According to CMS, each of these behavior changes induced by switching to the new model would cause CMS to spend more than the target amount. So the agency reduced the standard payment amount to keep estimated aggregate expenditures budget neutral—that is, at the $16.6 billion mark. *See* 84 Fed. Reg. at 60,512 & n.17.

Because the $16.6 billion number represents what CMS would have "otherwise" spent under the old model absent any changes, *see* 42 U.S.C. § 1395fff(b)(3)(A)(iv), CMS did not re-run that initial target-expenditure calculation based on the assumed changes in behavior. CMS ultimately calculated the final standard payment amount for home health services in calendar year 2020 under the new payment model to be $1,824.99. 84 Fed. Reg. at 60,518-19.

In making this forward-looking budget neutrality calculation under § 1395fff(b)(3)(A)(iv), CMS followed Congress's directives and complied with the statutory requirements. The calculation can be expressed as follows:

$$Payment\ Amount\ 1\ (old\ model)\ \times\ 2020\ services\ otherwise\ provided\ if\ no\ new\ payment$$

$$model\ were\ introduced =$$

$$\$16.6\ billion$$

$$=$$

$$Payment\ Amount\ 2\ (new\ model)\ \times\ projected\ 2020\ services,$$
$$taking\ into\ account\ assumed$$
$$behavior\ changes\ caused$$
$$by\ new\ model$$

The text highlighted in green—"Payment Amount 2 (new model)"—reflects the standard payment amount of $1,824.99" that CMS established before 2020, which was based on the assumed behavioral changes that the agency predicted would occur, and that CMS concluded would be necessary to ensure that aggregate expenditures would remain at $16.6 billion.

NAHC has no objection to how CMS implemented this part of the statute. CMS departed from the statute in 2022, however, when the agency initiated the rulemaking at issue in these proceedings.

### C.      The Rulemaking and Final Rule

On June 23, 2022, CMS issued a proposed rule to update the Medicare Home Health PPS for calendar year 2023. *See* AR99 (87 Fed. Reg. 37,600 (June 23, 2022)). The CY 2023 Rule purported to implement the statutory requirement to "determine the impact of differences between assumed behavior changes and actual behavior changes on estimated expenditures for CYs 2020-2021" and to "provide for … increases or decreases to the standard prospective payment amount … to offset for such increases or decreases in estimated aggregate expenditures" as required by § 1395fff(b)(3)(D)(i), (ii). AR99, AR102-03 (*Id.* at 37,600, 37,603-04). It did no such thing.

Instead of measuring, comparing, or calculating the impact of the differences between assumed behavior changes and actual behavior changes on 2020 and 2021 expenditures, CMS made the type of simplistic calculation that Congress expressly rejected. First, CMS determined

the actual amount of aggregate home health payments made under the new patient model. Second, the agency determined how much Medicare would have paid for those same services if payments had been made under the previous therapy model. Third, CMS calculated and adjusted for that difference. *See id.* at 37,616-17. In other words, instead of accounting for changes in behavior (comparing assumed behaviors with actual, observed behaviors), CMS's model looked only to behavior, as induced by the new model, and measured the difference between how the new and old model would pay for the same services.

Because CMS would have paid less for these same services under the old therapy model, CMS decided to reduce payment in accord with the old model that Congress rejected. For calendar year 2020, CMS estimated expenditures under the new model to be $15.2 billion. *See id.* at 37,618. Under the old model, CMS determined that it would have paid only $14.3 billion for those same services. *Id.* CMS then identified the $14.3 billion as its new target expenditure number for 2020 and calculated that it would need to prospectively adjust payments by—6.52% and claw back $873 million from home healthcare agencies to hit this new target expenditure amount of $14.3 billion. For calendar year 2021, CMS calculated expenditures under the new model to be $16.5 billion. *Id.* at 37,619. Under the old therapy model, however, CMS determined that it would have paid only $15.3 billion. *Id.* CMS thus identified $15.3 billion as its target expenditure amount for 2021 and calculated that it would need to make a further prospective payment adjustment by—1.26% to hit its new target expenditure amount and a temporary adjustment to recover another $1.15 billion. *Id.* Combined, the agency determined that it "would need to apply a—7.69 percent permanent adjustment to the CY 2023 base payment rate as well as implement a temporary adjustment of approximately $2.0 billion to reconcile retrospective overpayments in CYs 2020 and 2021." *Id.* at 37,620.

