**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NATIONAL ASSOCIATION FOR HOME CARE & HOSPICE, <br><br> *Plaintiff*, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services, <br><br> *Defendant*. | No. 1:23-cv-1942 (TNM) |

**DEFENDANT'S CONSOLIDATED MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF HIS
CROSS-MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY
JUDGMENT**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ERIC B. BECKENHAUER
Assistant Director

JOHN T. LEWIS (D.C. Bar No. 1033826)
CHETAN A. PATIL (D.C. Bar No. 999948)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20530
Tel: (202) 305-4968
Fax: (202) 616-8460
E-mail: chetan.patil@usdoj.gov

*Attorneys for Defendant*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 4

I.      The Home Health Prospective Payment System ................................................. 4

II.     The Bipartisan Budget Act of 2018 .................................................................... 7

III.    CMS's Rulemakings ............................................................................................ 9

IV.     Procedural History ............................................................................................. 13

LEGAL STANDARD ....................................................................................................... 14

ARGUMENT .................................................................................................................... 14

I.      This case should be dismissed for lack of subject-matter jurisdiction............... 14

        A.      Section 1395fff(d) expressly precludes review of NAHC's claims..................... 14

        B.      The Court lacks subject-matter jurisdiction because NAHC's members have not exhausted their administrative remedies. ........................................... 20

II.     In the alternative, the Court should enter judgment for CMS............................ 26

        A.      CMS properly implemented the budget-neutrality requirement. ......................... 28

        B.      CMS determined the impact of differences between assumed and actual behavior changes........................................................................................... 32

        C.      CMS eliminated the use of therapy thresholds in case-mix adjustment factors. .. 38

III.    NAHC's requested relief is overbroad................................................................ 41

CONCLUSION.................................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adirondack Med. Ctr. v. Burwell,*
782 F.3d 707 (D.C. Cir. 2015) ................................................................................. 27

*Adirondack Med. Ctr. v. Sebelius,*
29 F. Supp. 3d 25 (D.D.C. 2014) ............................................................................. 31

*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.,*
429 F.3d 1136 (D.C. Cir. 2005) ............................................................................... 42

*Alaska Airlines, Inc. v. TSA,*
588 F.3d 1116 (D.C. Cir. 2009) ............................................................................... 27

*Allied-Signal, Inc. v. Nuclear Reg. Comm'n,*
988 F.2d 146 (D.C. Cir. 1993) ................................................................................. 42

*Am. Chiropractic Ass'n v. Leavitt,*
431 F.3d 812 (D.C. Cir. 2005) ........................................................................... 21, 45

*Am. Clinical Lab'y Ass'n v. Becerra,*
40 F.4th 616 (D.C. Cir. 2022) ................................................................................. 21

*Am. Great Lakes Ports Ass'n v. Schultz,*
962 F.3d 510 (D.C. Cir. 2020) ................................................................................. 44

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy,*
22 F.4th 1018 (D.C. Cir. 2022) ............................................................................... 42

*Amgen, Inc. v. Smith,*
357 F.3d 103 (D.C. Cir. 2004) ........................................................................... 16, 18

*Ass'n for Cmty. Affiliated Plans v. U.S. Dep't of Treasury,*
966 F.3d 782 (D.C. Cir. 2020) ................................................................................. 28

*AT&T Servs., Inc. v. FCC,*
21 F.4th 841 (D.C. Cir. 2021) ................................................................................. 42

*Badgerow v. Walters,*
596 U.S. 1 (2022) ..................................................................................................... 37

*Block v. Cmty. Nutrition Inst.,*
467 U.S. 340 (1984) ................................................................................................. 15

*Bowles v. Russell*,
   551 U.S. 205 (2007) .................................................................................... 14

*BP PLC v. Baltimore*,
   141 S. Ct. 1532 (2021) ............................................................................... 37

*Cape Cod Hosp. v Leavitt*,
   565 F. Supp. 2d 137 (D.D.C. 2008) ................................................... 20, 21

*Cardiosom, LLC v. United States*,
   656 F.3d 1322 (Fed. Cir. 2011) .................................................................. 19

*Chevron USA Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) .................................................................................... 26

*Cmty. Care Found. v. Thompson*,
   318 F.3d 219 (D.C. Cir. 2003) ................................................................... 27

*Cmty. Oncology All., Inc. v. Off. of Mgmt. & Budget*,
   987 F.3d 1137 (D.C. Cir. 2021) ............................................................ 24, 25

*Cmty. Oncology All., Inc. v. OMB*,
   No. 18-cv-1256, 2019 WL 1440132 (D.D.C. Mar. 31, 2019) ................. 18

*Commodity Futures Trading Comm'n v. Nahas*,
   738 F.2d 487 (D.C. Cir. 1984) ................................................................... 14

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
   543 U.S. 157 (2004) .................................................................................... 39

*Davis v. Mich. Dep't of Treasury*,
   489 U.S. 803 (1989) .................................................................................... 31

*DCH Reg'l Med. Ctr. v. Azar*,
   925 F.3d 503 (D.C. Cir. 2019) ................................................................... 18

*Dillmon v. NTSB*,
   588 F.3d 1085 (D.C. Cir. 2009) ................................................................. 27

*Dist. Hosp. Partners, L.P. v. Burwell*,
   786 F.3d 46 (D.C. Cir. 2015) ............................................................... 27, 35

*Estep v. United States*,
   327 U.S. 114 (1946) .................................................................................... 15

*FCC v. Prometheus Radio Project*,
   141 S. Ct. 1150 (2021) ............................................................................... 27

*Fla. Health Scis. Ctr., Inc. v. Sec'y of HHS*,
830 F.3d 515 (D.C. Cir. 2016) ........................................................ 18

*Gill v. Whitford*,
138 S. Ct. 1916 (2018) ................................................................... 44

*Harmon v. Thornburgh*,
878 F.2d 484 (D.C. Cir. 1989) ....................................................... 41

*Hecht Co. v. Bowles*,
321 U.S. 321 (1944) ....................................................................... 45

*Heckler v. Ringer*,
466 U.S. 602 (1984) ....................................................................... 20

*In re al-Nashiri*,
791 F.3d 71 (D.C. Cir. 2015) ......................................................... 15

*Knapp Med. Ctr. v. Burwell*,
192 F. Supp. 3d 129 (D.D.C. 2016) ............................................... 18

*Knapp Med. Ctr. v. Hargan*,
875 F.3d 1125 (D.C. Cir. 2017) ..................................................... 18

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994) ....................................................................... 14

*Lannett Co., Inc. v. FDA*,
300 F. Supp. 3d 34 (D.D.C. 2017) ................................................. 14

*Loma Linda Univ. Med. Ctr. v. Sebelius*,
684 F. Supp. 2d 42 (D.D.C. 2010) ................................................. 14

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) ....................................................................... 44

*Manakee Pro. Med. Transfer Serv., Inc. v. Shalala*,
71 F.3d 574 (6th Cir. 1995) ........................................................... 26

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ....................................................................... 25

*Mellouli v. Lynch*,
575 U.S. 798 (2015) ....................................................................... 32

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
583 U.S. 366 (2018) ....................................................................... 30

*Methodist Hosp. of Sacramento v. Shalala,*
  38 F.3d 1225 (D.C. Cir. 1994) ................................................................. 27

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ................................................................................ 27

*NAHC v. Burwell,*
  142 F. Supp. 3d 119 (D.D.C. 2015) ......................................................... 27

*NAHC v. Burwell,*
  77 F. Supp. 3d 103 (D.D.C. 2015) ........................................................... 26

*Nat'l Home Infusion Ass'n v. Becerra,*
  No. 19-393 (TJK), 2021 WL 2439570 (D.D.C. June 15, 2021) ................. 23

*Oklahoma v. Castro-Huerta,*
  142 S. Ct. 2486 (2022) ............................................................................ 39

*Painter v. Shalala,*
  97 F.3d 1351 (10th Cir. 1996) ................................................................. 16

*Petal Gas Storage, LLC v. FERC,*
  496 F.3d 695 (D.C. Cir. 2007) ................................................................. 27

*Ryan v. Bentsen,*
  12 F.3d 245 (D.C. Cir. 1993) ................................................................... 23

*Sampson v. Murray,*
  415 U.S. 61 (1974) ................................................................................ 26

*SAS Inst., Inc. v. Iancu,*
  138 S. Ct. 1348 (2018) ............................................................................ 37

*Scranton Quincy Hosp. Co. v. Azar,*
  514 F. Supp. 3d 249 (D.D.C. 2021) ......................................................... 18

*Sebelius v. Auburn Reg'l Med. Ctr.,*
  568 U.S. 145 (2013) ................................................................................ 26

*Shalala v. Ill. Council on Long Term Care, Inc.,*
  529 U.S. 1 (2000) ......................................................................... 20, 24, 26

*Shands Jacksonville Med. Ctr. v. Burwell,*
  139 F. Supp. 3d 240 (D.D.C. 2015) ......................................................... 42

*Smith v. Berryhill,*
  139 S. Ct. 1765 (2019) ............................................................................ 20

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
    985 F.3d 1032 (D.C. Cir. 2021) ........................................................... 42

*Tataranowicz v. Sullivan,*
    959 F.2d 268 (D.C. Cir. 1992) ........................................................... 25

*Tex. All. for Home Care Servs. v. Sebelius,*
    681 F.3d 402 (D.C. Cir. 2012) ..................................................... 16, 19

*Thomas Jefferson Univ. v. Shalala,*
    512 U.S. 504 (1994) ........................................................................ 27

*Three Lower Cntys. Cmty. Health Servs. v. HHS,*
    517 F. Supp. 2d 431 (D.D.C. 2007) ................................................. 20

*Three Lower Ctys. Cmty. Health Servs., Inc. v. U.S. Dep't of Health & Hum. Servs.,*
    317 F. App'x 1 (D.C. Cir. 2009) ....................................................... 24

*United States v. Texas,*
    143 S. Ct. 1964 (2023) ............................................................... 41, 44

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ........................................................................ 45

*Weinberger v. Salfi,*
    422 U.S. 749 (1975) ................................................................... 20, 25

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) ..................................................................... 31

*Westar Energy, Inc. v. FERC,*
    473 F.3d 1239 (D.C. Cir. 2007) ....................................................... 37

*Williston Basin Interstate Pipeline Co. v. FERC,*
    519 F.3d 497 (D.C. Cir. 2008) ......................................................... 42

*XO Energy MA, LP v. FERC,*
    77 F.4th 710 (D.C. Cir. 2023) ......................................................... 44

*Yates v. United States,*
    574 U.S. 528 (2015) ........................................................................ 31

**Statutes**

42 U.S.C. § 1395b-6 ............................................................................ 6

42 U.S.C. § 1395ff ...................................................................... passim

42 U.S.C. § 1395fff ..................................................................... passim

42 U.S.C. § 1395ii ................................................................................................ 20

42 U.S.C. § 1395x .................................................................................................. 5

42 U.S.C. § 1395yy ............................................................................................... 36

42 U.S.C. § 405 .............................................................................. 20, 21, 24, 25

5 U.S.C. § 706 ..................................................................................................... 44

Bipartisan Budget Act of 2018,
  Pub. L. No. 115-123, 132 Stat. 64 (2018) .................................................. 1, 7, 30

Consolidated Appropriations Act of 2023,
  Pub. L. No. 117-328, 136 Stat. 4459 (2023) ......................................... 3, 13, 18, 28