CMS's calculation did not measure the effect of behavior changes (assumed or actual) on estimated expenditures but rather kept behaviors constant and measured only the difference between how the old model and new model would pay for those same behaviors:

$$Payment\ Amount\ 1\ (old\ model)\ \times\ 2020\ services\ actually\ provided$$

$$=$$

$$\$14.3\ billion$$

$$=$$

$$Payment\ Amount\ 2\ (new\ model)\ \times\ 2020\ services\ actually\ provided\ \times\ Adjustment$$

Commenters pointed out the flaws in this approach and the severe consequences it would have for home health agencies. *See, e.g.*, AR2233-46 (Memorandum on Analysis of Statutory Authority for Proposed Update to Home Health Payment System Rate (Aug. 15, 2022)); AR791-92 ("imposing an unprecedented payment cut in this environment would severely restrict access to home health services by shuttering many agencies"); *cf.* Edwards Decl. ¶¶ 9-14. Nonetheless, on November 4, 2022, CMS issued the final CY 2023 rule adopting the methodology and applying a rate reduction for CY 2023 payments. *See* AR1 (87 Fed. Reg. 66,790). Although statutorily required to measure the difference between assumed behavior changes it predicted and the actual behavior changes it later observed and the impact of that difference on aggregate expenditures, CMS employed a methodology that kept behavior constant by looking only to actual behaviors induced by the new model. That is, CMS measured whether "actual aggregate expenditures under the [patient model] were higher than if the [therapy model] was still in place." AR16 (*Id.* at 66,805).

The result of this extreme statutory departure was a dramatic and far-reaching cut in payment amounts. *See* Edwards Decl. ¶¶ 6, 9-12. Faced with that reality, CMS was forced to acknowledge that the adjustment it calculated would be too severe. That should have caused CMS

to revisit whether it had misapplied the statute and failed to comply with Congress's budget-neutrality directive. Instead, while recognizing that its methodology would result in an untenable—7.85% permanent adjustment for CY 2023 payments, AR19 (87 Fed. Reg. at 66,808), CMS invoked its "discretion to implement any adjustment in a time and manner determined appropriate" to finalize "only a – 3.925 percent (half of the – 7.85 percent) permanent adjustment for CY 2023." *Id.* CMS promised to consider how to implement the calculated—$2 billion temporary adjustment "in future rulemaking." *Id.*

CMS justified its approach, in part, as a cost saving measure. Although CMS understood that "by law, [it was] required to ensure that estimated aggregate expenditures under the HH PPS are equal to [the agency's] determination of estimated aggregate expenditures that otherwise would have been made under the HH PPS in the absence of the change … in case-mix adjustment factors,"—i.e., the removal of therapy as a factor, AR7 (*id.* at 66,796), CMS acknowledged that the "decrease in aggregate expenditures" as measured by the old therapy model was "largely driven by therapy utilization," which was "an additional behavior change" caused by the payment methodology shift. *Id*. But a decrease in therapy could not possibly have caused an increase in expenditures in 2020; nonetheless, CMS still decided that it should pay less because of that change: "It would be inappropriate for CMS to continue to pay for therapy as if [home health agencies] were still inflating therapy provision based on the former therapy thresholds, when the number of therapy visits after the implementation of the [payment model] has actually declined." AR10 (*Id.* at 66,799).

CMS did not explain how its approach is consistent with Congress's directive to hold expenditures "equal to the estimated aggregate amount of expenditures that otherwise would have been made" without the change in payment models. 42 U.S.C. § 1395fff(b)(3)(A)(iv). Nor did

CMS explain how a decrease in the provision of therapy could have caused an increase in aggregate expenditures under a model that does not take therapy into account, such that an offsetting decrease in prospective payments could be warranted.

**D.    The Final Rule Causes Significant Harm**

CMS's sharp decrease in payment amounts is devastating for the National Association for Home Care & Hospice ("NAHC") and many of its members. As an example, NAHC member Home Health Services of Mary Lanning Healthcare in Hastings, Nebraska has faced severely reduced revenue. In 2023, Medicare revenues are projected to be only $559,736, down from $877,533 in 2019 under the previous payment model. *See* Edwards Decl. ¶¶ 6, 9. As a result of these falling revenues, the agency has been forced to decrease its service area twice already in 2023, leading to the rejection of prospective patients. If further Medicare cuts occur in 2024, Mary Lanning expects that it will no longer be able to provide home health care services. *See id.* ¶¶ 12-13.

Similarly, NAHC member Androscoggin Home Healthcare + Hospice—the only provider serving certain rural areas in Maine—has been forced to reduce its service area and eliminate most of its remote patient monitoring supports that are used to avoid unnecessary hospital admissions. *See* Albert Decl. ¶¶ 10-14. If Medicare payments are not corrected to be in line with statutory requirements, Androscoggin expects to make further service area reductions, including eliminating more home care programs and reducing overall home health service availability. *Id.* ¶¶ 12-14. Androscoggin has experienced a 34% decline in Medicare revenues, from $9,797,468 in 2019 under the previous payment model to a projected $6,564,259 under the current payment model at issue. *Id.* ¶¶ 6, 9.

Both Mary Lanning Healthcare and Androscoggin Home Healthcare + Hospice have submitted requests for redetermination for claims, alleging that the Secretary's payment is

unlawful. Edwards Decl. ¶ 14; Albert Decl. ¶ 15. CMS has either not responded to or denied these requests. Edwards Decl. ¶ 14; Albert Decl. ¶ 15. And no administrative body has authority to rule in their favor on these requests. *See* 42 C.F.R. § 405.1063.