**Regulations**

42 C.F.R. § 405.1002 ........................................................................................... 23

42 C.F.R. § 405.1100 ........................................................................................... 22

42 C.F.R. § 405.1132 ........................................................................................... 23

42 C.F.R. § 405.904 ....................................................................................... 21, 22

42 C.F.R. § 405.920 ............................................................................................. 21

42 C.F.R. § 405.940 ............................................................................................. 21

42 C.F.R. § 405.960 ............................................................................................. 21

42 C.F.R. § 405.968 ............................................................................................. 21

42 C.F.R. § 405.990 ............................................................................................. 22

42 C.F.R. § 424.22 ................................................................................................. 5

42 C.F.R. § 484.230 ............................................................................................. 25

*CY 2018 Home Health Prospective Payment System Rate Update and CY 2019 Case-Mix
  Adjustment Methodology Refinements,*
  82 Fed. Reg. 51,676 (Nov. 7, 2017) ........................................................................ 7

*CY 2018 Home Health Prospective Payment System Rate Update and Proposed CY 2019 Case-
  Mix Adjustment Methodology Refinements,*
  82 Fed. Reg. 35,270 (July 28, 2017) ............................................................... 6, 7, 38

*CY 2019 Home Health Prospective Payment System Rate Update and CY 2020 Case-Mix Adjustment Methodology Refinements*,
83 Fed. Reg. 56,406 (Nov. 13, 2018) ...................................................................... 9, 29

*CY 2020 Home Health Prospective Payment System Rate Update*,
84 Fed. Reg. 60,478 (Nov. 8, 2019) ........................................................... 9, 10, 11, 29

*CY 2023 Home Health Prospective Payment System Rate Update*,
87 Fed. Reg. 66,790 (Nov. 4, 2022) ................................................................... passim

*CY 2024 Home Health Prospective Payment System Rate Update*,
88 Fed. Reg. 77,676 (Nov. 13, 2023) ......................................................................... 19

Medicare Program; Prospective Payment System for Home Health Agencies,
65 Fed. Reg. 41,128 (1999) ......................................................................................... 5

**Rules**

Fed. R. Civ. P. 12 ....................................................................................................... 14

Fed. R. Civ. P. 56 ....................................................................................................... 14

**Other Authorities**

*Staff Report on Home Health and the Medicare Therapy Threshold*,
S. Rep. No. 113-5 (2013) ............................................................................................ 40

**INTRODUCTION**

In response to evidence that home health agencies were providing unnecessary therapy to maximize Medicare payments, Congress directed the Centers for Medicare & Medicaid Services ("CMS" or "the agency") to revise how it pays for home health services beginning in 2020. *See* Bipartisan Budget Act of 2018, Pub. L. No. 115-123, § 51001, 132 Stat. 64, 289-92 (2018) (codified at parts of 42 U.S.C. § 1395fff). As part of implementing these revisions, Congress required CMS to predict how the revised payment model would affect industry behavior and to set a budget-neutral prospective payment rate for 2020 such that CMS would pay the same "estimated aggregate amount of expenditures" for services under the revised model as it would have under the old one. *See* 42 U.S.C. § 1395fff(b)(3)(A)(iv). Congress understood that, because CMS's prospective payment rates would be set based on assumptions about industry behavior, the agency might at first set its rates too high or too low to achieve budget neutrality between the models. So it directed CMS, when setting subsequent prospective payment rates, to account "at a time and in a manner determined appropriate" for the impact of the *actual* behavior changes CMS observed each year from 2020 through 2026. *See id.* § 1395fff(b)(3)(D).

In implementing this directive, CMS estimated that the aggregate amount of expenditures in 2020 would be $16.6 billion under the old model. Once claims data from 2020 became available and CMS could evaluate its assumptions about the effect of the revised model on home health agencies' behavior in light of their actual behavior, CMS determined that the revised model had increased aggregate expenditures compared to the old model. Accordingly, CMS reduced the payment rate for future years in its annual rulemaking for 2023. *See CY 2023 Home Health Prospective Payment System Rate Update*, 87 Fed. Reg. 66,790 (Nov. 4, 2022); AR1-98 (the "2023 Rule").

1

The National Association for Home Care & Hospice ("NAHC") challenges this reduction. NAHC contends that Congress did not direct CMS to achieve budget neutrality between the old payment model and the new payment model but to freeze payments at the specific $16.6 billion amount CMS projected it would have spent in 2020 under the old model, regardless of the amount of services that were actually provided. *See, e.g.*, Pl.'s Mem. in Supp. of Mot. for Summ. J. at 25, ECF No. 15-1 ("PMSJ"). NAHC's insistence that CMS is required to pay home health agencies that same projected $16.6 billion each year for some indeterminate amount of time is not supported by the statute. Nor does it make sense. If overall usage of home health services in Medicare drops precipitously or home health agencies decide to provide fewer services for the same spell of illness, under NAHC's theory, CMS should still pay home health agencies collectively $16.6 billion—a windfall for the industry. But under that same theory, if home health agencies provide *more* services for the same spell of illness, then CMS should still pay $16.6 billion—which would presumably draw a challenge from industry on opposite grounds. NAHC also argues that, because Congress eliminated the use of therapy thresholds in one aspect of how payments are calculated, CMS had to ignore the fact that home health agencies provided much less therapy under the new model, which is a large part of the reason CMS needed to reduce payments. But that is not what Congress directed, and neither the Bipartisan Budget Act of 2018, the Medicare statute, nor the Administrative Procedure Act compel that result.

As a threshold matter, this case should be dismissed for lack of subject-matter jurisdiction. In 42 U.S.C. § 1395fff(d), Congress expressly provided that "[t]here shall be no administrative or judicial review" of challenges to certain aspects of the administration of the Home Health Prospective Payment System. That express-preclusion provision, which is intended

to ensure certainty and finality in the operation of a highly complex prospective payment scheme, applies to the 2020 budget-neutrality provision on which NAHC's claims turn, as well as to other key aspects of NAHC's claims. Even if NAHC's claims were not expressly precluded, NAHC's members—on which NAHC relies in claiming standing to sue—have failed to exhaust their administrative remedies as required under the Medicare statute. They have not completed the expedited judicial review administrative process that Congress requires when a challenger alleges, as NAHC does here, that administrative adjudicators lack the authority to consider their arguments.

If the Court nevertheless reaches the merits, it should enter judgment for CMS. CMS properly implemented Congress's directives in the Bipartisan Budget Act of 2018 in all respects. Indeed, Congress effectively ratified the agency's methodology in the Consolidated Appropriations Act of 2023, when it required the agency to provide information about how it implemented Congress's directives but made plain that it was not altering or calling into question the agency's methodology in its implementing regulations or restricting the Secretary's discretion over the methodology. *See* Pub. L. No. 117-328, § 4142, 136 Stat. 4459, 5929-30 (2023).

*First*, CMS calculated a budget-neutral prospective payment amount for 2020. 42 U.S.C. § 1395fff(b)(3)(A)(iv). To do so, the agency estimated that aggregate expenditures would have totaled $16.6 billion under the old model and calculated a payment rate under the new model to yield the same overall estimated aggregate expenditures, in light of CMS's assumptions about how the industry would change its behavior under the new model. That is all the "budget neutrality for 2020" provision requires CMS to do. Contrary to NAHC's assertions, the statute

does not require the agency to pay home health agencies $16.6 billion indefinitely regardless of what services they actually provide.

***Second***, CMS adjusted the prospective payment rate for 2023 to account for differences between CMS's behavioral assumptions and the industry's actual behavior changes from both 2020 and 2021. *Id.* § 1395fff(b)(3)(D). Once the agency received actual claims data for 2020 and 2021, it calculated what it would have paid for those claims under the old model and adjusted the 2023 prospective payment rate to ensure that the shift between payment models would be budget neutral in the face of unexpected behavior changes, consistent with what Congress directed in the statute.

***Third***, CMS eliminated the use of "therapy thresholds" in making case-by-case adjustments to the payment amount for specific circumstances, as directed by statute. *Id.* § 1395fff(b)(4)(B)(ii). The agency no longer pays home health agencies a different amount depending on whether they provide a certain number of therapy visits during a period of care. Contrary to NAHC's assertions, the statute does not prohibit the agency from considering shifts in the provision of therapy visits as an actual behavior change when calculating any payment adjustment required by section 1395fff(b)(3)(D).

For these reasons, the Court should deny NAHC's motion, grant CMS's motion, and dismiss this case for lack of jurisdiction or, in the alternative, enter judgment for CMS.

## BACKGROUND

## I.    The Home Health Prospective Payment System

The Medicare program, established under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395iii (commonly known as the Medicare statute), is a federal health insurance program that pays for covered medical care provided to eligible aged and disabled persons. CMS is the component of the Department of Health and Human Services that is charged with

administering the Medicare program. Among other things, Medicare covers certain "home health services," which are services provided to persons in the home by participating "home health agencies" ("HHAs"). *Id.* § 1395x(m). These services include skilled nursing, therapeutic, and medical services, and can also include services provided by a home health aide. *See id.*; 42 C.F.R. § 424.22.

Since 2000, Medicare payments to home health agencies have been based on a prospective payment system (commonly known as the "Home Health Prospective Payment System" or "Home Health PPS"). *See* 42 U.S.C. § 1395fff. A prospective payment system is a system that pays providers prospectively based on a predetermined amount for providing care, rather than retrospectively reimbursing providers based on the actual costs incurred to provide that care. In the Home Health Prospective Payment System, Congress instructed CMS to define an appropriate "unit of service" to serve as the basis for payment, *id.* § 1395fff(b)(2)(A), which CMS originally defined as a 60-day period of care, *see* Medicare Program; Prospective Payment System for Home Health Agencies, 65 Fed. Reg. 41,128, 41,135-36 (1999). Congress also instructed CMS to compute a "standard prospective payment amount … based on the most current audited cost report data available" to the agency at the time. *Id.* § 1395fff(b)(3)(A)(i). CMS updates the standard prospective payment amount on an annual basis to account for changes in the cost of goods and services and other factors. *Id.* § 1395fff(b)(3)(B).

To determine how much a home health agency is paid for an actual unit of service, CMS applies various adjustments to the standard prospective payment amount (which essentially serves as a base rate). *See id.* § 1395fff(b)(4). First, CMS applies a "case mix adjustment," which is intended to account for "variation in cost among different units of services"—*e.g.*, some patients require more intensive or expensive care. *Id.* § 1395fff(b)(4)(A)(i), (B). Those

adjustments are based on "case mix adjustment factors," like the severity of a patient's conditions and the services they utilize. *Id.* § 1395fff(b)(4)(B). Second, CMS applies an "area wage adjustment," which is intended to account for "geographic differences" in wages and wage-related costs. *Id.* § 1395fff(b)(4)(A)(ii), (C).