If CMS's unlawful actions are not stopped, the final rule will leave numerous Medicare beneficiaries with limited or no access to vital home health services, directly contrary to Congress's intent. Some home health agencies will no longer be able to provide essential services, especially in remote rural areas, and many home health providers will be forced out of business. *See* Edwards Decl. ¶¶ 10-13. Instead of reforming Medicare reimbursement rates to be more patient-centric and less therapy-centric, as Congress directed, CMS's final rule will disrupt the market, penalize home health agencies that relied on Congress's statutory reforms, prevent beneficiaries from accessing the essential home health services they need, and ultimately drive up the cost of health care by forcing the elderly and disabled to seek care in more expensive institutional settings.

## STANDARD OF REVIEW

Where, as here, a court is reviewing final agency action under the Administrative Procedure Act ("APA"), summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006); *see also Roberts v. United States*, 883 F. Supp. 2d 56, 62–63 (D.D.C. 2012). Under the APA, a reviewing court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "When a rule is contrary to law, the 'ordinary practice is to vacate' it." *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 673 (D.C. Cir. 2019) (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)).

15

**ARGUMENT**

CMS's authority to adjust payments to home health care agencies is controlled by Congress. The Bipartisan Budget Act of 2018 prescribes specific restrictions on what actions CMS may undertake when adjusting payments to home health agencies. The statute specifically requires CMS to change its payment model and ensures that expenditures remain constant between what is paid under the new model and what the agency otherwise would have paid if the new model were never introduced. CMS's rule violates the letter, structure, and purpose of this budget-neutral payment shift by tying total expenditures to how the old model would pay for services provided *after* the introduction of the new model. CMS's model thus penalizes home health agencies for responding to the incentives Congress created. And CMS's rule violates the statute's instruction of what to measure. In issuing the rule, CMS has not complied with the basic requirements of reasoned decision-making. It has not acted reasonably, responded meaningfully to objections, or adequately justified its departures from the statute's plain text. In sum, the CY 2023 Rule transgresses statutory limits, and it accordingly must be held unlawful and vacated. *Am. Bankers Ass'n*, 934 F.3d at 673.

**I.     The Final Rule Violates Congress's Command to Determine the Impact on Expenditures Resulting from Differences Between Assumed and Actual Behavior Changes.**

The final rule exceeds CMS's statutory authority, violates the statute's plain text, and is arbitrary and capricious because it does not correct the agency's behavioral assumptions. The statute requires CMS to solve two different equations at two different points in time. *First*, before 2020, CMS must calculate a standard payment amount to ensure that expenditures under the new model in 2020—taking into account assumed behavior changes that the new model is predicted to trigger—"equal … the estimated aggregate amount of expenditures that *otherwise* would have been made under the system during such period if" the old model remained in place. 42 U.S.C.

§ 1395fff(b)(3)(A)(iv) (emphasis added). That is what is referred to as the budget-neutrality calculation. *Second*, after 2020, CMS must look back and determine "the impact of differences between assumed behavior changes" as described in the first calculation "and actual behavior changes on estimated aggregate expenditures" and adjust the standard payment amount "to offset for such increases or decreases in estimated aggregate expenditures." *Id.* § 1395fff(b)(3)(D)(i), (ii). That is what is referred to as the behavior-change-adjustment calculation.

In the final rule, CMS solved the wrong equation with the wrong variables. Instead of applying the second calculation to adjust for behavior-induced increases or decreases in expenditures, as the statute requires, CMS remade the first calculation in a way that undermines Congress's budget-neutral objectives. In particular, the agency calculated a payment amount to keep expenditures under the new model equal to expenditures under the old model. But instead of ensuring that the expenditures under the old model are those "that otherwise would have been made under the system during such period if [the statutory changes] had not been enacted," *id.* § 1395fff(b)(3)(A)(iv), CMS applied the old payment model to the new, changed behaviors. In other words, instead of setting target expenditures at the amount CMS would have otherwise paid absent any change in models, CMS set target expenditures as if Congress had retroactively decided to re-impose the old model onto actual behaviors and services. That approach directly conflicts with the statute's plain text.

1.     It bears emphasis that CMS previously completed the first equation—and did so consistent with the statutory requirements. It calculated the "estimated aggregate amount of expenditures that otherwise would have been made under the system during such period if" the old model remained in place to be $16.6 billion. 42 U.S.C. § 1395fff(b)(3)(A)(iv); 84 Fed. Reg. at 60,512, 60,518-19. And CMS determined that, on this basis, a 30-day budget neutral standard

payment amount would need to be \$1,908.18. 84 Fed. Reg. at 60,513. CMS then identified three assumed behavior changes and predicted their expected impact on aggregate expenditures. Specifically, CMS predicted that home health agencies would (1) change their documentation and coding practices under the new patient model to place the highest paying diagnosis code as the principal diagnosis code, (2) identify more comorbidities in their diagnoses, which could increase payments; and (3) provide 1 to 2 extra visits to receive a full 30-day payment, rather than receiving payment for a shorter period of care. 83 Fed. Reg. at 56,455, 56,461. Under paragraph 3(A)(iv), CMS concluded that these three behavior changes would increase expenditures, requiring a – 4.36% adjustment to standard payment amounts to keep aggregate expenditures at the budget-neutral "target amount of \$16.6 billion." 84 Fed. Reg. at 60,512, 60,516, 60,518-19. As a result, CMS calculated the final standard payment amount for home health services in calendar year 2020 under the new model to be \$1,824.99. *Id.* at 60,518-19.