Prior to 2020, CMS also included "therapy thresholds" as a significant case-mix adjustment factor. A home health agency was paid one amount if a patient received 0-5 therapy visits in a 60-day period, more at 6, and then even more at 7-9, 10, 11-13, 14-15, 16-17, 18-19, and 20+ visits, respectively. *See CY 2018 Home Health Prospective Payment System Rate Update and Proposed CY 2019 Case-Mix Adjustment Methodology Refinements*, 82 Fed. Reg. 35,270, 35,274 (July 28, 2017). CMS conducted a study and found that there were sharp increases in therapy use by home health agencies just above each therapy threshold, which suggested that they were changing the care provided to patients in "response to financial incentives in the home health payment system." *Id.* at 35,276. Similar findings were reported in studies performed by the Medicare Payment Advisory Commission ("MedPAC") and the Senate Finance Committee. *See id.* at 35,275-76.[1] CMS concluded that "the current home health payment system may discourage HHAs from serving patients with clinically complex and/or poorly controlled chronic conditions who do not need therapy services but require skilled nursing care." 82 Fed. Reg. at 35,294. Separately, CMS found that costs are "much higher" and that patients receive more visits in the first 30 days of a 60-day payment unit, so a 30-day payment unit would be a more accurate way to pay home health agencies. *Id.* at 35,301.

---

[1] MedPac is an independent advisory commission within the Legislative Branch that is responsible for advising Congress on issues affecting the Medicare program. *See* 42 U.S.C. § 1395b-6.

In 2017, CMS proposed updating the prospective payment system for 2019 to shift away from a service-utilization model to a patient-characteristic driven model. *Id.* at 35,277. Among other things, the proposed methodology would change the case-mix adjustment factors, including eliminating therapy thresholds as a factor, and shift to a 30-day payment unit. *Id.* CMS did not propose to make the shift to the new model budget neutral, so it expected that HHAs would paid less under the new model than they would have been paid under the old one. *See id.* at 35,307. CMS, however, did not finalize the proposed changes for 2019 because it received comments from the industry that it wished to consider further. *CY 2018 Home Health Prospective Payment System Rate Update and CY 2019 Case-Mix Adjustment Methodology Refinements*, 82 Fed. Reg. 51,676, 51,699 (Nov. 7, 2017).

## II. The Bipartisan Budget Act of 2018

Shortly after CMS announced it would not implement its proposed changes for 2019, Congress passed the Bipartisan Budget Act of 2018, which directed CMS to implement several changes beginning in 2020. *See* Pub. L. No. 115-123 § 51001, 132 Stat. at 289. Specifically, Congress directed the agency to pay home health agencies based off a "30-day unit of service" rather than a 60-day unit. 42 U.S.C. § 1395fff(b)(2). It also amended the case-mix adjustment subsection to direct the agency to "eliminate the use of therapy thresholds (established by the Secretary) in case mix adjustment factors … for calculating payments under the prospective payment system under this subsection." *Id.* § 1395fff(b)(4)(B)(ii).

Congress further instructed CMS to take certain steps in implementing these changes to ensure that the new model did not increase or decrease aggregate expenditures compared to the old one. In a subsection titled "Budget Neutrality for 2020," Congress directed the agency to "calculate a standard prospective payment amount" for 2020 "in a manner such that the estimated aggregate amount of expenditures … is equal to the estimated aggregate amount of

expenditures that otherwise would have been made under the system" if Congress had not enacted changes to a 30-day unit of payment. *Id.* § 1395fff(b)(3)(A)(iv). Because setting a prospective payment rate necessarily involves making predictions about what the universe of claims will be in the future, Congress also directed the agency to "make assumptions about behavior changes that could occur as a result of the implementation" of the 30-day unit of service and the changes CMS made to the case-mix adjustment factors, including eliminating therapy thresholds, and "provide a description of such assumptions in the notice and comment rulemaking used to implement this clause." *Id.* In that way, the agency would have to think through and obtain public input on its assumptions and then set a payment rate likely to yield the same amount of estimated expenditures that otherwise would have been made under the old model for 2020.

Congress understood that CMS's assumptions about behavior changes would be made without the benefit of historical data about home health agencies' actual behavior changes. Thus, Congress instructed that once actual claims data became available, CMS must update its prospective payment rates based on that data, such that the new payment model would yield the same amount of aggregate expenditures for those actual claims that CMS would have paid for those claims under the old model. Specifically, Congress directed the agency to "annually determine the impact of differences between assumed behavior changes" as described in the budget-neutrality provision and "actual behavior changes on estimated aggregate expenditures" from 2020 to 2026. *Id.* § 1395fff(b)(3)(D)(i). The agency must then, "at a time and in a manner determined appropriate," implement certain permanent adjustments to the payment amount (as well as temporary adjustments, which are not at issue in this case). *Id.* § 1395fff(b)(3)(D)(i), (ii). As to permanent adjustments, the agency must "provide for one or more permanent increases or

decreases to the standard prospective payment amount (or amounts) for applicable years, on a prospective basis, to offset for such increases or decreases in estimated aggregate expenditures." *Id.* § 1395fff(b)(3)(D)(ii). In other words, Congress intended for the agency to check, and annually recheck for several years, whether, as a result of providers' actual behavior as demonstrated through the submission of actual claims, the agency was paying more or less to reimburse providers for those claims than it would have paid under the prior model, and adjust future prospective payment rates accordingly.

## III.   CMS's Rulemakings

CMS has implemented the Balanced Budget Act of 2018's mandates through a series of rulemakings from 2018 through the present. As NAHC concedes, "CMS eliminated the use of therapy service threshold[s] and finalized a new case-mix classification[,] named the Patient Driven Groupings Model ('PDGM')," and also "calculated a new standard payment amount for a 30-day episode of care," pursuant to 42 U.S.C. § 1395fff(b)(2)(B) and (b)(4)(B)(ii). PMSJ 8 (citing *CY 2019 Home Health Prospective Payment System Rate Update and CY 2020 Case-Mix Adjustment Methodology Refinements*, 83 Fed. Reg. 56,406, 56,454-55 (Nov. 13, 2018)). NAHC does not take issue with either of these decisions. *Id.*

Next, CMS calculated a new standard prospective payment amount intended to ensure that the agency would pay the same amount for home health services under the new model that it would have paid under the prior model, as Congress instructed. *See* 42 U.S.C. § 1395fff(b)(3)(A)(iv). The agency estimated that it would pay $16.6 billion to home health agencies for services provided in 2020 using the prior model (*i.e.*, using a 60-day unit of payment and therapy thresholds) and the 2019 payment rate based on predicted utilization. *See CY 2020 Home Health Prospective Payment System Rate Update*, 84 Fed. Reg. 60,478, 60,512 (Nov. 8, 2019). To hit $16.6 billion under the new model without any assumed behavioral

changes, CMS calculated that it would need to set a payment rate of $1,908.18 for 2020 per 30-day unit of service. *Id.*

The agency then calculated the payment rate it would need using three assumptions that had been set forth in a separate rulemaking about how providers would change their behavior to receive higher payments under the new payment model. *Id.* Specifically, the agency assumed that providers would apply higher-paying principal diagnosis codes; that they would list more secondary diagnosis codes (to receive a payment increase for caring for a patient with more illnesses); and that they would provide additional visits during a 30-day period to avoid a downward adjustment for low utilization. *Id.* The agency did not include any assumptions regarding decreased therapy utilization as a result of the elimination of therapy thresholds because it thought the industry would continue to provide the same amount of therapy regardless, as needed by individual patients. *Id.* at 60,497; *see also* AR11.

Applying those three assumptions, CMS calculated that it would need a standard prospective payment amount of $1,748.11 per 30-day unit of service—a rate that reflected an 8.389% decrease from the rate without behavioral assumptions. 84 Fed. Reg. at 60,513. In response to concerns from commenters who argued that it would take time for home health agencies to implement changes to their practices in response to the new payment model, CMS reduced the decrease to 4.36%. *Id.* at 60,518. CMS therefore calculated a final prospective payment amount of $1,864.03 for 2020. *Id.* at 60,519. However, CMS cautioned that if the agency had

> underestimate[d] the amount of the reductions to the 30-day payment rate necessary to offset behavior changes and maintain budget neutrality for CY 2020, larger adjustments to the 30-day payment amount would be required in the future, pursuant to [42 U.S.C. § 1395fff(b)(3)(D)], to ensure budget neutrality with respect to estimated expenditures for CY 2020.

10

*Id.* at 60,518. Again, NAHC does not challenge this approach to setting a budget-neutral payment rate for 2020. *See* PMSJ 9 ("CMS followed Congress's directives and complied with the statutory requirements."); *id.* at 10 ("NAHC has no objection to how CMS implemented this part of the statute.").

What NAHC does challenge is the method CMS used to determine the impact of differences between assumed and actual behavior changes in the 2023 Rule, pursuant to 42 U.S.C. § 1395fff(b)(3)(D)(i). *See* AR1-98 (final 2023 Rule); AR99-182 (proposed 2023 Rule). To measure these differences, CMS used actual claims data from 2020 and 2021 to calculate what it would have paid to process those claims under the prior model. CMS explained that this methodology allowed it "to control for actual utilization, not predicted utilization, to determine the impact of differences between what we estimate aggregate expenditures would have been in the absence of the PDGM using actual data and what the expenditures actually were under the PDGM." AR9. In other words, rather than relying on an estimate for how much CMS would have paid under the prior model, CMS was now able to compare how much it would have paid in actual claims under the old model to how much it would pay in actual claims under the new model. CMS thereby measured the difference between actual behavior changes and its assumed behavior changes in the aggregate and adjusted future payment rates so that the change in payment formula would not increase or decrease aggregate expenditures—*i.e.*, that aggregate expenditures under the new model would be equal to those "that otherwise would have been made" under the prior payment model. 42 U.S.C. § 1395fff(b)(3)(A)(iv); *id.* § 1395fff(b)(3)(D).

In adopting this approach, CMS addressed and explicitly rejected comments raising precisely the arguments pressed by NAHC. *See* AR8-10. As CMS explained, the statute does not require the agency "to correct each of its original assumptions regarding home health agency

behavior changes or itemize each behavior change for which its methodology accounts." AR9. Moreover, CMS's methodology was designed to account both for discrepancies in its original three behavioral assumptions as well as actual behavior changes that CMS did not take into account at all. *Id.* In particular, CMS found that home health agencies had, in fact, reduced their provision of therapy services, contrary to CMS's predictions. *Id.* CMS therefore concluded that it would be inappropriate to "artificially inflate aggregate expenditures in CYs 2020 and 2021 by including payments for therapy visits that may have occurred under the old thresholds, but that were in fact not provided under the new system." *Id.* Instead, CMS's methodology ensures that home health agencies "were still paid the same amount they would have been under the old system for services they actually did provide—thus achieving budget neutrality" between the systems. AR10.

CMS then applied this approach to determine how aggregate expenditures under the new model differed from those that would have been made under the prior model. AR15-18. Using claims data from 2020 and 2021, the agency calculated that its aggregate expenditures for those years would have been approximately $14.3 and $15.8 billion, respectively, under the prior model. *Id.* The agency then recalculated the payment rate for 2021 to determine what the rate would have needed to be to achieve the same level of expenditures. AR17. It concluded that the base rate would have needed to be 7.85% lower to achieve budget neutrality between the two payment models. *Id.* Instead of applying a 7.85% reduction to the prospective payment rate for 2023, CMS cut that reduction in half and decided not to incorporate an additional temporary adjustment to the base rate that year, in light of the potential hardship of implementing this adjustment in a single year. AR18-19. CMS therefore arrived at a final permanent adjustment of -3.925%, AR19—*i.e.*, a rate reduction of less than 4%.