Nothing in the statute gives CMS license to re-do this budget-neutrality calculation. Instead, the statute directs CMS to solve the second equation and, for each year, "determine the impact of differences between assumed behavior changes (as described in paragraph 3(A)(iv)) and actual behavior changes on estimated aggregate expenditures" 42 U.S.C. § 1395fff(b)(3)(D)(i), and then adjust the standard payment amount "to offset for such increases or decreases in estimated aggregate expenditures (as determined under clause (i))," *Id.* § 1395fff(b)(3)(D)(ii). The second calculation that the statute requires is thus straightforward:

$$\textit{Impact of } \textbf{\textit{assumed}} \textit{ behavior changes on } 2020 \textit{ expenditures}$$

$$=$$

$$\textit{Impact of } \textbf{\textit{actual}} \textit{ behavior changes on } 2020 \textit{ expenditures} \times \textit{Adjustment}$$

Because CMS previously identified three assumed behavior changes and, under paragraph 3(A)(iv), estimated that they would increase expenditures to approximately 4% above

the $16.6 billion target amount, CMS was required to determine what the effect of actual behavior changes was on 2020 expenditures and to offset any difference between that effect and the previously calculated effect of assumed behavior changes. If actual behavior changes caused CMS to spend *more* than expected in 2020 and 2021, it should adjust payments downward. If actual behavior changes caused CMS to spend *less* than expected in 2020 and 2021, it should adjust payments upward.

That statutory directive makes sense. In undertaking the budget-neutrality calculation, CMS was required to predict how home health agencies would respond to a new payment methodology. But no prediction is perfect. So the behavior-assumption-adjustment directs CMS to compare its predictions to reality and to calculate the effect on aggregate expenditures resulting from any assumptions that proved incorrect. If, for example, home health agencies did not provide 1 to 2 extra days of service to receive the full 30-day payment (or did so less frequently than predicted) while everything else stayed the same, CMS would need to increase aggregate expenditures to make up for that wrong assumption. That is no mere hypothetical. As at least one commenter pointed out, the data "demonstrates that CMS's behavioral assumption that agencies provide extra visits to receive a full … payment … did not occur since the beginning of [the patient model]." AR1737 (Pennant Group Comment Letter on Proposed Rule to Calendar Year 2023 Home Health Prospective Payment System Rate Update (Aug. 16, 2022)).

2.     The methodology applied in the CY 2023 Rule, however, neither evaluates the accuracy of CMS's behavioral assumptions, nor makes any adjustments based on changes in behavior. In the rule, CMS identifies four actual behavior changes but never calculates their impact on aggregate expenditures. *See* AR7 (87 Fed. Reg. at 66,796) (looking to its methodology "[r]egardless of the magnitude and frequency of individual behavior change"). Three of those

19

behavior changes were those that CMS had previously identified. *Id.* But while in the previous rulemaking, CMS had broken apart each assumed behavior change and predicted how much each would affect expenditures, *see* 84 Fed. Reg. at 60,512, CMS failed to take those essential steps in its final rule. Nor did CMS contest the data showing that at least some of the three predicted behavior changes did not occur. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 538 (2009) (explaining that an agency action is arbitrary and capricious where the agency "did not address its prior factual findings" (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 49-51 (1983))). Moreover, although CMS identified "a decline in therapy utilization" as "an additional behavior change," AR7 (87 Fed. Reg. at 66,796), it failed to calculate the effect on expenditures of this additional behavior change.

In fact, CMS's final rule—which purports to be measuring behavior change and its impact on expenditures—does not measure any behavior change or the effect of a behavior change at all. Instead, the rule re-runs the budget-neutrality calculation while ignoring Congress's demand to keep expenditures neutral to the amount that "otherwise" would have been paid absent the statutory changes. 42 U.S.C. § 1395fff(b)(3)(A)(iv). Specifically, CMS's rule first "estimate[d] what aggregate expenditures would have been under the [old therapy model] and 60-day unit of payment" based on actual CY 2020 and CY 2021 behavior (post-dating the effective date of the Bipartisan Budget Act). AR7 (87 Fed. Reg. at 66,796). The rule then compared this simulated amount to the amount that would be paid for that exact same behavior under the new model with 30-day units of service. AR7-8 (*Id.* at 66,796-97).