After CMS finalized the rule in December 2022, Congress directed CMS to release certain information about how it implemented the Bipartisan Budget Act of 2018. *See* Consolidated Appropriations Act, 2023, Pub. L. 117-328, § 4142, 136 Stat. 4459, 5929-30. In doing so, however, Congress clarified that "[n]othing in this section shall be construed to require any change in the methodology used to implement [42 U.S.C. § 1395fff(b)(3)(D)], to restrict the Secretary's discretion in establishing the methodology to implement such section, or to suggest that the Secretary's promulgation of the methodology … was inadequate under [the Administrative Procedure Act]." *Id.* § 4142(c).

## IV.    Procedural History

NAHC now asks this Court to give it relief Congress did not. Compl., ECF No. 1. The Complaint asserts that the 2023 Rule is "not in accordance with law," based on an "unreasonable construction" of the statute, and "arbitrary and capricious." *Id.* ¶¶ 78-104. Boiled down, NAHC challenges three purported aspects of the 2023 Rule: that it does not comply with the budget-neutrality requirement, PMSJ 24-28; that it fails to determine the impact of differences between assumed and actual behavior changes, PMSJ 16-24; and that it does not implement Congress's instruction to eliminate therapy thresholds in case-mix adjustment factors, PMSJ 28-31. *See, e.g.*, Compl. ¶ 5. NAHC filed its motion for summary judgment on November 10, 2023, *see* ECF No. 15, enclosing declarations from the leaders of two NAHC members, Mary Lanning Healthcare, *see* Decl. of Carrie Edwards ("Edwards Decl."), ECF No. 15-2, and Androscoggin Home Healthcare + Hospice, *see* Decl. of Ken Albert ("Albert Decl."), ECF No. 15-3, that claim to have faced reduced revenues in 2023 as compared to 2019, which, notwithstanding other potential causes including the COVID-19 pandemic, they attribute to the 2023 Rule.

**LEGAL STANDARD**

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a case must be dismissed if the Court lacks subject-matter jurisdiction. "A federal court's subject-matter jurisdiction, constitutionally limited by article III, extends only so far as Congress provides by statute." *Commodity Futures Trading Comm'n v. Nahas*, 738 F.2d 487, 492 (D.C. Cir. 1984). "It is to be presumed that a cause lies outside this limited jurisdiction, … and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

To the extent the Court has subject-matter jurisdiction, summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In cases seeking judicial review of agency action under the [APA], '[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review.'" *Lannett Co., Inc. v. FDA*, 300 F. Supp. 3d 34, 41 (D.D.C. 2017) (quoting *Loma Linda Univ. Med. Ctr. v. Sebelius*, 684 F. Supp. 2d 42, 52 (D.D.C. 2010)).

**ARGUMENT**

**I.     This case should be dismissed for lack of subject-matter jurisdiction.**

NAHC's lawsuit suffers from two jurisdictional defects, either of which warrants dismissal: first, its claims are expressly precluded by 42 U.S.C. § 1395fff(d); and second, the identified NAHC members have failed to exhaust their administrative remedies.

**A.     Section 1395fff(d) expressly precludes review of NAHC's claims.**

"Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider," including "when, and under what conditions, federal courts can hear them." *Bowles v. Russell*, 551 U.S. 205, 212-13 (2007). Thus, "when it comes to jurisdiction, the

14

Congress giveth and the Congress taketh away." *In re al-Nashiri*, 791 F.3d 71, 76 (D.C. Cir. 2015); *see also Estep v. United States*, 327 U.S. 114, 120 (1946) ("[E]xcept when the Constitution requires it, judicial review of administrative action may be granted or withheld as Congress chooses."). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984).

Congress expressly precluded judicial review of certain claims seeking to challenge HHS's efforts to implement the Prospective Payment System. The statute provides:

There shall be no administrative or judicial review under section 1395ff of this title, 1395*oo* of this title, *or otherwise* of—

(1) the establishment of a transition period under subsection (b)(1);

(2) the definition and application of payment units under subsection (b)(2);

(3) the computation of initial standard prospective payment amounts under subsection (b)(3)(A) (including the reduction described in clause (ii) of such subsection);

(4) the establishment of the adjustment for outliers under subsection (b)(3)(C);

(5) the establishment of case mix and area wage adjustments under subsection (b)(4); and

(6) the establishment of any adjustments for outliers under subsection (b)(5).

42. U.S.C. § 1395fff(d).

That subsection encompasses the challenges NAHC has asserted here. Indeed, it is difficult to think of anything "Congress could have said to make the plain and unambiguous

language of the statute, and its corresponding intent, more clear." *Painter v. Shalala*, 97 F.3d 1351, 1356 (10th Cir. 1996); *see, e.g.*, *Tex. All. for Home Care Servs. v. Sebelius*, 681 F.3d 402, 409 (D.C. Cir. 2012) (explaining that a similar "mandate that there be 'no administrative or judicial review' under the two cited statutes 'or otherwise' unequivocally precludes review of the Secretary's actions [listed in the provision]" (emphasis omitted)); *Amgen, Inc. v. Smith*, 357 F.3d 103, 112 (D.C. Cir. 2004) (concluding that "Congress['s] inten[t] to preclude judicial review of the Secretary's adjustments to prospective payment amounts is 'clear and convincing' from the plain text of [a similarly-worded provision of the Medicare statute] alone").

To start, section 1395fff(d)(3) precludes judicial review of "the computation of initial standard prospective payment amounts under subsection (b)(3)(A)," which includes CMS's implementation of the budget-neutrality requirement in subsection (b)(3)(A)(iv). This covers NAHC's first two claims, which relate to the manner in which the 2023 Rule maintained budget neutrality. Indeed, subsections (b)(3)(D)(i) and (ii), which establish the requirement to adjust payment rates to reflect behavior changes, explicitly relate back to the budget-neutrality requirement, requiring CMS to "determine the impact of differences between assumed behavior changes (*as described in paragraph (3)(A)(iv)*) and actual behavior changes on estimated aggregate expenditures," and then to implement a permanent adjustment "to offset for such increases or decreases in estimated aggregate expenditures (*as determined under clause (i)*)." 42 U.S.C. § 1395fff(b)(3)(D)(i), (ii) (emphasis added).

NAHC's brief confirms that it is challenging decisions Congress intended to not be subject to judicial review. The crux of NAHC's argument in its first two claims is that CMS failed to peg expenditures to the $16.6 billion figure the agency initially estimated, in violation of section 1395fff(b)(3)(A)(iv). *See* PMSJ 27-28 (arguing that CMS is wrong to "disregard the

16

original budget-neutral target amount" and therefore the methodology "directly conflicts with the budget-neutrality provision"). In other words, NAHC argues that CMS must compute the initial standard payment amount based on a $16.6 billion target with no room for variation based on behavior changes as evidenced by the actual claims submitted. *See id.* at 18-20 (critiquing CMS's methodology for "ignoring Congress's demand to keep expenditures neutral to the amount that 'otherwise' would have been paid absent the statutory change"). NAHC admits as much when it asserts that CMS needed to "keep[] overall expenditures the same"—*i.e.*, at $16.6 billion—"as if the switch away from the therapy never happened." *Id.* at 21. But all of these arguments simply second-guess how CMS implemented section 1395fff(b)(3)(A), which is precluded by subsection (d)(3). Similarly, by challenging how CMS adjusted payment rates after implementing the 30-day unit of service, which is contained in subsection (b)(2)(B), NAHC's claims are also precluded by subsection (d)(2), which bars judicial review of "the definition and application of payment units under subsection (b)(2)." 42 U.S.C. § 1395fff(d)(2).

That leaves NAHC's claim that CMS failed to implement Congress's instruction in subsection (b)(4)(B)(ii) to eliminate therapy thresholds from case-mix adjustment factors. *See* PMSJ 28-31. But subsection (d)(5) separately precludes any challenge to "the establishment of case mix and area wage adjustments under subsection (b)(4)," and therapy thresholds were simply one type of "case mix … adjustment[]." 42 U.S.C. § 1395fff(d)(5). Congress left it to the agency to determine how to eliminate therapy thresholds from the case-mix adjustment, and NAHC's assertion that CMS implicitly re-established therapy thresholds through its behavioral adjustment methodology is, again, exactly the type of methodological design choice Congress meant to prevent litigants from second-guessing.

It is no answer to say that NAHC challenges certain decisions or analytical steps that CMS made in the course of implementing these provisions. The D.C. Circuit has instructed that "the dispositive issue" in assessing whether an action is unreviewable is whether the action is "inextricably intertwined with an action that all agree *is* shielded from review, regardless of where that action lies in the agency's decision tree." *Fla. Health Scis. Ctr., Inc. v. Sec'y of HHS*, 830 F.3d 515, 521 (D.C. Cir. 2016). For that reason, the manner in which an agency reached a decision that is precluded from review, including the agency's calculations, data, and estimates, is also unreviewable. *See e.g.*, *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 506 (D.C. Cir. 2019) ("[E]stimates cannot be separated from the methodology used to generate them."); *Scranton Quincy Hosp. Co. v. Azar*, 514 F. Supp. 3d 249, 261 (D.D.C. 2021); *Cmty. Oncology All., Inc. v. OMB*, No. 18-cv-1256, 2019 WL 1440132, at *2-3 (D.D.C. Mar. 31, 2019); *Knapp Med. Ctr. v. Burwell*, 192 F. Supp. 3d 129, 135 (D.D.C. 2016), *aff'd sub nom. Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125 (D.C. Cir. 2017).

Finally, Congress's decision expressly to preclude judicial review in subsection (d)(3) makes good sense. CMS's adjustments under the Home Health PPS are highly technical decisions, and Congress has afforded the Secretary substantial discretion in setting a payment methodology. *See* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 4142, 136 Stat. 4459, 5929-30 (recognizing "Secretary's discretion in establishing methodology" for Home Health PPS). Subjecting CMS's technical decision to subsequent judicial review "could result in the retroactive ordering of payment adjustments after hospitals have already received their payments for the year." *Amgen*, 357 F.3d at 112.

Precluding judicial review, then, promotes certainty and finality in CMS's payment scheme. Indeed, because each year's payment adjustment must account for the prior year's

18

adjustment, *see CY 2024 Home Health Prospective Payment System Rate Update*, 88 Fed. Reg. 77,676, 77,692 (Nov. 13, 2023) (factoring in "adjustment that we determined for CYs 2020 and 2021" in 2023 rule), unraveling one year's adjustments after-the-fact could result in delaying even payments for future years. That concern is particularly acute here, where the statute requires CMS to account for behavior changes for each year through 2026. 42 U.S.C. § 1395fff(b)(3)(D)(i). By making a behavior adjustment in the 2023 payment rule, CMS will be able to observe the effects of its adjustment by analyzing actual claims data from 2023; incorporate any needed adjustments into the payment rates for future years; observe the effects of those adjustments through actual claims data from those future years; and make any further adjustments as needed. Allowing judicial review could delay finalizing even the first behavior adjustment for years, disrupting the iterative process envisioned in the statute and threatening Congress's instruction to make behavior adjustments "at a time and in a manner determined appropriate." *Id.* § 1395fff(b)(3)(D)(ii). Moreover, as evidenced by the Consolidated Appropriations Act of 2023, Congress itself has closely supervised CMS's exercise of its discretion in the context of the Home Health PPS and expressly declined to disturb CMS's judgment.