The rule thus calculated an adjustment to the standard payment amount to ensure that aggregate expenditures under the new model for actual 2020 behaviors equal aggregate expenditures under the old model for actual 2020 behaviors. That is, CMS took a set of actual

claims and measured the difference in how much the old and new methodology would pay for those same claims. Applying this methodology, CMS (unsurprisingly) determined that the amount paid in CYs 2020 and 2021 under the new patient-driven model was greater than if CMS had applied the old therapy model to services provided after the changes required by the Bipartisan Budget Act.

CMS's methodology neither precisely nor roughly calculates the impact of differences between assumed and actual behavior changes on estimated aggregate expenditures. A simple example bears this out. If, in reality, none of the behavior changes initially predicted by CMS came to pass and the *only* change home health agencies made in response to Congress's switch away from the therapy model was offering less therapy sessions, then the proper course would be to *increase* the payment amount to account for CMS's initial misguided assumptions about behavior change. Under CMS's proposed model, however, CMS would simply ask how much it would have paid for these services under the old therapy model and how much it paid under the new patient model. If, as one would expect, the reduced therapy meant that expenditures would have been less under the therapy model, then CMS's methodology would *reduce* rates *further* to account for that difference. Far from keeping overall expenditures the same as if the switch away from the therapy model never happened, CMS's approach would reduce expenditures precisely *because* home health agencies changed their behaviors in response to the switch.

CMS embraces this fact. The agency admits that "there has been a significant change (decline) in therapy visits due to the implementation of the [patient model]." AR9 (87 Fed. Reg. at 66,798). And CMS agrees that this decline in therapy visits is what drives much of CMS's reduction in payment. AR9-10 (*Id.* at 66,798-99). But CMS never reasonably explains how this decline could possibly result in an "increase … in estimated aggregate expenditures" that would

warrant a reduction to the standard prospective payment amount. 42 U.S.C. § 1395fff(b)(3)(D)(ii). Such a position conflicts not only with the statute but also with basic logic. Because Congress expressly removed therapy thresholds as a driver of expenditures, it makes no sense to have payments change as a result of the amount of therapy. *See* 42 U.S.C. § 1395fff(b)(4)(B)(ii). Moreover, a decline in therapy (an actual 2020 behavior change identified by CMS) cannot possibly have caused expenditures in 2020 to increase, yet that is a major driver of CMS's calculated adjustment.

3.      In another context with similarly situated entities, CMS acknowledged that the approach it now embraces does not work. *See* 86 Fed. Reg. 42,424 (Aug. 4, 2021). In 2019, CMS replaced an old payment system (that relied on therapy utilization) with a patient-driven patient model for skilled nursing facilities. *See id.* at 42,466 (noting that the new patient-driven payment model was implemented in 2019). Like the change for home health care agencies, CMS aimed to keep the model shift budget neutral. *Id.* After an initial analysis, CMS proposed a 46% adjustment. *See id.*

Later, however, CMS proposed to adjust payments again to keep them budget neutral in the face of actual behavior changes. CMS explained that to do so, it "would typically utilize claims and assessment data from a given period under the new payment system, classify patients under both the current and prior payment model using the same set of data, compare aggregate payments under each payment model, and calculate an appropriate adjustment factor to achieve budget neutrality"—i.e., the method CMS has applied in the 2023 Final Rule in the home health care agency context here. *Id.* at 42,467. But CMS acknowledged that this formula would not work to achieve budget neutrality because the payment methodology triggered behavioral changes. As CMS explained, the "significant changes in therapy provision" since implementation of the new

22

model would lead to "a significant underestimation" of what aggregate payments would have been under the previous system. *Id.* Confronted with this reality, CMS changed course: it recalibrated its methodology. *Id.* at 42,468-69; *see also* AR183, AR206-08, AR211 (87 Fed. Reg. 47,502, 47,525-27, 47,530 (Aug. 3, 2022)).

These same behavioral changes are present here. The shift of payment incentives away from therapy visits, as well as the impact of COVID-19, "drove a 29.7% reduction in CY 2020 therapy visits." AR2205 (Dobson | DaVanzo, *Evaluation of Medicare Home Health Services Under PDGM and Implications for CY 2023 HH PPS Proposed Rule, at 6 (Sept. 9, 2021)); see also* AR7 (87 Fed. Reg. at 66,796) ("the decline in therapy utilization is indicative of an additional behavior change"). That is precisely why Congress mandated that CMS calculate the effects of actual behavior changes on expenditures each year rather than ask CMS to re-run a "budget-neutrality" calculation that ignores behavioral changes. That type of calculation cannot keep expenditures neutral when the model itself spurs behavior changes.