In sum, the statutory "language, combined with the broad range of subjects expressly immunized from review, manifest the Congress's intent to 'proceed with these initial administrative processes without risk of litigation blocking the execution of the program.'" *Tex. All.*, 681 F.3d at 409 (quoting *Cardiosom, LLC v. United States*, 656 F.3d 1322, 1326 (Fed. Cir. 2011)). The Court should honor that intent.

19

**B.      The Court lacks subject-matter jurisdiction because NAHC's members have not exhausted their administrative remedies.**

Even if review were not precluded, the Court lacks jurisdiction for the independent reason that NAHC's members have failed to exhaust their administrative remedies, as they must to obtain judicial review under the Medicare statute. Under 42 U.S.C. § 405(h), incorporated into the Medicare statute by 42 U.S.C. § 1395ii, "[f]ederal subject matter jurisdiction over claims arising under the Medicare statute is permitted only upon the completion of the administrative process outlined in that statute and its implementing regulations." *Cape Cod Hosp. v Leavitt*, 565 F. Supp. 2d 137, 139 (D.D.C. 2008) (quoting *Three Lower Cntys. Cmty. Health Servs. v. HHS*, 517 F. Supp. 2d 431, 435 (D.D.C. 2007)). The Medicare statute explicitly precludes general federal-question jurisdiction under 28 U.S.C. § 1331, 42 U.S.C. § 405(h), and "demands the 'channeling' of virtually all legal attacks through the agency," *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 5, 13 (2000). The Supreme Court has characterized the section 405(h) bar to other avenues of review as "sweeping and direct," *Weinberger v. Salfi*, 422 U.S. 749, 757 (1975), and explained that it applies to "all 'claim[s] arising under' the Medicare [statute]," *Heckler v. Ringer*, 466 U.S. 602, 615 (1984), regardless of the nature of the particular claim, *Ill. Council*, 529 U.S. at 14. The exhaustion requirement "prevent[s] premature interference with agency processes," thereby ensuring the agency can operate efficiently and correct its own errors and "afford[ing] the parties and the courts the benefit of its experience and expertise." *Salfi*, 422 U.S. at 765; *see also Smith v. Berryhill*, 139 S. Ct. 1765, 1779 (2019) ("[A] court generally goes astray if it decides a question that has been delegated to an agency if that agency has not first had a chance to address the question.").

NAHC admits that its claims "arise under … the Medicare statute," Compl. ¶ 13, and so it may only obtain judicial review after its claims have "been presented to the Secretary and

administrative remedies have been exhausted." *Am. Chiropractic Ass'n v. Leavitt*, 431 F.3d 812, 816 (D.C. Cir. 2005); *Cape Cod*, 565 F. Supp. 2d at 139-40. An association can "fulfill[] the requirements of presentment and exhaustion through [a] member" by showing that the member has "presented claims to the agency and exhausted its administrative remedies." *Am. Clinical Lab'y Ass'n v. Becerra*, 40 F.4th 616, 624 (D.C. Cir. 2022).

To present a claim to the agency, a healthcare provider must submit an individual claim for a benefit—in this case for home health services—to a Medicare Administrative Contractor ("MAC"). 42 U.S.C. § 1395ff(a)(1). The MAC issues an initial determination of whether services are covered and the payment amount. *Id.* § 1395ff(a)(1); 42 C.F.R. §§ 405.904(a)(2), 405.920. If the claimant is dissatisfied with the MAC's initial determination, the claimant may request a redetermination from the MAC. 42 U.S.C. § 1395ff(a)(3); 42 C.F.R. §§ 405.904(a)(2), 405.940. If dissatisfied with the MAC's redetermination, the claimant may then request a reconsideration of the redetermination by a qualified independent contractor ("QIC"), who can collect additional evidence. 42 U.S.C. § 1395ff(b), (c); 42 C.F.R. §§ 405.904(a)(2), 405.960, 405.968(a). In the ordinary course, there are two additional levels of administrative appeals before judicial review under 42 U.S.C. § 405(g), culminating in the Departmental Appeals Board. 42 U.S.C. §§ 405(b), (g), 1395ff(b)(1)(A), (d)(1)-(2); 42 C.F.R. §§ 405.1000-405.1140.

NAHC identifies only two members who have attempted any step of this process, and even then, only the first—presenting a claim and seeking redetermination from the MAC. Assuming that both redetermination decisions are unfavorable to NAHC's members, they must still request reconsideration of their claim by the QIC, request a hearing from an ALJ, and request that the Medicare Appeals Council review their cases. Only then will NAHC's members

have received a final decision that would permit them—or NAHC—to invoke this Court's jurisdiction. *See* 42 U.S.C. § 1395ff; 42 C.F.R. § 405.904(a)(2).

Instead of completing the administrative process, NAHC and its members assert that it would be "futile" to require them to do so because "[n]o administrative body has authority to rule in the members' favor, even though the members are correct on the law." Compl. ¶ 15; *see also* Edwards Decl. ¶ 16; Albert Decl. ¶ 17. But Congress has established a process that allows providers to obtain expedited access to judicial review in precisely these circumstances—one that NAHC's members have not even tried to utilize.

In the Medicare statute, Congress established a process "under which a provider … may obtain access to judicial review when a review entity … determines that the Departmental Appeals Board does not have the authority to decide the question of law or regulation relevant to the matters in controversy and that there is no material issue of fact in dispute." 42 U.S.C. § 1395ff(b)(2). Under that process, once "[a] QIC has made a reconsideration determination" and collected all relevant evidence regarding the individual claims, a provider may skip the remaining administrative procedures by identifying the regulation they "consider[] invalid." 42 C.F.R. § 405.990(b), (c). If the agency adjudicators decide that "the Departmental Appeals Board does not have the authority to decide the question of law or regulation relevant to the matters in controversy and that there is no material issue of fact in dispute," 42 U.S.C. § 1395ff(b)(2)(A), the provider may go straight to court under 42 U.S.C. § 1395ff(b)(2)(C). The agency must rule within 60 days of such a request. *Id.* § 1395ff(b)(2)(B); *accord* 42 C.F.R. § 405.990(f).[2]

---

[2]    Aside from expedited judicial review, claimants who are dissatisfied with the pace of proceedings may, at various levels of the administrative process, seek to expedite the agency's review of their claims. *See, e.g.*, 42 C.F.R. § 405.1100(b) ("Under circumstances set forth in §§ 405.1016 and 405.1108, the appellant may request that a case be escalated to the [Medicare

NAHC has provided no justification for its members' failure to avail themselves of the expedited judicial review process. Expedited review "is not another wall constructed to stymie a claimant's efforts to obtain judicial review of his claim." *Ryan v. Bentsen*, 12 F.3d 245, 249 (D.C. Cir. 1993). Procedures like this benefit both the parties and the court: the claimant may obtain judicial review more quickly, and "when the case reaches the district court there will be no question regarding exhaustion of remedies or applicability of the futility doctrine." *Id.* at 248. This in turn conserves "judicial effort" and focuses the Court on the precise legal question at issue. *Id.* at 249. "When an agency has provided an abbreviated procedure that accelerates the decision-making process, it is in the best interests of the court, the agency and the claimant that the procedure be utilized." *Id.*

Thus, in *National Home Infusion Ass'n v. Becerra*, the district court held that it lacked jurisdiction over a suit brought by an association of home infusion medical services challenging an HHS rule interpreting a statutory provision in the context of a Medicare payment scheme. No. 19-393 (TJK), 2021 WL 2439570, at *1, 7 (D.D.C. June 15, 2021). Three of the plaintiff's members presented claims, but the plaintiff filed suit "within days of its members presenting their claims," when the claims had only progressed to "the second step in the process." *Id.* at *3. Like here, none of the plaintiff's members pursued expedited judicial review. *Id.* Accordingly, the district court concluded that it lacked jurisdiction because the plaintiff's members had failed to "avail themselves of the [expedited judicial review] process" and the Secretary had not exercised his discretion to waive the exhaustion requirement. *Id.* at *6.

---

Appeals] Council for a decision even if the ALJ or attorney adjudicator has not issued a decision, dismissal, or remand in his or her case."); *see also id.* §§ 405.1002(b), 405.1132; 42 U.S.C. §§ 1395ff(c)(3)(C)(ii), 1395ff(d)(3).

Moreover, while NAHC seeks vacatur of the rule on behalf of its members, as noted above, the Court lacks general federal question jurisdiction over this case, *see supra* p. 20, and section 1395ff(b) limits the Court's review to individual "claims for benefits." Allowing NAHC to circumvent the expedited judicial review process would turn the statutory scheme on its head, transforming a substantive channeling requirement into a formalistic check-the-box legal requirement that has no bearing on how claims make it to court. *See Ill. Council*, 529 U.S. at 14 (rejecting effort to treat "general legal" challenges differently from individual claims for benefits); *accord Three Lower Ctys. Cmty. Health Servs., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 317 F. App'x 1, 2 (D.C. Cir. 2009) (holding that parties with a direct, "'facial'" challenge "must exhaust the agency review process"). Congress authorized expedited judicial review as an avenue to bring a purely legal question to court, but NAHC's members have simply declined to use it.

In fact, NAHC's effort to bypass the expedited judicial review process has left it unable to prove its entitlement to relief even on its own theory. Section 405(g) authorizes a court only to "affirm[], modify[], or revers[e]" individual adjudications. There is no evidence in the administrative record addressing those individual adjudications. *See Cmty. Oncology All., Inc. v. Off. of Mgmt. & Budget*, 987 F.3d 1137, 1144 (D.C. Cir. 2021) (no jurisdiction under section 405(g) when plaintiff failed to submit "claim numbers, claim amounts, agency dockets, agency findings, agency records, or agency decisions of any kind"). While NAHC submits declarations on behalf of two member organizations that identify two claim numbers for two providers (Edwards ¶ 14; Albert Dec. ¶15), the statute does not authorize the court to act as a factfinder in the first instance, *see* 42 U.S.C. § 1395ff(b)(3) (precluding consideration of any evidence not submitted to the QIC); *id.* § 405(g) (authorizing remand to agency to find further facts). Even if

the court could consider material outside the administrative record, these declarations fail to meet NAHC's burden to show that the claims "satisfy other requirements for review under section 405(g)," such as venue, limitations statutes, and the amount at stake. *Cmty. Oncology*, 987 F.3d at 1144; *see* 42 U.S.C. § 1395ff(b)(1)(D), (E); *id.* § 405(g). Indeed, some of the claims referenced in the declarations may not even be affected by NAHC's challenge, because they might include low-utilization claims ineligible to receive the base payment amount. *See* 42 C.F.R. § 484.230(b) (providing alternative payment methodology for periods with "minimal services").

Given the availability of the expedited judicial review process, the Court should reject NAHC's request to waive exhaustion as futile. *See Mathews v. Eldridge*, 424 U.S. 319, 330 (1976) (observing that "under § 405(g) the power to determine when finality has occurred ordinarily rests with the Secretary since ultimate responsibility for the integrity of the administrative program is his"); *Salfi*, 422 U.S. at 765-66 ("[A] court may not substitute its conclusion as to futility for the contrary conclusion of the Secretary."). Indeed, by enacting section 1395ff(b)(2), Congress explicitly vested authority in the agency to determine when further exhaustion would be futile, and thereby displaced earlier cases to the extent they suggest that courts could waive exhaustion requirements purely on futility grounds. *See, e.g.*, *Tataranowicz v. Sullivan*, 959 F.2d 268, 274 (D.C. Cir. 1992).