CMS's willingness to embrace a different model to account for actual behavior changes in the context of skilled nursing facilities makes it arbitrary and capricious for CMS to cling to its old model here. The same factors are at play: implementation from a therapy-driven payment model to a patient-driven model. And the real-world actions are similar: reduced therapy in both instances. If anything, the statutory command to adjust for actual behavior changes means that CMS should be more attuned to those changes in the Home Health Agency context than in calculating payments for Skilled Nursing Facilities. If an agency makes an exception and departs from its old model to calculate budget neutrality "in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases." *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007). CMS can make no distinction that justifies its action.

*See* AR13 (87 Fed. Reg. at 66,802) (distinguishing the two because "CMS is required, by law, to account for behavior changes related to the implementation of the [new model]"). Its decision to treat similarly situated entities like skilled nursing facilities and home health care agencies differently is arbitrary and capricious on its face. *See El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*, 300 F. Supp. 2d 32, 42 (D.D.C. 2004) (an agency acts in an arbitrary and capricious manner by "treat[ing] similarly situated parties differently" (quoting *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 27-28 (D.D.C. 1997)).

Even more importantly, however, the methodology adopted by CMS's final rule simply does not measure what the statute demands. And CMS has no authority to disregard Congress explicit commands. *FEC v. Cruz*, 596 U.S. 289, 301 (2022) ("[a]n agency … 'literally has no power to act' … unless and until Congress authorizes it to do so by statute." (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). Here, the "statute meticulously lays out the formula that [CMS] must employ": calculate the difference between assumed behavior changes and actual behavior changes on estimated aggregate expenditures and to make adjustments based on that calculation. *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 728 (2022). CMS can "point to no statute authorizing" its reductions payment amount. *Atl. City Elec. Co.*, 295 F.3d 1, 15 (D.C. Cir. 2002). Because the rule "extends beyond the agency's legitimate reach," it is unlawful and should be vacated. *Nat'l Fed'n of Indep. Bus. v. OSHA* (*NFIB*), 595 U.S. 109, 119 (2022) (per curiam).

## II.     The Final Rule Violates Congress's Budget Neutrality Requirement.

Not only does CMS's final rule violate the statutory provision it purports to implement, it also runs afoul of the budget-neutrality provision. In the Bipartisan Budget Act, Congress directed CMS to ensure that its reforms to the payment scheme are budget neutral. 42 U.S.C. § 1395fff(b)(3)(A)(iv). Specifically, Congress required CMS to calculate prospective payment amounts "in a manner such that the estimated aggregate amount of expenditures under the system

… is equal to the estimated aggregate amount of expenditures that otherwise would have been made under the system during such period if" the statutory changes had not been enacted. *Id.* In making this budget-neutrality calculation, CMS must "make assumptions about behavior changes that could occur" as a result of the reduced time unit of payment and the removal of therapy. *Id.* This statutory provision comports with the general principle of budget neutrality, under which a rate adjustment is implemented "in a manner that would have no effect on the annual total of Medicare payments." *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 206 (D.C. Cir. 2011).

1.      In 2019, CMS implemented this budget neutrality directive to determine that the total expenditures for 2020 would be $16.6 billion to stay budget neutral. 84 Fed. Reg. at 60,516. After making assumptions about behavioral changes, CMS calculated a prospective payment amount with the goal that estimated expenditures would hit that $16.6 billion target number. *Id.* Actual expenditures, however, did not hit that target for 2020. According to the calculations in the rule, actual expenditures for 2020 reached only $15.2 billion. AR16 (87 Fed. Reg. at 66,805).

Such a difference between actual expenditures and estimated budget-neutral expenditures should have resulted in an upward adjustment or at least caused CMS to explain reasonably and in detail why it spent so much less than the budget-neutral target Congress set. Indeed, a consulting firm that ran the numbers based on the data available determined that that expenditures under the patient model "were approximately 2.5 percent below budget neutrality (with COVID-19 cases included) and 2.4 percent below budget neutrality with COVID-10 cases excluded," which would warrant an upward adjustment. AR2220. CMS failed to grapple with that serious objection, stating only that nothing "requires CMS to ensure that it actually spends the amount of the original estimated aggregate expenditures." AR9 (87 Fed. Reg. at 66,798). Such short shrift fails the agency's basic responsibility to "consider and respond to significant comments received during

25

the period for public comment" and it certainly does not explain the data undermining CMS's approach. *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 95 (2015); *see also DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) ("[J]udicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)).

2.     Rather than increase prospective payments to ensure budget neutrality (or at least account for this decline as unrelated to the change in payment models), the final rule flouts the budget neutrality provision in two distinct ways:

*First*, the rule violates Congress's judgment that CMS should hold expenditures "equal to the estimated aggregate amount of expenditures that *otherwise* would have been made under the [previous payment] system." 42 U.S.C. § 1395fff(b)(3)(A)(iv) (emphasis added). CMS calculated this amount to be approximately $16.6 billion. But the final rule's methodology would reduce expenditures to just $14.2 billion for CY2020. A $2 billion decrease in expenditures is not budget neutral. *See Adirondack Med. Ctr. v. Sebelius*, 29 F. Supp. 3d 25, 28 (D.D.C. 2014) (explaining that the purpose of a budget neutrality proviso is to ensure that there is not "either higher or lower overall Medicare hospital reimbursements from one year to the next."), *aff'd sub nom. Adirondack Med. Ctr. v. Burwell*, 782 F.3d 707 (D.C. Cir. 2015) (per curiam). Had Congress intended to allow CMS to reduce expenditures, "it presumably would have done so expressly as it" has in the past. *Russello v. United States*, 464 U.S. 16, 23 (1983). Instead, Congress did just the opposite—it required budget neutrality.