NAHC's suggestion that its members will face harm if they are required to exhaust the administrative process, *see* Compl. ¶¶ 8-9; Edwards Decl. ¶¶ 10-13; Albert Decl. ¶¶ 10-14, cannot excuse their failure to utilize the expedited access to judicial review process, particularly when following that process would have enabled them to quickly obtain the very judicial review they seek without running into this jurisdictional hurdle. Regardless, these asserted harms fail on

their own terms. Congress's decision to channel "virtually all legal attacks through the agency …

comes at a price, namely, occasional individual, delay-related hardship." *Ill. Council*, 529 U.S. at

13. Monetary loss, "ultimately to be recovered, does not usually constitute irreparable injury."

*Sampson v. Murray*, 415 U.S. 61, 90 (1974). Indeed, "even if the Secretary's actions were to

force a health care provider out of business, the injuries are not necessarily 'irreparable,'

considering the risk known to the health care provider when it enters the Medicare program."

*Manakee Pro. Med. Transfer Serv., Inc. v. Shalala*, 71 F.3d 574, 581 (6th Cir. 1995); *see also

NAHC v. Burwell*, 77 F. Supp. 3d 103, 110 (D.D.C. 2015) ("To demonstrate irreparable harm, a

plaintiff generally must demonstrate more than economic distress, even if severe."). The

members' assertions of decreased payments and service adjustments do not meet this bar.

      For these reasons, NAHC's members have failed to exhaust their administrative

remedies, and they should not be permitted to end-run the agency's processes through litigation.

## II.    In the alternative, the Court should enter judgment for CMS.

      Because the Court lacks subject-matter jurisdiction, it need not reach the merits. But if it

does, it should hold that CMS properly implemented Congress's instructions in the Bipartisan

Budget Act of 2018 and enter judgment for the agency. All of CMS's decisions were premised

on the best reading of the text of the statute and represent reasonable exercises of the agency's

policy judgment and expertise.

      "A court lacks authority to undermine the regime established by the Secretary unless [his]

regulation is 'arbitrary, capricious, or manifestly contrary to the statute.'" *Sebelius v. Auburn

Reg'l Med. Ctr.*, 568 U.S. 145, 157 (2013) (quoting *Chevron USA Inc. v. Nat. Res. Def. Council,

Inc.*, 467 U.S. 837, 844 (1984)). In particular, "the scope of review under the 'arbitrary and

capricious' standard is narrow and a court is not to substitute its judgment for that of the

agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29,

43 (1983). The court must "defer to the wisdom of the agency, provided its decision is reasoned and rational, and even uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Dillmon v. NTSB*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (quotation omitted). Under this "deferential" standard, the court "simply ensures that the agency has acted within a zone of reasonableness," *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021); an agency "is not required to choose the best solution, only a reasonable one," *Petal Gas Storage, LLC v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007).

Moreover, "the 'tremendous complexity' of the Medicare program enhances the deference due the Secretary's decision." *Cmty. Care Found. v. Thompson*, 318 F.3d 219, 225 (D.C. Cir. 2003) (quoting *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1229 (D.C. Cir. 1994)). "The Supreme Court has stated that the deference is 'even more warranted' when the Secretary's interpretation concerns such a 'complex and highly technical regulatory program.'" *Id.* (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)); *see also Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 60 (D.C. Cir. 2015) ("[W]hen agency decisions 'involve complex judgments about sampling methodology and data analysis that are within the agency's technical expertise,' they receive 'an extreme degree of deference.'") (quoting *Alaska Airlines, Inc. v. TSA*, 588 F.3d 1116, 1120 (D.C. Cir. 2009)); *NAHC v. Burwell*, 142 F. Supp. 3d 119, 124 (D.D.C. 2015) (deferring to CMS's judgment in prior home health payment challenge). This "wide discretion" to implement Medicare payment rules "includ[es] determining how to meet Medicare's budget neutrality requirements." *Adirondack Med. Ctr. v. Burwell*, 782 F.3d 707, 710 (D.C. Cir. 2015).

That deference is even higher still where, as here, Congress has signaled that it has no objections to the agency's approach. In the Consolidated Appropriations Act of 2023, Congress

directed CMS to release certain information about how it implemented the Bipartisan Budget Act of 2018. *See* Pub. L. No. 117-328, § 4142, 136 Stat. 4459, 5929-30 (2022). In doing so, however, Congress clarified that "[n]othing in this section shall be construed to require any change in the methodology used to implement [42 U.S.C. § 1395fff(b)(3)(D)], to restrict the Secretary's discretion in establishing the methodology to implement such section, or to suggest that the Secretary's promulgation of the methodology … was inadequate under [the APA]." *Id.* § 4142(c). Given that Congress was plainly "familiar[] with the administrative interpretation at issue," yet generally chose to leave it "intact," the Court should hesitate before it disturbs the agency's methodology. *Ass'n for Cmty. Affiliated Plans v. U.S. Dep't of Treasury*, 966 F.3d 782, 790 (D.C. Cir. 2020).

NAHC's challenge to the 2023 Rule blends together three distinct requirements and analytical steps, each of which must be assessed on its own terms. In 2020, CMS changed to a 30-day unit of service and eliminated therapy thresholds in case-mix adjustment factors, and then calculated a payment rate, based on certain assumptions about how the industry would respond, intended to produce the same aggregate expenditures that it would have made without those changes. *See* Part II.A. Then, in 2023, CMS revisited those assumptions by comparing how much it spent on claims in 2020 and 2021 under the new payment rate to what it would have spent to pay those same claims under the old system and implemented a permanent adjustment to bring expenditures in line. *See* Part II.B. And, in referencing diminished therapy utilization in the 2023 Rule, CMS did not improperly resuscitate the use of therapy thresholds in case-mix adjustment factors. *See* Part II.C.

### A.      CMS properly implemented the budget-neutrality requirement.

The budget-neutrality requirement directed CMS to take specific steps to prevent the changes to the payment model in 2020 from affecting aggregate expenditures. That

28

requirement—which the statute refers to as "Budget neutrality for 2020"—directed CMS to "calculate a standard prospective payment amount … for 30-day units of service" furnished "during the 12-month period beginning January 1, 2020," "such that the estimated aggregate amount of expenditures … is equal to the estimated aggregate amount of expenditures that otherwise would have been made under the system" if the agency had made no changes at all. 42 U.S.C. § 1395fff(b)(3)(A)(iv). To ensure that CMS calculated the 2020 payment rate in a reasoned manner, Congress further instructed the agency to "make assumptions about behavior changes that could occur" as a result of the changes to the payment model, and to "provide a description of such assumptions in … notice and comment rulemaking." *Id.*

As NAHC acknowledges, CMS fulfilled these duties. *See, e.g.*, PMSJ 9 ("In making this forward-looking budget neutrality calculation under § 1395fff(b)(3)(A)(iv), CMS followed Congress's directives and complied with the statutory requirements."); *id.* at 10 ("NAHC has no objection to how CMS implemented this part of the statute."); *id.* at 17 ("It bears emphasis that CMS previously completed the first equation—and did so consistent with the statutory requirements."); *id.* at 25 ("In 2019, CMS implemented this budget neutrality directive….."). Specifically, the agency finalized three assumptions about how the changed model would affect behavior via notice and comment rulemaking. *See* AR6 (citing 83 Fed. Reg. at 56,455). And it then utilized those assumptions to calculate a payment rate that it estimated would yield the same aggregate expenditures for 2020 as if the payment model had not changed—*i.e.*, $16.6 billion. *See* AR7 (citing 84 Fed. Reg. at 60,519). That is all CMS was required to do.

Where NAHC goes wrong is in treating the budget neutrality requirement as an ongoing obligation to ensure that aggregate expenditures *never* change—and in particular, to ensure that expenditures remain fixed at a $16.6 billion figure that the agency calculated as an *estimate*

based on assumed behavior. Specifically, NAHC asserts that CMS was obligated to impose "an upward adjustment" to square up the purported $1.4 billion gap between actual expenditures ($15.2 billion) and the $16.6 billion estimate. PMSJ 25. Presumably, it will assert that CMS is required to do the same in 2024, and then again in following years, regardless of changes in the (declining) usage of home health services. But that cannot be right. It would mean, for example, that if only a hundred people required home health services in a given year, CMS would still be obligated to pay *$16.6 billion* for their care—or roughly $166 million per person.[3]

Fortunately, the budget neutrality provision imposes no such requirement. The statute directs CMS to calculate a budget-neutral rate for 2020, taking into account specific changes in the payment model. 42 U.S.C. § 1395fff(b)(3)(a)(iv) ("Budget neutrality *for 2020*") (emphasis added); Bipartisan Budget Act of 2018, Pub. L. No. 115-123, § 51001(a), 132 Stat. at 289 ("Budget Neutral *Transition to a 30-day Unit of Payment for Home Health Services*") (emphasis added); *see also Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 380 (2018) (explaining that "section headings … supply cues as to what Congress intended") (quotation omitted). And it requires the agency to do so by comparing expenditures "to the estimated aggregate amount of expenditures that *otherwise would have been made under the system*" if the new one had *not been enacted*," 42 U.S.C. § 1395fff(b)(3)(A)(iv) (emphases added)—*i.e.*, the amount the agency would have paid to process claims under the prior model. CMS is allowed, and indeed required, *see id.* § 1395fff(b)(3)(D)(i), to revisit its estimate in future years based off what it learned from actual claims and expenditures in the intervening time.

---

[3]   NAHC also notes that an industry-affiliated survey found that expenditures under the new model were below the budget-neutral figure. PMSJ 25-26. But that argument is predicated on the same flawed assumption: that the $16.6 billion figure represents a target that CMS is required to hit in perpetuity.

NAHC objects that anything but $16.6 billion in aggregate expenditures is "not budget neutral" because, in their telling, budget neutral just means no change in payments from year to year. PMSJ 26. But "'it is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme,'" *West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)); after all, "[i]n law as in life, … the same words, placed in different contexts, sometimes mean different things," *Yates v. United States*, 574 U.S. 528, 537 (2015).

That is particularly true for budget neutrality, which frequently means different things in different statutory contexts. Budget neutrality requires equalizing an amount to a particular baseline. Sometimes—as when budget neutralizing the annual updates at issue in *Adirondack Med. Ctr. v. Sebelius*, 29 F. Supp. 3d 25 (D.D.C. 2014) (cited at PMSJ 26)—that baseline might be a prior year's expenditures. Here, however, Congress wanted expenditures under the new model to equal the baseline of expenditures that "otherwise would have been made under the" old model, as updated for six years to reflect the industry's actual behavior. 42 U.S.C. § 1395fff(b)(3)(A)(iv). Far from causing a "2 billion decrease in expenditures," as NAHC claims, PMSJ 26, CMS prevented the new model from causing an unwarranted extra $2 billion in expenditures based on services that were not actually provided. That is precisely what the statute requires.

NAHC also faults CMS for purportedly "re-run[ning] the budget-neutrality calculation." *Id.* at 27. But the agency was required to revisit its estimate. The statute directs CMS to "annually determine the impact of differences between assumed behavior changes … and actual behavior changes on estimated aggregate expenditures," expressly referencing the budget-

neutrality requirement in subsection (b)(3)(A)(iv). 42 U.S.C. § 1395fff(b)(3)(D)(i). It must therefore assess how the original assumptions it made in performing the budget-neutrality analysis bore out and to adjust the payment rate as appropriate. NAHC's reading would force a conflict between the budget-neutrality and behavior-adjustment requirements into what would otherwise be a "symmetrical and coherent regulatory scheme." *Mellouli v. Lynch*, 575 U.S. 798, 809-10 (2015) (quotation omitted).