CMS's explanation of its decision to disregard the budget-neutral target that it previously calculated directly conflicts with the statutory language. According to CMS, it opted for this new number because it would be inappropriate to "be setting payment based on how providers would

26

have presumably behaved under the old system rather than actual behaviors under the new system." AR9 (87 Fed. Reg. at 66,798). But that is precisely what the statute demands: expenditures must be held equal to the amount that "otherwise" would have been spent if the statutory change had never been enacted. *See* 42 U.S.C. § 1395fff(b)(3)(A)(iv). Although CMS must consider how behavior changes affect expenditures under the new payment model, it cannot avoid that step by setting a new budget target and measuring how behavior changes would have affected expenditures under the old model if it were applied retroactively. The budget-neutral target is based on the "expenditures that otherwise would have been made" if the statutory changes had not been enacted. *Id.* "[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. V. EPA*, 573 U.S. 302, 328 (2014); *see also Landmark Hosp. v. Azar*, 442 F. Supp. 3d 327, 331 (D.D.C. 2020) (McFadden, J.) (if an agency's reasoning is deficient, the "court should not attempt itself to make up for such deficiencies" or "supply a reasoned basis for the agency's action that the agency itself has not given" (quoting *State Farm*, 463 U.S. at 43).

*Second*, and equally important, CMS has no authority to re-run the budget-neutrality calculation. The statute commands CMS to make a budget-neutral calculation one time to set the standard prospective payment amount for "the 12-month period beginning January 1, 2020." 42 U.S.C. § 1395fff(b)(3)(A)(iv). The behavior adjustment, by contrast, is not a new budget-neutrality calculation. Instead, it requires CMS to look back and evaluate its own work, by determining whether actual behavior changes caused CMS to spend more or less than previously anticipated and to offset for that increase or decrease.

CMS sees things differently. According to CMS, it can disregard the original budget-neutral target amount calculated pursuant to the statute. *See* AR9 (87 Fed. Reg. at 66,798) ("we

are not required to compare our original estimated aggregate expenditures … to actual expenditures …, and make up the difference"). In the agency's view, it was entitled to "re-estimate aggregate expenditures under the pre-[patient model] based on actual behavior changes, as derived from actual claims." *Id.* In other words, instead of a budget neutral expenditure amount tied to the amount that CMS would have "otherwise" paid if Congress had not enacted the Bipartisan Budget Act, CMS has created a new target expenditure that measures how the old system would pay for services *with* the new payment model enacted. Such an approach finds no support in the behavior-adjustment provision CMS purports to be implementing. It directly conflicts with the budget-neutrality provision. And it "make[s] little sense given the statute's overall structure." *Am. Hosp. Ass'n*, 596 U.S. at 737.

"The role of th[e] [c]ourt is to apply the statute as it is written—even if [it] think[s] some other approach might 'accor[d] with good policy.'" *Burrage v. United States*, 571 U.S. 204, 218 (2014) (quoting *Commissioner v. Lundy*, 516 U.S. 235, 252 (1996)). Whatever the policy merits of CMS's desire not to pay the amount it would have spent had the payment model not switched, *see* AR10 (87 Fed. Reg. at 66,799) ("It would be inappropriate for CMS to continue to pay for therapy as if HHAs were still inflating therapy provision based on the former therapy thresholds, when the number of therapy visits after the implementation of the [patient model] has actually declined"), that is the decision Congress made. Congress chose a budget-neutral transition to serve as a stabilizing bridge between payment models. CMS has no authority to override Congress's clear commands. *Util. Air Regul. Grp.*, 573 U.S. at 328.

## III.    The Final Rule Violates Congress's Command to Remove Therapy Thresholds as a Factor that Influences Payment.

The final rule suffers from a further major defect: it fails to comply with Congress's instruction that CMS eliminate the use of therapy thresholds as a factor for payment. Rather than

eliminating therapy services as a factor, the final rule does the opposite: it uses the amount of therapy provided to establish a payment rate to be applied to home health services. By continuing to connect payment to the therapy services rendered, CMS has violated the Bipartisan Budget Act of 2018.