At bottom, NAHC and its home health agency members are unhappy that CMS corrected its assumptions and adjusted the payment rate downward to match actual behavioral changes—*i.e.*, diminished services—reducing the payments they will receive. Otherwise, NAHC's members could have taken advantage of the new payment system by decreasing their services even further while demanding the same amount of money. But the statute simply does not compel CMS to pay providers their desired amount, let alone to do so indefinitely.

### B.    CMS determined the impact of differences between assumed and actual behavior changes.

CMS crafted a payment rate that it thought, based on assumptions about how the new payment model would change behavior, would keep expenditures budget neutral—*i.e.*, would cause the agency to pay the same amount for what it thought would be the universe of future home health service claims under either the old system or the new system. Recognizing that even the most rigorous assumptions can miss the mark, however, Congress required CMS to look back and compare its assumptions about behavioral changes to what actually happened and implement a permanent adjustment to ensure that it paid the same amount for *actual* claims under either the old or new system. Here, too, the agency did exactly as Congress instructed.

1.    Section 1395fff requires CMS to "annually determine the impact of differences between assumed behavior changes" as described in the budget-neutrality requirement "and

actual behavior changes on estimated aggregate expenditures." 42 U.S.C. § 1395fff(b)(3)(D)(i). The statute instructs the agency to determine the *overall* effect that deviations from the agency's assumptions had on aggregate expenditures. It does not require CMS to engage in an itemized assessment of how its assumptions bore out and explain how each assumption led to a specific increase or decrease in expenditures. Congress then directed the agency to, "at a time and in a manner determined appropriate, … provide for one or more permanent increases or decreases to the standard prospective payment amount … to offset for such increases or decreases in estimated aggregate expenditures." *Id.* § 1395fff(b)(3)(D)(ii).

CMS performed both of these tasks. First, the agency determined the impact of behavioral changes by feeding actual claims data for 2020 and 2021 back through the old payment model and calculating how much it would have paid for those claims in the aggregate under the old system. AR7-8. Second, the agency calculated a permanent prospective adjustment by determining what the payment rate should have been for 2020 and 2021 to yield the same aggregate expenditures, and then implementing a percentage change to turn the actual 30-day base payment rate into the recalculated 30-day base payment rate. AR15-18. Together, these two steps corrected CMS's assumptions in a manner that maintained budget neutrality by ensuring that the agency would pay the same in the aggregate for claims under the new system that it would have paid to cover those claims under the old system.

2.     NAHC's fundamental objection to this approach—that "CMS solved the wrong equation with the wrong variables," PMSJ 17—is hard to parse. Specifically, NAHC complains that "CMS applied the old payment model to the new, changed behaviors." *Id.*; *see also id.* at 20-21. But that is the point: CMS had to determine the "expenditures that otherwise would have been made" under the old model to cover actual claims. 42 U.S.C. § 1395fff(b)(3)(A)(iv). It then

had to ensure that it would have made the same expenditures under both the old model and the new model—that it cost the same amount to cover the actual services rendered, whether under the prior payment model or the adjusted one. The entire goal of this statutory structure is to ensure that expenditures for services actually provided remain the same regardless of the formula used to calculate them, not to ensure that total expenditures always remain the same regardless of fluctuations in utilization or other behavior changes. The difference between the 2020 prospective rate and the 2023 prospective rate is that the 2023 rate accounts for home health agency's *actual* behavior changes, using actual claims data from 2020 and 2021, rather than just the behavioral changes that CMS predicted might occur before that data was available. That is what subdivision (b)(3)(D) requires. *See supra* Part II.

Much like NAHC's budget-neutrality arguments, the flaw in NAHC's reasoning becomes even more apparent when assessing its consequences. As NAHC asserts, its approach would require CMS "to increase aggregate expenditures" in the event that "home health agencies did not provide 1 to 2 extra days of service to receive the full 30-day payment" as the agency previously assumed. PMSJ 19. Or if home health agencies "offer[ed] less therapy sessions, then the proper course would be to *increase* the payment amount." *Id.* at 21. According to NAHC, CMS would have to *pay home health agencies more* for providing *fewer services*, rather than paying agencies the same for the services they actually provided. NAHC's approach would allow home health providers to increase their margins by drastically cutting their services. But Congress enacted the Bipartisan Budget Act of 2018 to address the fact that home health agencies were overproviding therapy, not to reward that prior behavior.

NAHC also asserts that CMS was required to "br[eak] apart each … behavior change" and assess "how much each would affect expenditures." PMSJ 20. But the statute imposes no

such requirement. The statute instructs CMS to "determine the impact of differences" between assumed and actual behavior changes on aggregate expenditures. 42 U.S.C. § 1395fff(b)(3)(D)(i). It is silent on how CMS should do so, meaning that Congress left it to the agency's "technical expertise" to determine the appropriate method. *Dist. Hosp. Partners, L.P.*, 786 F.3d at 60. CMS's methodology captured the effects of all behavior changes in the aggregate by determining how much the agency would have paid for 2020 and 2021 claims under the old payment system and then adjusting the payment rate accordingly. *See* AR7 ("Regardless of the magnitude and frequency of individual behavior change (for example, LUPAs, therapy, etc.), the occurrence of any behavior change is captured by the methodology to determine the impact on aggregate expenditures."). NAHC's insistence that CMS was required to conduct a particularized analysis of the accuracy of each of its behavioral assumptions or to itemize the impact of each on aggregate expenditures lacks any basis in the statutory text. Moreover, confounding factors like COVID-19, interactions between different behaviors for which CMS would need to account, and the potential need to survey home health agencies about their behavior make this level of analysis unfeasible.

Regardless, CMS did explain how certain behavioral changes warranted a recalculation of the payment rate. CMS found that "the three assumed behavior changes did occur as a result of the implementation of the PDGM," but that "other behaviors, such as changes in the provision of therapy, also occurred." AR7.[4] For example, the president of NAHC noted that his members

---

[4]    NAHC also asserts that CMS did not "contest the data showing that at least some of the three predicted behavior changes did not occur," including with respect to low utilization payment adjustments, PMSJ 19-20, but that is incorrect. *See* AR7 ("Tables B4, B6, and B7 (87 FR 37607 through 37609) indicate that the three assumed behavior changes did occur as a result of the implementation of the [new payment model]."); AR106 (showing that, on average, there were even more visits per low utilization period than CMS had assumed).

reported that "categorically, across the board, we're going to reduce our therapy services" in response to the elimination of therapy thresholds. AR9. This supports CMS's reasonable conclusion that "[i]t would be inappropriate for CMS to continue to pay for therapy as if [providers] were still inflating therapy provision based on the former therapy thresholds." AR10. By calculating how much CMS would have paid for actual 2020 and 2021 claims under the old system, CMS was able to "ensure[] that [providers] were still paid the same amount they would have been under the old system for services they actually did provide—thus achieving budget neutrality." *Id.*

NAHC objects that CMS's approach differs from the methodology it used in the context of skilled nursing facilities, PMSJ 22-23, but CMS addressed this concern as well, AR13. CMS is not required to determine the impact of differences between assumed and actual behavior changes in the skilled nursing facility context, as it is in the home health context. *Id.* In the home health context, CMS initially set the payment rate on the assumption that changing the payment model would *not* affect the provision of therapy; when that turned out to be incorrect, CMS was required to implement an adjustment.

Moreover, skilled nursing facilities are paid under a separate system governed by different statutory requirements, and so it is unreasonable to assume that the same methodology would work in both contexts. *See* 42 U.S.C. § 1395yy. Among other things, "[skilled nursing facilities] are paid a per-diem payment with different case-mix variables, and [home health agencies] are paid under a bundled payment system." AR13. Because those case-mix variables are based in part on specific services a skilled nursing facility provided in a given day, skilled nursing facilities are explicitly paid a different amount depending on whether they are providing therapy services. AR191 (noting the following case-mix adjustment components; Physical

36

Therapy, Occupational Therapy, Speech Language Pathology, Nursing, and Non-Therapy

Ancillaries); AR193-4 (listing case-mix adjustment rates). By contrast, the home health payment

system does not vary payment based on the type of services that were provided, so payment

would generally be the same if the period of care included therapy services or not. In other

words, the skilled nursing facility payment system already accounts for diminished therapy

utilization, while the home health system does not. These "relevant distinctions" warrant

different approaches. *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007).

Finally, NAHC alludes at several points to how CMS's methodology may affect home

health providers and access to care. *See* PMSJ 2, 12, 14-15, 31. But NAHC does not explicitly

rely on these policy arguments, and for good reason: they are both irrelevant and incorrect.

"'Even the most formidable policy arguments cannot overcome a clear statutory directive.'"

*Badgerow v. Walters*, 596 U.S. 1, 16 (2022) (quoting *BP PLC v. Baltimore*, 141 S. Ct. 1532,

1542 (2021)) (alteration omitted)); *see also SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018)

("Policy arguments are properly addressed to Congress, not this Court."). In passing the

Bipartisan Budget Act of 2018, Congress instructed the agency to correct its assumptions and

implement adjustments to account for actual behavioral changes, including decreases in services

provided, even if that might cut into home health providers' margins. *See* 42 U.S.C.

§ 1395fff(b)(3)(D).

Regardless, CMS reasonably considered all of these issues in promulgating the 2023

Rule. As the agency explained, it "d[id] not believe that this methodology and its resulting

payment adjustment would result in a loss of access to care" given CMS's own analysis and

MedPAC's March 2022 report that "found positive access, quality, and financial indicators for

the sector." AR12. That report also found that "Medicare margins increased under the PDGM,

from 15.4 percent in 2019 to 20.2 percent in 2020," which, "despite economic challenges, demonstrate[s] that the payment rate, along with the market basket update, are more than adequate to support business operations." AR18. MedPAC supported the proposed payment reduction and recommended that CMS further reduce payments to align them with actual incurred costs. *Id.*; AR1634, 2809, 2858; *see also* PMSJ 6-7, 29 (relying on MedPAC reports). Nonetheless, CMS has repeatedly sought to mitigate the effect of these adjustments in any single year on the industry, including by phasing-in the behavior change permanent reduction, *see* AR7, and by not proposing any additional temporary adjustment thus far, *see* AR18-19. No more was required.

For these reasons, CMS properly implemented the statute's mandate to determine the impact of differences between assumed and actual behavior changes and to implement an appropriate permanent adjustment. 42 U.S.C. § 1395fff(b)(3)(D)(i), (ii).

## C.   CMS eliminated the use of therapy thresholds in case-mix adjustment factors.

Finally, NAHC objects to how CMS implemented Congress's instruction to "eliminate the use of therapy thresholds (established by the Secretary) in case mix adjustment factors." 42 U.S.C. § 1395fff(b)(4)(B)(ii). There is no dispute that CMS has, in fact, eliminated therapy thresholds in case-mix adjustment. *See* AR5, AR2825-26; *see also* PMSJ 8 ("CMS eliminated the use of therapy service threshold and finalized a new case-mix classification…."). Home health agencies are no longer paid a certain amount if they provide 0-5 therapy visits during a certain period, more once they hit 6, and so on. *Cf.* 82 Fed. Reg. at 35,274. CMS has therefore done all the statute requires it to do.