With the Bipartisan Budget Act, "Congress [] enacted a comprehensive scheme and [] deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 519 (1996) (Thomas, J., dissenting)). In particular, Congress eliminated the use of "therapy thresholds (established by the Secretary)" as a factor for calculating reimbursement for services. 42 U.S.C. § 1395fff(b)(4)(B)(ii). That was done to establish a more patient-centric approach to care—and to encourage home health agencies to focus less on therapy and more on other efficient ways of providing care. As MedPac, Congress, and CMS all understood, the previous payment model over-incentivized the use of therapy, which resulted in the provision of excess therapy. By eliminating therapy thresholds, home health care agencies would be incentivized to provide lower amounts of therapy.

CMS's final rule ignores this directive and undercuts Congress's policy aims. In reducing payments, CMS unlawfully continues to consider the amount of therapy services provided by home health agencies. Indeed, the adjustment that the final rule adopts is predicated on the amount that CMS would owe if it ignored Congress's judgment and simply applied the old therapy model to calculate aggregate expenditures. In effect, CMS applied the old payment model—which Congress statutorily rejected—compared it to the new payment model, and decided it likes payment amounts under the old payment model better. Determining payment amounts by applying the therapy model flies in the face of the new statutory scheme.

The link between payment rates and the amount of therapy provided set forth in the final rule is no accident. CMS expressly tied the newly calculated payment rate to the amount of therapy provided. The final rule states that "[i]t would be inappropriate for CMS to continue to pay for therapy as if [home health agencies] were still inflating therapy provision based on the former therapy thresholds, when the number of therapy visits after the implementation of the [patient model] has actually declined." AR10 (87 Fed. Reg. at 66,799). Separately, the final rule asserts that the statute "do[es] not require CMS to pay for therapy that never actually occurred." *Id.* In other words, rather than taking therapy out of the payment equation, CMS wants to ensure that its payment tracks the exact amount of therapy provided.

Such an approach is not only inconsistent with the statute, it also undercuts Congress's policy goals and "reconfigure[s] Congress's statutory scheme." *Howard v. Pritzker*, 775 F.3d 430, 432 (D.C. Cir. 2015). Congress wanted home health agencies to respond to the new model by focusing less on therapy and more on the quality of patient care. Under CMS's methodology, however, less therapy equals less payment (and more therapy results in higher expenditures). In other words, CMS's methodology affirmatively penalizes home health agencies for responding to the incentives that Congress provided. Indeed, CMS's perverse approach—setting payment amounts so that more therapy services lead to higher payments, and less therapy services lead to lower payments—is precisely what Congress eliminated. 42 U.S.C. § 1395fff(b)(4)(B)(ii) (directing CMS to eliminate the use of "therapy thresholds (established by the Secretary)"). *See State Farm*, 463 U.S. at 43 (an agency abuses its discretion when it "relie[s] on factors which Congress has not intended it to consider").

The Bipartisan Budget Act, the Administrative Procedure Act, and general principles of reasoned decision-making all demand more. When Congress has given an agency "strict

instructions, clear criteria, and a duty," failure to follow those instructions and to use "extraneous factors" is arbitrary and capricious action. *Cayuga Nation v. United States*, 594 F. Supp. 3d 64, 75 (D.D.C. 2022); *see also Kakar v. U.S. Citizenship & Immigr. Servs.*, 29 F.4th 129, 135 (2d Cir. 2022). Because the rule links payment to therapy, it "extends beyond the agency's legitimate reach" and is unlawful. *NFIB*, 595 U.S. at 119.

* * *

In passing the Bipartisan Budget Act, Congress created a payment scheme that seeks to achieve a delicate balance of objectives. It transformed the way CMS paid home health agencies by cutting the tie between therapy and payment, shifting the incentives of home health agencies away from providing therapy and toward providing services better tailored to patient needs. Congress expressly acknowledged that home health agencies were likely to change their behaviors as a result of the new payment model, and it demanded that CMS hold aggregate expenditures neutral: actions taken by home health agencies in response to the new payment model should not increase or decrease CMS's payments. Pursuing this path ensured that neither home health agencies nor CMS could game the system. Instead of following Congress's command, however, CMS has taken the statute as an invitation to slash payment rates to home health agencies and to penalize home health agencies for no longer providing as much therapy as before. Such an approach violates the statute and common sense, and it can only hurt patients. An agency cannot save money by ignoring Congress's commands. This Court's intervention is urgently needed to enforce the statute Congress enacted.

## CONCLUSION

For these reasons, the Court should grant summary judgment in favor of NAHC and vacate the CY 2023 Rule.

Date: November 10, 2023

Respectfully submitted,

*/s/ Mark D. Polston*
Mark D. Polston
D.C. Bar No. 431233
Ashley C. Parrish
D.C. Bar No. 464683
Amy R. Upshaw
D.C. Bar No. 888156455
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, D.C. 20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737
mpolston@kslaw.com
aparrish@kslaw.com
aupshaw@kslaw.com

William A. Dombi
D.C. Bar No. 445832
Center for Health Care Law
228 Seventh Street SE
Washington, D.C. 20003
Telephone: (202) 547-5262
Facsimile: (202) 547-3140
wad@nahc.org

*Attorneys for Plaintiff National
Association for Home Care & Hospice*