Not satisfied, NAHC instead reads the statute to bar CMS from considering therapy utilization in setting payments *at all*. *See* PMSJ 29 (objecting that the 2023 Rule "continu[es] to

38

connect payment to the therapy services rendered"). But that places more weight on their interpretation of the statute than its text can bear. The statute required CMS to eliminate one method of tying therapy to payment amounts, artificial "thresholds," in one aspect of how payments are calculated, the adjustment of the overall payment rate to the specific case mixes involved in individual units of service. *See also* 42 U.S.C. § 1395fff(b)(4)(B)(iv) (barring CMS from using therapy thresholds in calculating payments "under this subsection"). It did not prohibit CMS from considering therapy utilization whatsoever or from doing so in setting an overall prospective payment rate. Nor, as CMS explained, did it "mandate a reduction in the provision of therapy or even decrease the payment rates for therapy disciplines," but rather merely removed a particular payment incentive. AR10. Finally, the statute instructed CMS to eliminate the therapy thresholds "established by the Secretary," which can only mean the preexisting therapy thresholds that had been incorporated in case-mix adjustment factors. 42 U.S.C. § 1395fff(b)(4)(B)(ii). Again, nobody disputes that CMS has eliminated those thresholds.

NAHC predicates its contrary reading on a warped understanding of the policy goals that Congress—and CMS—sought to accomplish in eliminating therapy thresholds. PMSJ 29-31. But "Congress expresses its intentions through statutory text passed by both Houses and signed by the President," and so "the text of a law controls over purported legislative intentions unmoored from any statutory text." *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2496 (2022); *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 167-68 (2004) ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.") (quotation omitted). Whatever goal Congress sought to accomplish, it chose to do so by eliminating therapy thresholds, not by barring the agency from treating therapy utilization as a factor in other aspects of the payment calculation.

Moreover, NAHC is wrong that the purpose of eliminating therapy thresholds was to incentivize home health agencies "to provide lower amounts of therapy." PMSJ 29. Therapy thresholds created an artificial incentive to increase therapy provision by encouraging home health agencies to hit the next threshold regardless of whether a patient actually needed therapy (*i.e.*, to push from five to six therapy visits in a single time period). AR10. Nonetheless, as CMS repeatedly stated, "therapy must be provided in accordance with the plan of care"; the new model "was not limiting or prohibiting the provision of therapy services" in cases where patients actually needed them. AR13. CMS also thought that a different change to the case-mix adjustment factors not at issue here would "effectively offset reductions in therapy visits that could result from the elimination of the therapy thresholds." AR12. When that assumption turned out to be incorrect, CMS appropriately adjusted the payment rate rather than basing payment rates on therapy that was never in fact provided. AR10.

NAHC also relies on several reports and comments, some of which were issued years before the enactment of the Bipartisan Budget Act of 2018, that it characterizes as opposing any consideration of therapy utilization. PMSJ at 6. Even if these documents could somehow override the language that Congress enacted, they do not support NAHC's position. For example, the Senate Finance Committee specifically found that "therapy visit records for each company showed concentrated numbers of therapy visits at or just above the point at which a 'bonus' payment was triggered"—in other words, that home health agencies were artificially inflating the provision of therapy to hit thresholds in order to maximize payments. *Staff Report on Home Health and the Medicare Therapy Threshold*, S. Rep. No. 113-5, at 36 (2013). Moreover, MedPAC *supported* CMS's adjustment methodology, AR1636, and separately noted that "the implementation of the PDGM case-mix system addressed a long-standing recommendation by

the Commission: to eliminate the number of in-person therapy visits provided during home health service as a payment factor in the PPS," AR2838. These documents cast no doubt on CMS's compliance with the statutory mandate.

In sum, it was not inappropriate for CMS to consider diminished therapy utilization in imposing a permanent adjustment. To the contrary, doing so was entirely in keeping with CMS's duty to ensure that the transition from the old model to the new model remained budget neutral, rather than giving the industry an inappropriate windfall for services it never provided.

## III.   NAHC's requested relief is overbroad.

NAHC is not entitled to judgment on any of its claims. But even if it were, the relief it requests—to "vacate the CY 2023 Rule," presumably across-the-board, PMSJ at 31—is overbroad. The Court should not take the extraordinary step of throwing the entire Home Health Prospective Payment System into chaos for the benefit of just two providers who claim to have been harmed yet have not meaningfully attempted to present and exhaust their claims before the agency.[5]

Even assuming vacatur is an available remedy, *see, e.g.*, *Harmon v. Thornburgh*, 878 F.2d 484, 494 (D.C. Cir. 1989),[6] the Court should do no more than remand the rule for further consideration in light of its opinion. Even where a court has concluded that an agency's explanation lacks adequate support, it "'is not without discretion' to leave agency action in place

---

[5]   Although the Complaint also seeks injunctive relief, *see* Compl. at 29 ¶ C (Prayer for Relief), that request appears to have been abandoned, as NAHC's summary-judgment motion seeks no such relief, PMSJ at 31, and makes no attempt to satisfy the traditional prerequisites for it, including irreparable harm.

[6]   Defendants respectfully preserve all arguments that the APA does not permit such a remedy, particularly on a universal basis. *See, e.g.*, *United States v. Texas*, 143 S. Ct. 1964, 1980 (2023) (Gorsuch, J., concurring in the judgment, joined by Thomas and Barrett, JJ.) (noting that although the Court has sometimes assumed that vacatur is a permissible remedy if a rule is held invalid in a suit under the APA, it has never squarely decided the question).

while the decision is remanded for further explanation." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (quoting *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005)). "The decision whether to vacate depends on [(1)] the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and [(2)] the disruptive consequences of an interim change that may itself be changed." *AT&T Servs., Inc. v. FCC*, 21 F.4th 841, 853 (D.C. Cir. 2021) (quoting *Allied-Signal, Inc. v. Nuclear Reg. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)). Though there is no requirement that CMS "prevail on both factors," *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 270 (D.D.C. 2015), here both *Allied-Signal* factors cut in favor of remand without vacatur.

     *First*, CMS will likely be able to cure any deficiencies in its reasoning. "The 'seriousness' of a deficiency … is determined at least in part by whether there is 'a significant possibility that the [agency] may find an adequate explanation for its actions' on remand." *Standing Rock Sioux Tribe*, 985 F.3d at 1051 (quoting *Williston Basin Interstate Pipeline Co. v. FERC*, 519 F.3d 497, 504 (D.C. Cir. 2008)). In general, "failures to explain" are "the type of deficiency most readily remedied on remand." *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 22 F.4th 1018, 1031 (D.C. Cir. 2022), *appealed after remand*, 72 F.4th 1324 (D.C. Cir. 2023). NAHC challenges how the agency understood and applied complex regulatory requirements and how it defended its methodology in response to concerns from the industry—including because CMS failed adequately to explain differences between the skilled nursing facility payment system and the Home Health PPS, PMSJ 22-23, as well as because CMS failed adequately to break down how much of the behavioral adjustment was attributable to particular behavior

changes, *id.* at 20. These are precisely the type of issues that the agency is well-positioned to address, if need be, with additional explanation on remand.

**Second**, and in any event, vacating—and then potentially reinstating—the methodology in the 2023 Rule would wreak havoc on CMS's claims and payment systems. Vacating the rule would leave the agency without a payment rate to apply to claims submitted for the 2023 payment year, making it unclear what payment rate the agency would need to use to pay home health agencies for services provided. CMS might need to engage in notice-and-comment rulemaking to specify a new methodology and set a new payment rate. In doing so, CMS would still need to implement the statutory budget neutrality requirement, such that overall estimated aggregate expenditures do not increase or decrease.

More specifically, if the 2023 payment rate is vacated, CMS would need to figure out how to adjust claims that have already been paid, as well as make determinations about a payment rate for any incoming claims, which can be timely submitted up to a year after the service was provided. For claims that have been filed and paid, CMS would have to identify any appropriate claims, apply the new payment rate to the payment methodology, and then make a payment adjustment. For new incoming claims, CMS would need to either continue using a payment rate based on the policies included in the vacated rule or set a temporary payment rate, both of which would likely need to be adjusted once CMS specifies a new payment rate for 2023. At that point, CMS would also have to identify appropriate claims, apply the new payment rate to the payment methodology, and then make a payment adjustment. Reprocessing of claims and adjustment payment is both burdensome and costly to the agency. Additionally, there may be impacts to the payment rates used and finalized for future years, including for 2024, for which

notice-and-comment rulemaking was used to set the payment rate, because the prior year's payment rate is factored into the payment rate for the following year.

Moreover, if the agency were required to pay providers according to some other payment rate, it could be left in the untenable position of potentially having to claw back payments if the 2023 Rule is later reinstated. *Cf. Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020) (noting the difficulty of "attempting to recoup and redistribute funds"). Providers might also submit requests for redetermination of payments already calculated or made, deluging the agency in requests that it would not need to consider if it maintains the 2023 Rule's methodology. Thus, "preservation of the status quo is appropriate pending the [agency's] further explanation of its reasoning." *XO Energy MA, LP v. FERC*, 77 F.4th 710, 719 (D.C. Cir. 2023), *reh'g en banc denied*, No. 22-1096, 2023 WL 5985180 (D.C. Cir. Sept. 13, 2023).

If the Court nevertheless determines that vacatur is warranted, that relief should be appropriately tailored. Ordinary principles of Article III standing and equity generally require that remedies sweep no more broadly than necessary to remedy the plaintiffs' injury. *See, e.g.*, *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *see also Texas*, 143 S. Ct. at 1980, 1986 (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment (recognizing that courts should "ask[] whether party-specific relief can adequately protect the plaintiff's interests" and, if so, entering "broader relief is an abuse of discretion"). And nothing in the APA's language referencing the "set[ting] aside" of "agency action" mandates that such actions must be set aside globally, rather than with respect to the plaintiffs in a given case. *See* 5 U.S.C. § 706(2).

Congress enacted the APA against a background rule that statutory remedies should be construed in accordance with "traditions of equity practice," *Hecht Co. v. Bowles*, 321 U.S. 321,

329 (1944), and while Congress "may intervene and guide or control the exercise of the courts'

discretion," courts should "not lightly assume that Congress has intended to depart from

established [equity] principles," *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982).

Indeed, here, in the Medicare statute, Congress permitted judicial review over only a

"determination with respect to a claim for benefits," 42 U.S.C.A. § 1395ff(a)(1), (b)(1)(A), and

only "after the claim has been presented to the Secretary and administrative remedies have been

exhausted." *Am. Chiropractic Ass'n*, 431 F.3d at 816. Courts should not attempt to craft a broad

equitable remedy under the APA for parties that have failed to meet those requirements.

## CONCLUSION

The Court should dismiss the Complaint for lack of subject-matter jurisdiction. In the

alternative, it should enter judgment for CMS.

Dated: December 15, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ERIC B. BECKENHAUER
Assistant Director

*/s/ Chetan A. Patil*
JOHN T. LEWIS (D.C. Bar No. 1033826)
CHETAN A. PATIL (D.C. Bar No. 999948)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20530
Tel: (202) 305-4968
Fax: (202) 616-8460
Email: chetan.patil@usdoj.gov

*Attorneys for Defendant*