**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NATIONAL ASSOCIATION FOR HOME CARE & HOSPICE, <br><br> *Plaintiff*, <br><br> v. <br><br> XAVIER BECERRA, *In His Official Capacity as Secretary of Health and Human Services*, <br><br> *Defendant*. | Civil Action No. 1:23-cv-01942-TNM |

**PLAINTIFF NATIONAL ASSOCIATION FOR HOME CARE & HOSPICE'S
COMBINED REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO DEFENDANT'S CROSS-MOTION TO DISMISS OR,
<u>IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

REPLY IN SUPPORT OF NAHC'S MOTION FOR SUMMARY JUDGMENT ....................... 1

I.     The Final Rule Violates Congress's Command to Determine the Impact on
       Expenditures Resulting from Differences Between Assumed and Actual Behavior
       Changes ........................................................................................................................ 3

II.    The Final Rule Violates Congress's Budget Neutrality Requirement .............................. 10

III.   The Final Rule Violates Congress's Command to Remove Therapy Thresholds as
       a Factor that Influences Payment .................................................................................. 15

CONCLUSION ................................................................................................................. 18

OPPOSITION TO GOVERNMENT'S CROSS-MOTION TO DISMISS OR IN THE
ALTERNATIVE FOR SUMMARY JUDGMENT .................................................................. 19

I.     The Judicial Review Bar Does Not Apply ...................................................................... 19

II.    There Is No Other Jurisdictional Bar to this Court's Review ........................................... 24

III.   Vacatur Is the Only Appropriate Remedy ...................................................................... 28

CONCLUSION ................................................................................................................. 31

# TABLE OF AUTHORITIES

**Cases**

*Agostini v. Felton*,
    521 U.S. 203 (1997)...................................................................................................... 28

*Allied-Signal Inc. v. U.S. Nuclear Regul. Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993)...................................................................................... 29

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
    934 F.3d 649 (D.C. Cir. 2019)...................................................................................... 29

*Am. Clinical Lab'y Ass'n v. Azar* (*ACLA*),
    931 F.3d 1195 (D.C. Cir. 2019)........................................................................ 21, 22, 23

*Am. Hosp. Ass'n v. Azar*,
    348 F. Supp. 3d 62 (D.D.C. 2018)........................................................................... 24, 28

*Am. Hosp. Ass'n v. Azar*,
    964 F.3d 1230 (D.C. Cir. 2020)................................................................................ 22, 23

*Am. Hosp. Ass'n v. Becerra*,
    2022 WL 4534617 (D.D.C. Sept. 28, 2022)............................................................ 29, 31

*Am. Hosp. Ass'n v. Becerra*,
    596 U.S. 724 (2022)..................................................................................... 20, 22, 23, 24

*Am. Paper Inst., Inc. v. EPA*,
    996 F.2d 346 (D.C. Cir. 1993)........................................................................................ 7

*Batoh v. McNeil-PPC, Inc.*,
    167 F. Supp. 3d 296 (D. Conn. 2016)............................................................................. 7

*Bayer HealthCare, LLC v. FDA*,
    942 F. Supp. 2d 17 (D.D.C. 2013)................................................................................ 26

*Black Oak Energy, LLC v. FERC*,
    725 F.3d 230 (D.C. Cir. 2013)...................................................................................... 31

*Bowen v. City of New York*,
    476 U.S. 467 (1986)...................................................................................................... 25

*Bowen v. Mich. Acad. of Fam. Physicians*,
    476 U.S. 667 (1986)................................................................................................. 19, 22

*Bracco Diagnostics, Inc. v. Shalala*,
    963 F. Supp. 20 (D.D.C. 1997)..................................................................................... 14

*Brendsel v. Off. of Fed. Hous. Enter. Oversight*,
   339 F. Supp. 2d 52 (D.D.C. 2004) ................................................................. 21

*Cal. Rest. Ass'n v. City of Berkeley*,
   65 F.4th 1045 (9th Cir. 2023) ..................................................................... 15

*Calderon v. Berryhill*,
   2019 WL 4575605 (D.D.C. Sept. 20, 2019) ................................................. 24

*Chem. Mfrs. Ass'n v. Nat'l Res. Def. Council, Inc.*,
   470 U.S. 116 (1985) ...................................................................................... 17

*City of Arlington v. FCC*,
   569 U.S. 290 (2013) ...................................................................................... 23

*Cmty. Oncology All., Inc. v. Off. of Mgmt. & Budget*,
   987 F.3d 1137 (D.C. Cir. 2021) .................................................................. 27

*Cobell v. Salazar*,
   573 F.3d 808 (D.C. Cir. 2009) .................................................................... 13

*Cummings v. Missouri*,
   71 U.S. 277 (1866) ........................................................................................ 15

*Cuozzo Speed Techs., LLC v. Lee*,
   579 U.S. 261 (2016) ...................................................................................... 19

*Dep't of Com. v. New York*,
   139 S. Ct. 2551 (2019) ................................................................................... 9

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
   140 S. Ct. 1891 (2020) ................................................................................. 17

*Edwards' Lessee v. Darby*,
   25 U.S. 206 (1827) .......................................................................................... 7

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*,
   300 F. Supp. 2d 32 (D.D.C. 2004) ............................................................... 14

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ...................................................................................... 14

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ........................................................................................ 7

*Friends of Earth v. Haaland*,
   583 F. Supp. 3d 113 (D.D.C. 2022) ............................................................. 31

*Griffith v. Fed. Lab. Rels. Auth.*,
 842 F.2d 487 (D.C. Cir. 1988) ............................................................... 23

*Guerrero-Lasparilla v. Barr*,
 140 S. Ct. 1062 (2020) ........................................................................... 19

*Hoeber v. D.C. Redevelopment Land Agency*,
 483 F. Supp. 1356 (D.D.C. 1980) ............................................................ 7

*In re Core Commc'ns, Ins.*,
 531 F.3d 849 (D.C. Cir. 2008) ............................................................... 31

*In re Griffith*,
 206 F.3d 1389 (11th Cir. 2000) ............................................................. 21

*Kingdomware Techs., Inc. v. United States*,
 579 U.S. 162 (2016) ............................................................................... 28

*Kucana v. Holder*,
 558 U.S. 233 (2010) ............................................................................... 19

*Landstar Express Am., Inc. v. Fed. Mar. Comm'n*,
 569 F.3d 493 (D.C. Cir. 2009) ................................................................. 5

*Lindahl v. OPM*,
 470 U.S. 768 (1985) ............................................................................... 20

*Mach Mining, LLC v. EEOC*,
 575 U.S. 480 (2015) ............................................................................... 19

*Mathews v. Eldridge*,
 424 U.S. 319 (1976) ............................................................................... 24

*Morgan Stanley DW Inc. v. Rothe*,
 150 F. Supp. 2d 67 (D.D.C. 2001) .......................................................... 26

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983) ............................................................................. 9, 14

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
 59 U.S. (18 How.) 272 (1855) ............................................................... 23

*Nat'l Home Infusion Ass'n v. Becerra*,
 2021 WL 2439570 (D.D.C. June 15, 2021) ....................................... 26, 27

*Nat'l Parks Conservation Ass'n v. Semonite*,
 422 F. Supp. 3d 92 (D.D.C. 2019) .......................................................... 29

*Ne. Hosp. Corp. v. Sebelius*,
   657 F.3d 1 (D.C. Cir. 2011) .................................................................................. 6

*Niz-Chavez v. Garland*,
   593 U.S. 155 (2021) ..................................................................................... 6, 8

*Pereira v. Sessions*,
   138 S. Ct. 2105 (2018) ...................................................................................... 6

*Physicians for Soc. Resp. v. Wheeler*,
   956 F.3d 634 (D.C. Cir. 2020) ......................................................................... 14

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) ....................................................................................... 16

*Saad v. SEC*,
   980 F.3d 103 (D.C. Cir. 2020) ......................................................................... 28

*Sanofi-Synthelabo v. Apotex, Inc.*,
   470 F.3d 1368 (Fed. Cir. 2006) ....................................................................... 26

*SAS Inst., Inc., v. Iancu*,
   138 S. Ct. 1348 (2018) .............................................................................. 19, 23

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) .......................................................................................... 9

*Sensory Neurostimulation, Inc. v. Azar*,
   977 F.3d 969 (9th Cir. 2020) ........................................................................... 28

*Smith v. Berryhill*,
   139 S. Ct. 1765 (2019) .................................................................................... 26

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard*,
   600 U.S. 181 (2023) ....................................................................................... 15

*United States v. Whitten*,
   610 F.3d 168 (2d Cir. 2010) ............................................................................ 15

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) ...................................................................................... 8, 23

*Weinberger v. Salfi*,
   422 U.S. 749 (1975) ....................................................................................... 26

*Weyerhaeuser Co. v. United States Fish & Wildlife Serv.*,
   139 S. Ct. 361 (2018) ..................................................................................... 23

*WildEarth Guardians v. Zinke*,
  368 F. Supp. 3d 41 (D.D.C. 2019) ........................................................... 29

*Wis. Cent. Ltd. v. United States*,
  138 S. Ct. 2067 (2018) ............................................................................... 6

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ................................................................. 25

**Statutes**

5 U.S.C. § 551(13) ........................................................................................ 30

5 U.S.C. § 702 .............................................................................................. 19

5 U.S.C. § 704 .............................................................................................. 19

5 U.S.C. § 706 .............................................................................................. 28

42 U.S.C. § 405(g) ................................................................................... 24, 28

42 U.S.C. § 1395fff ................................................................................. *passim*

Pub. L. No. 117-328,
  136 Stat. 4459 (2022) .............................................................................. 6, 7

**Regulations**

42 C.F.R. § 405.1063 ................................................................................... 26

83 Fed. Reg. 56,406 (Nov. 13, 2018) ........................................................... 27

84 Fed. Reg. 60,478 (Nov. 8, 2019) ........................................................... 7, 8

86 Fed. Reg. 42,424 (Aug. 4, 2021) ............................................................ 13

87 Fed. Reg. 66,790 (Nov. 4, 2022) .............................................................. 8

**REPLY IN SUPPORT OF**
**NAHC'S MOTION FOR SUMMARY JUDGMENT**

CMS's response brief all but concedes that the agency has violated the statute. It tries to avoid that conclusion by sowing confusion and attacking straw-men arguments that NAHC never raised. But this case is nowhere near as complicated as CMS tries to make it seem. As NAHC's opening brief explains, Congress directed the agency to implement a new payment methodology to shift away from therapy-focused services. Because Congress expected home health care agencies to change their behaviors in response to the new methodology, it also instructed CMS to predict what those changes would be when setting rates and to adjust payments so total expenditures remain budget neutral notwithstanding those predicted changes in behavior. Congress then required CMS to look back each year and to measure the difference in aggregate expenditures based on assumed and actual behaviors—that is, to compare its forward-looking predictions to what actually occurred—and to adjust the payment rate to offset for any difference.

CMS's approach violates these express statutory mandates, reducing payments far below what Congress intended and in a way that will harm home health care providers and the patients who depend on their services. In 2019, CMS calculated a payment rate for 2020 that it predicted would result in total expenditures of $16.6 billion, assuming home health agencies behaved in a particular way in response to Congress's new payment methodology. CMS targeted the $16.6 billion amount to hold expenditures neutral—that is, to keep expenditures the same as they would have been absent any change in methodology. But home health agencies did not behave exactly as expected, and CMS's predictions proved wrong. When CMS applied that payment rate to reimburse home health agencies based on their actual behaviors, expenditures totaled only $15.2 billion. Even though it is undisputed that actual behavior changes made after the new methodology's implementation resulted in lower overall expenditures than predicted, CMS did not

make a positive adjustment to the payment rate to ensure budget neutrality. It instead imposed a negative adjustment. And it calculated that adjustment not by measuring the difference between predicted and actual behavior changes and discovering that its predictions had been too conservative but rather by re-applying the old payment methodology that Congress rejected to actual behaviors in 2020 and 2021. In CMS's own words, it reduced rates to ensure that the agency paid "the same amount for *actual* claims under either the old or new system." Def.'s Consol. Opposition, Dkts. 18-1 & 19 ("Opp.") at 32.

This approach violates Congress's mandates. In making payment rate adjustments, Congress required CMS to (1) calculate the difference between (a) expenditures based on assumed behavior changes and (b) expenditures based on actual behavior changes, and then (2) adjust the payment rate to offset for any increase or decrease in overall expenditures. In this way, Congress ensured that CMS's expenditures would continue to be budget neutral. That is, aggregate expenditures would be equal to what "otherwise would have been made under the system during such period if [the new payment model] had not been enacted." 42 U.S.C. § 1395fff(a)(3)(A)(iv). By enacting a statutory scheme that prevents behavior changes from increasing or decreasing aggregate expenditures, Congress wisely ensured that home health care providers would not be penalized for being more judicious in the provision of services (like therapy) that Congress, CMS, and MedPAC believed had previously been overprovided *and* that providers would not be rewarded for providing unnecessary services to try to boost payment under the new methodology. The mandate is thus straightforward—CMS must determine what was actually expended by Medicare considering the actual behavioral changes that occurred and compare that to the amount of expenditures that would have been made under the old model *without* those behavior changes.

Instead of complying with Congress's commands, CMS refused to account for behavior changes at all. It instead applied the old and new model to the same set of actual behaviors. And it reduced expenditures and penalized home health agencies because they responded to the changed payment methodology—as Congress intended—by providing fewer therapy services. In short, CMS used the change in payment methodology as an excuse to ignore the role of behavior changes and to reduce expenditures—failing to comply with Congress's budget-neutrality requirement. Because CMS has violated the statute and exceeded its authority, this Court should vacate the 2023 Rule.

I. **The Final Rule Violates Congress's Command to Determine the Impact on Expenditures Resulting from Differences Between Assumed and Actual Behavior Changes.**

CMS's final rule should be struck down because it does not undertake the analysis that the statute expressly commands. Each year, CMS must "determine the impact of differences between assumed behavior changes (as described in paragraph 3(A)(iv)) and actual behavior changes on estimated aggregate expenditures," 42 U.S.C. § 1395fff(b)(3)(D)(i), and then adjust the standard payment amount "to offset for such increases or decreases in estimated aggregate expenditures," *Id*. § 1395fff(b)(3)(D)(ii). Although both CMS and NAHC agree that this is the operative statutory language, the parties diverge on what the plain language requires as a matter of law.

In NAHC's view, the statutory language directs CMS to determine whether its prediction— that home health agencies would change their behaviors in a way that would cause increased expenditures under the new payment methodology—was accurate and to adjust for any inaccuracy. In other words, the relevant inquiry is whether actual behavior changes in 2020 and 2021 caused CMS to spend more than it predicted the behavior changes would cause it to spend, and, if so, by how much. Under paragraph (3)(A)(iv), CMS predicted that assumed behavior changes occurring because of the new payment model would cause it to pay more in 2020 than if no behavior changes

occurred. Accordingly, what CMS must now determine is whether its prediction was correct. Did home health care providers change their behaviors to cause higher or lower expenditures than predicted? The evidence in the administrative record shows that CMS spent less than predicted and, as a result, a positive adjustment in payments is warranted. *See* Pl.'s Mem. in Supp. of Mot. for Summ. J., Dkt. 15-1 ("NMSJ") at 25 (citing AR2220).

CMS reads the statute to require a different calculation: the agency must pay "the same amount for *actual* claims under either the old or new system." Opp. 32; *see also id.* at 33-34 (contending that CMS had to ensure "that it cost the same amount to cover the actual services rendered, whether under the prior payment model or the adjusted one"). According to CMS, it should make an adjustment so that expenditures under the new model equal what expenditures would be if Congress retroactively re-imposed the old payment model.[1]

CMS's interpretation defies the statute's plain text. The statute is clear that CMS must "annually determine the impact of differences between assumed behavior changes (as described in paragraph 3(A)(iv)) and actual behavior changes on estimated aggregate expenditures." 42 U.S.C. § 1395fff(b)(3)(D)(i). The relevant provision does not, as CMS argues, require CMS to annually determine the differences between how much it would have paid if expenditures were calculated under the old model versus under the new model. CMS's position assumes—contrary to Congress's express instructions—that no behavior changes occurred due to the new payment

---

[1] CMS says that "the agency determined the impact of behavioral changes by feeding actual claims data for 2020 and 2021 back through the old payment model and calculating how much it would have paid for those claims in the aggregate under the old system." Opp. 33. To the extent CMS is claiming that this measures the impact of actual behavior changes on expenditures (caused CMS to spend $14.2 billion) and that CMS's past calculation measured the impact of assumed behavior changes on expenditures (predicted to cause CMS to spend $16.6 billion), then CMS's adjustment is backward. Actual behavior changes caused CMS to spend far less than predicted based on assumed behaviors.

methodology, as it applies the old and new payment models to the exact same set of behaviors. And it penalizes home health care providers for making the changes in the mix of services that Congress expected (and wanted) to occur.

Even though CMS's methodology assumes that no behavior change occurred—proceeding as if home health care agencies would have provided the exact same services under the old model as they did under the new model—CMS's findings say the opposite. In CMS's view, it is entitled to rewrite the statute because home health care agencies changed their behavior to provide fewer therapy services. *See* Opp. 32 (explaining that "actual behavioral changes" included providing "diminished services"). According to CMS, the agency should thus reduce the payment rate to account for the reduced amount of therapy provided. *See id.*

But CMS's attempt at fiscal savings is directly contrary to the statutory scheme that Congress created. *See Landstar Express Am., Inc. v. Fed. Mar. Comm'n*, 569 F.3d 493, 500 (D.C. Cir. 2009) ("agency cannot rewrite a statute just to serve a perceived statutory 'spirit'"). Congress required CMS to adjust for behavior changes to ensure that the new payment methodology— whether it resulted in increased or decreased services—would not affect the total level of expenditures by CMS. In doing so, Congress ensured that the new payment model would redistribute payment rates away from therapy-type episodes of care towards other patient services.[2]

---

[2] Consider an example. Under the former payment model, a care episode involving 18 therapy visits and 10 skilled nursing visits over 60 days resulted in a payment of $4,981.14. Under the new model as originally adopted, however, this care episode would result in payment of only $4,143.44 or a 16.82% rate reduction—and this would be so even if the care episode involved 19 therapy visits or 17 therapy visits because Congress removed therapy thresholds from payment consideration. By holding aggregate expenditures equal, Congress ensured that the difference in these two payments would be spent on other services that had previously been undercompensated, like wound care. This outcome accordingly does not represent paying for therapy that is no longer provided. Instead, it represents a shift away from paying based on therapy volume and toward non-therapy care periods.

Under Section 1395fff(b)(3)(D)(ii), a downward adjustment thus cannot be tied to reduced therapy services but can be made only "to offset for … increases … in estimated aggregate expenditures." *Id.* Where actual behavior changes in response to the new payment methodology caused a "decrease[] in estimated aggregate expenditures," Congress directed the agency to make a positive adjustment to "offset for such … decreases." *Id.*

No deference or "practical considerations" can save an agency action that defies "the statute's clear text." *Pereira v. Sessions*, 138 S. Ct. 2105, 2118 (2018). CMS asserts that "enhance[d] … deference" is due because of the "tremendous complexity of the Medicare program." Opp. 27. But courts are perfectly capable of interpreting statutory provisions. And the American people "are entitled … to have independent judges exhaust 'all the textual and structural clues' bearing on" a statute's meaning and "to apply the law" as the court "find[s] it." *Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021) (quoting *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018)). As the Supreme Court "has long made plain, pleas of administrative inconvenience and self-serving regulations never 'justify departing from the statute's clear text.'" *Niz-Chavez*, 593 U.S. at 169 (quoting *Pereira*, 138 S. Ct. at 2118).

Nor is it relevant that Congress intervened to require CMS to be more transparent in how it implements Section 1395fff(b)(3)(D). *See* Pub. L. No. 117-328, § 4142, 136 Stat. 4459, 5929-30 (2022). To be sure, the fact that Congress found CMS's actions problematic enough to warrant direct intervention might lead a court to scrutinize CMS's rate reduction more closely to protect against the agency reverting to its unlawful "policy of paying out as little money as possible." *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 20 n.1 (D.C. Cir. 2011) (Kavanaugh, J., concurring). Congress made clear, however, that its primary focus was to ensure that CMS behaved transparently; it left it to the courts to decide whether CMS's actions—when viewed fully—complied with the law. *See*

6

Pub. L. No. 117-328, § 4142, 136 Stat. at 5929 ("Nothing *in this section* shall be construed to require any change in … methodology … ." (emphasis added)); *Am. Paper Inst., Inc. v. EPA*, 996 F.2d 346, 353 n.6 (D.C. Cir. 1993) (explaining that a "savings clause inserted at the end" of a statutory section "by its own terms, does not speak exclusively"); *cf. Batoh v. McNeil-PPC, Inc*., 167 F. Supp. 3d 296, 321 n.19 (D. Conn. 2016) (where a provision uses the language "nothing in this section" it "only limits the scope of the" specific section and "does not purport to limit the … effect of other sources of federal law").

CMS's argument—that the behavior-change adjustment can be used to reduce payments in light of a reduction in services—is further belied not only by the statutory text but also by its past actions. CMS now asserts that it would be "flaw[ed]" for the agency to increase rates if home health agencies did not provide 1 to 2 extra days of services to receive the full 30-day payment that CMS had predicted. Opp. 34. In the agency's view, that would have CMS "pay home health agencies more for providing fewer services." *Id.* (emphasis omitted). But CMS previously *reduced* rates based on a prediction that home health agencies would change their behavior to provide those extra days of care. *See* 84 Fed. Reg. 60,478, 60,512 & n.17 (Nov. 8, 2019). CMS thus originally interpreted the behavior-change adjustment to require the agency to hold expenditures neutral in light of behavior changes, not to reduce overall expenditures for reduced services or to increase total expenditures for increased services. This earlier "contemporaneous construction" of the Bipartisan Budget Act of 2018 is right and "entitled to very great respect." *Edwards' Lessee v. Darby*, 25 U.S. 206, 210 (1827); *see also Hoeber v. D.C. Redevelopment Land Agency*, 483 F. Supp. 1356, 1364 (D.D.C. 1980) ("The contemporaneous interpretation of a statute by the agency that is assigned to implement its provisions is accepted by the courts absent compelling indication that it is incorrect."); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (an agency

must "provide reasoned explanation" for a policy change and "[cannot] depart from a prior policy *sub silentio*"); *Niz-Chavez*, 593 U.S. at 160 ("this Court normally seeks to afford the law's terms their ordinary meaning at the time Congress adopted them"). CMS's contrary position now that it can (1) reduce rates by predicting that home health agencies would provide extra services and then (2) reduce rates further if the home health agencies do not provide those extra services is both incompatible with the statute and illogical as a matter of common sense. If CMS wishes to reduce overall expenditures—at great harm to patients and home health agencies—it must ask Congress for that authority. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("An agency confronting resource constraints may change its own conduct, but it cannot change the law.").

CMS next argues that it is not required to identify each and every behavior change and explain how each would affect expenditures as it did in its estimate of assumed behavior changes. Opp. 34-35. According to CMS, it was entitled to "capture[] the effects of all behavior changes." *Id.* at 35. But NAHC's argument is that "CMS's methodology neither precisely nor roughly calculates the impact of differences between assumed and actual behavior changes on estimated aggregate expenditures," not that CMS failed to identify each behavior. NMSJ 21. On this argument, CMS has no response. The agency does not explain how applying two different methodologies to the exact same behaviors captures behavior *changes* or their effects on expenditures. In fact, it appears undisputed that the effect of all behavior changes was to cause CMS to spend far less in the aggregate than CMS calculated that it would have spent based on assumed behavior changes. *Compare* AR16 (87 Fed. Reg. 66,790, 66,805 (Nov. 4, 2022)) (estimating actual expenditures based on actual behavior to be approximately $15.2 billion) *with* 84 Fed. Reg. at 60,516 (estimating expenditures based on assumed behavior to be approximately $16.6 billion).

CMS might have argued that only *some* behavior changes were properly attributed to the change in payment methodology and that subset of behavior changes caused CMS to spend more in the aggregate. But there is nothing in the administrative records to support such an argument, which is presumably why CMS did not raise it. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) (agency decision must be judge on grounds "upon which the record discloses that its action was based"); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (explaining that courts "may not accept appellate counsel's *post hoc* rationalizations). As CMS admits, it never attempted to break apart behavior changes to find that any, in particular, caused the agency to spend more money than it anticipated in a way that would warrant a downward adjustment. Instead, CMS purported to rely on "the effects of all behavior changes in the aggregate." Opp. 35; *see also Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019) ("[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record.").

CMS's closest attempt to justify its downward payment adjustment based on a particular behavior change only underscores that its actions were unlawful. CMS found, for example, that home health care providers reduced therapy services in response to the changed payment methodology. Opp. 35-36. But CMS never explains how this *decrease* in therapy services could have caused an *increase* in overall expenditures that would warrant a downward adjustment under the behavior-change adjustment. It cannot do so. Had CMS assumed that providers would reduce therapy services in response to the new payment model in the first instance, for example, it would not have affected the estimate of expenditures under the new model because Congress removed therapy thresholds from payment calculations. Here, in contrast, CMS argues that it would be inappropriate to "pay for therapy as if [providers] were still inflating therapy provision based on

the former therapy thresholds." Opp. 36 (quoting AR10). But that is exactly what the statute commands: the aggregate amount of expenditures is supposed to remain "equal to the estimated aggregate amount of expenditures that *otherwise* would have been made" without the changes. 42 U.S.C. § 1395fff(b)(3)(A)(iv) (emphasis added).

CMS accordingly can only make a downward behavior-change adjustment when actual behavior changes caused CMS to spend more in the aggregate than CMS predicted it would spend based on assumed behavior changes. *Id.* § 1395fff(b)(3)(D)(ii). CMS ignored the statute's requirement by reducing payment rates without finding that actual behavior changes caused expenditures to exceed those based on assumed behavior changes.

## II.    The Final Rule Violates Congress's Budget Neutrality Requirement.

CMS's implementation of the behavior-change adjustment also defies the statute's budget-neutrality provision. As CMS concedes, it had already completed the required budget-neutrality determination long before the 2023 Rule. In 2019, CMS determined that budget-neutral expenditures for 2020 would be $16.6 billion, and it considered behavior changes to set payment rates such that it would ultimately spend $16.6 billion. CMS's actual expenditures for 2020, however, reached only $15.2 billion. The only reason for that difference is that home health agencies did not behave in ways that CMS had assumed. The predicted $16.6 billion expenditure was based on how CMS assumed home health agencies would provide services; the $15.2 billion expenditures was based on how home health agencies actually provided services. Because actual behaviors caused CMS to spend much less than predicted, that "should have resulted in an upward adjustment or at least caused CMS to explain reasonably and in detail why it spent so much less than the budget-neutral target." NMSJ 25.

CMS offers no meaningful defense of its position. It initially implemented the budget-neutrality provision and estimated a payment rate such that aggregate expenditures for 2020 would

be the same "as if the payment model had not changed—*i.e.*, $16.6 billion." Opp. 29. That was what "CMS was required to do." *Id.* But CMS now appears to argue that its past implementation of the statute is irrelevant. That is wrong.

CMS repeatedly attacks a strawman of its own making, arguing that nothing in the statute requires "that expenditures remain fixed at $16.6 billion." Opp. 29. According to CMS, if, for some unexplained reason, only 100 people required home health services in a given year, budget neutrality would not obligate CMS to spend roughly $166 million per person. *Id.* at 29-30. But that farfetched hypothetical only underscores how little CMS has to say for its position and how much it has failed to ground its position in the administrative record. NAHC has never argued that CMS must ignore changes—in this case, a hypothetical decrease in patients seeking home health services—that are *not* attributable to changes in behaviors of home health agencies resulting from the change in payment methodology. In fact, NAHC's comments on the proposed rule clearly recognized that factors unrelated to the provider behavior changes, such as the volume of patients served and the number of care episodes received by patients, would affect overall aggregate expenditures. AR2162-2163.

What NAHC has argued is that CMS must hold expenditures equal to "the estimated aggregate amount of expenditures that otherwise would have been made" without the changes. 42 U.S.C. § 1395fff(b)(3)(A)(iv). For that reason, Congress directed CMS to focus on behavioral changes that occurred not for some unexplained reason but *as a result of the change in payment methodology.* Had CMS followed this command, it would have found that behavior changes caused a decrease in total expenditures, warranting an increase in payment rates. Indeed, NAHC in its comment submitted a report by a consulting firm that aimed to capture the impact of only those behavior changes caused by the changed payment methodology, and it found that

expenditures under the new model "were approximately 2.5 percent below budget neutrality (with COVID-19 cases included) and 2.4 percent below budget neutrality with COVID-19 cases excluded." AR2220; *see also* NMSJ 25 (citing same). And beyond the detailed and in-depth consultant's report, NAHC also offered a simple budget neutrality calculation methodology that mirrored CMS's own methodology setting forth the initial payment rate. *See* AR2162-2163. This calculation methodology results in a provider underpayment in 2020 of $60.06 per 30-day period or 3.22%. *Id*.

CMS has no response to this record evidence. It (concededly) failed to break apart behavior changes as a whole to determine which were caused by the payment methodology change. And, though CMS purports to rely on all behavior changes, it ignored its past estimates, which show that the effect of all behavior changes made after the payment-model switch caused a decrease in total expenditures. Instead, the adjustment methodology CMS actually adopted and applied is premised on the position—contrary to Congress's command—that no behavior changes were made in response to the new payment methodology: CMS simply measured how the old system and the new system would pay for the exact same services and reduced rates accordingly, even though provider behaviors would be different under the two distinct payment models. In other words, CMS uses behavior changes under the new model to predict behavior changes under the past model, all while recognizing that behaviors would have been different under the two models. That position—an illogical detour to the Twilight Zone—defies both the statute and common sense.

Because CMS determined that it was required to make an adjustment to account for all changed behavior, it is stuck with the numbers it has already calculated: CMS predicted that expenditures would amount to $16.6 billion on assumed behaviors and spent $15.2 billion on actual behaviors. It should make an upward adjustment to account for that difference. In contrast,

if CMS had decided to tease apart actual behavior changes to determine whether they were tied to the change in payment methodology or were instead the result of some unrelated factor, then it was required to do something more than merely slap on two different payment methodologies to actual 2020 and 2021 behaviors. What it cannot do is what it did—violate the statute to cut overall expenditures by billions of dollars on the (concededly wrong) view that no behavioral change resulted from the new payment methodology. *See Cobell v. Salazar*, 573 F.3d 808, 813 (D.C. Cir. 2009) (agency cannot "throw up its hands" and fail to provide the accounting that Congress required). That is not budget neutrality.

Finally, CMS contends that it is entitled to re-run the budget neutrality calculation each year. *See* Opp. 31-32, 33-34. It is not. Congress directs CMS to re-visit only one small piece of the budget-neutrality equation: its assumption about how home health care agencies would change their behaviors in response to the new payment model and the effect of those behavior changes on expenditures. Because CMS did not limit itself to that piece of the equation, it exceeded its statutory authority.

In any event, even if CMS did have statutory license to re-do a brand-new budget neutrality calculation each year, it has previously recognized that the methodology it employed here would not keep expenditures budget neutral. In the skilled-nursing-facility context, CMS rejected the very calculation it employs here because the reduction "in therapy provision" since implementation of the new model would lead to "a significant underestimation" of what aggregate payments would have been under the previous system and thus not hold expenditures budget-neutral. 86 Fed. Reg. 42,424, 42,467 (Aug. 4, 2021).

CMS acknowledges that fact now but poses two reasons why it does not matter. *First*, CMS notes that it was not required to account for behavior changes in the skilled-nursing-facility

context, though it is here. Opp. 36. But that distinction only hurts CMS. Even when not required to account for behavior change, CMS did so in the skilled-nursing-facility context because to do otherwise would make a mockery of the budget-neutrality principle. Here, where Congress demands that CMS account for behavior change, it cannot ignore those changes and simply impose the old and new payment methodology on the exact same set of behaviors.

*Second*, CMS notes that skilled nursing facilities are paid under a separate system governed by different statutory requirements that continue to tie payment to the provision of therapy services. Opp. 36-37. But other than a brief reference to "different case-mix variables," it does not appear that CMS relied on this therapy-based justification in the administrative record. *See* AR13; *see also State Farm*, 463 U.S. at 50 (courts may not accept "*post hoc* rationalizations"). And even if CMS had previously raised the point, CMS fails to explain in its brief why the differences in the new models would matter when the relevant question is whether applying the old model to new-model behaviors is an appropriate measure of budget-neutral expenditures. *See Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 646 (D.C. Cir. 2020) (an agency "must 'provide a reasoned explanation for [its] change'" (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016))). It was not in the skilled-nursing-facility context, and it is not here. *See El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*, 300 F. Supp. 2d 32, 42 (D.D.C. 2004) (an agency acts in an arbitrary and capricious manner by "treat[ing] similarly situated parties differently" (quoting *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 27-28 (D.D.C. 1997))). Simply put, CMS's blatant disregard of the statutory behavior-change-adjustment language not only violates that provision but also disrupts the budget-neutrality framework that Congress wrote into the statute.

14

### III.   The Final Rule Violates Congress's Command to Remove Therapy Thresholds as a Factor that Influences Payment.

With the Bipartisan Budget Act, Congress eliminated the use of "therapy thresholds" as a factor for calculating reimbursement for services. 42 U.S.C. § 1395fff(b)(4)(B)(ii). This action was taken against a particular backdrop: Congress, CMS, and MedPac had all expressed concern that the previous payment model over-incentivized the provision of therapy. *See* NMSJ 5-8. By instructing CMS to remove therapy thresholds from the case-mix adjustment, Congress addressed that concern.

CMS's Rule ignores this directive and unlawfully continues to tie payment to the amount of therapy services provided by home health agencies. *Id.* at 28-31. In its brief, CMS does not dispute that the 2023 Rule continues to connect payment to therapy services. In fact, CMS concedes that it "considered diminished therapy utilization in imposing a permanent adjustment." Opp. 41. CMS's argument is simply that it has, in fact, "eliminated therapy thresholds in case-mix adjustment." *Id.* at 38.

But what the law prohibits a government actor from doing directly, "cannot be done indirectly." *Cummings v. Missouri*, 71 U.S. 277, 325 (1866); *cf. Students for Fair Admissions, Inc. v. President & Fellows of Harvard*, 600 U.S. 181, 230 (2023) ("universities may not simply establish through … other means the regime we hold unlawful today"); *United States v. Whitten*, 610 F.3d 168, 194 (2d Cir. 2010) ("[T]he government may not do indirectly what it cannot do directly"); *Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045, 1056 (9th Cir. 2023) ("States and localities can't skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly*."). CMS should not be able to accomplish through the behavior-change adjustment (tying expenditures to therapy thresholds) what it is prohibited from doing through the case-mix adjustment (tying expenditures to therapy thresholds).

Congress here "enacted a comprehensive scheme" that works together. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). Congress changed the unit of payment and removed therapy thresholds as a case-mix adjustment factor to change the incentives home health agencies faced. Congress then directed that these changes be applied in a budget neutral manner, so that CMS would continue to spend the same overall expenditures as it "otherwise" would have done had Congress not made the change. 42 U.S.C. § 1395fff(b)(3)(A)(iv). And Congress recognized that, in making this determination, CMS would need to do more than just compare the old and new payment models and equalize expenditures; it would need to consider whether home health care providers would change behaviors to cause CMS to spend more than if the providers had kept their behaviors constant. CMS's refusal to implement the behavior-change adjustment provision as written messes up the entire statutory scheme. It ignores actual behavior changes; it violates budget neutrality; and it re-inserts the perverse therapy incentives into payment expenditures that Congress eliminated.

CMS argues that NAHC's reading is based "on a warped understanding of the policy goals that Congress—and CMS—sought to accomplish in eliminating therapy thresholds." Opp. 39. But CMS's explanation of Congress's policy goals is no different than NAHC's. According to CMS, "[t]herapy thresholds created an artificial incentive to increase therapy provision by encouraging home health agencies to hit the next threshold regardless of whether a patient actually needed therapy (*i.e.,* to push from five to six therapy visits in a single time period)." *Id.* at 40. With the removal of these thresholds, home health agencies would be properly incentivized to provide only the five needed therapy visits. *See id.* But CMS's rule up-ends the incentive system Congress created. By tying payment rates to the old system, which incorporated therapy thresholds, CMS reduces payments if agencies do not provide the extra (unneeded) therapy visit and increases

payments if they do. It thus not only violates the statute, it penalizes home health agencies for making the changes that Congress intended should be made in response to the new payment methodology. *Chem. Mfrs. Ass'n v. Nat'l Res. Def. Council, Inc.*, 470 U.S. 116, 125 (1985) ("[I[f] Congress has clearly expressed an intent contrary to that of the Agency, [a court's] duty is to enforce the will of Congress.").

As the Supreme Court has noted, executive agencies "should turn square corners in dealing with the people." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020). CMS did not turn square corners here. It cut corners in its own self-interest and to the prejudice of home health agencies and their patients, the administrative process, and thus the public. *See id.* The Court should therefore vacate the final rule.

* * *

An analogy illustrates why this case is not as complicated as CMS tries to make it seem. Assume this Court paid clerks a rate of $5 for three different types of services—preparing (1) legal memoranda, (2) final opinions, and (3) draft opinions—and that, in the past, clerks received a total of $50 each year for producing 2 memoranda, 2 final opinions, and 6 drafts (2 x $5 + 2 x $5 + 6 x $5 = $50). Assume further that the Court decides that its clerks are spending too much time on draft opinions, so the Court changes the payment methodology to ensure that compensation has nothing to do with the number of drafts produced. The Court might direct the clerk's office to predict how its law clerks would respond. And the clerk's office might predict that in the coming year the clerks would change their behaviors to produce 4 memoranda, 3 final opinions, and only 3 draft opinions. To ensure budget neutral expenditures of $50, it would need to set a payment rate of $7.15, which would be applied to each final opinion and memorandum (4 x $7.15 + 3 x $7.15 = $50)

17

At the end of the year, however, the predictions are wrong, and the clerks have in fact responded to the change in payment methodology by preparing 2 memoranda, 4 final opinions, and 1 draft. Applying the new payment rate, the clerks would receive approximately $43 (2 x $7.15 + 4 x $7.15 = $43). To ensure budget neutrality and to account for the difference between the effect of actual behavior change and assumed behavior change, the rate would need to be adjusted upward (to approximately $8.33) to maintain total expenditures of $50 (2 x $8.33 + 4 x $8.33 = $50). In sharp contrast, CMS's approach would re-apply the old methodology and calculate a new target expenditure of $35 (for 2 memoranda, 4 final opinions, and 1 draft at $5 each). It would then reduce the payment rate under the new methodology (from $7.15 to $5.83)—failing to achieve budget neutrality and penalizing the clerks for preparing fewer draft opinions (2 x $5.83 + 4 x $5.83 = $35).

No reasonable person would say the clerks in this analogy are being treated fairly or consistent with the Court's intent. No reasonable person would think that CMS's approach was making adjustments based on the difference between assumed and actual behaviors. No reasonable person would say that $35 is the same as $50 and therefore budget neutral. And no reasonable person could deny that CMS's approach was making compensation turn on the number of draft opinions, directly contrary to the Court's directions. Indeed, CMS's methodology would defy the very purpose of the Court's payment rate change: It would penalize the clerks for doing precisely what the Court wanted to occur—reallocating their efforts to produce fewer drafts.

The same conclusions apply here. CMS has violated the statute and exceeded its lawful authority. Its rule is unlawful and should be vacated.

## CONCLUSION

CMS's 2023 Rule not only violates the statute it purports to be implementing but also defies the careful statutory scheme Congress created. The Court should vacate the Rule.

**OPPOSITION TO GOVERNMENT'S CROSS-MOTION TO DISMISS
OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

Perhaps recognizing that it has no serious defense on the merits, CMS urges the Court to ignore the agency's statutory violations and abandon its obligation to require agencies to comply with the law that Congress has written. It argues that this case falls within a judicial review bar, even though the bar is obviously not relevant. And it suggests that NAHC should exhaust its administrative remedies, even though it has already tried to do so and it is clear that pursuing the administrative process would be futile.

## I.    The Judicial Review Bar Does Not Apply.

The Administrative Procedure Act provides that a person adversely affected by final agency action is entitled to judicial review. 5 U.S.C. §§ 702, 704. Courts should accordingly "appl[y] a 'strong presumption' favoring judicial review of administrative actions." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986)). A statute must clearly and convincingly bar judicial review to foreclose review. *See Guerrero-Lasparilla v. Barr*, 140 S. Ct. 1062, 1069 (2020). A statute bars judicial review only if it is not "reasonably susceptible" to a "divergent interpretation." *Id.* (quoting *Kucana v. Holder*, 558 U.S. 233, 251 (2010)). And "judicial review remains available" when an agency has "engaged in 'shenanigans' by exceeding its statutory bounds." *SAS Inst., Inc., v. Iancu*, 138 S. Ct. 1348, 1359 (2018) (quoting *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 275 (2016)).

CMS here has not satisfied its "'heavy burden' … to show that Congress 'prohibit[ed] all judicial review'" of CMS's compliance with the Bipartisan Budget Act of 2018. *Mach Mining*, 575 U.S. at 486. In this lawsuit, NAHC challenges agency action making a payment rate adjustment for the difference in assumed and actual behavior changes under 42 U.S.C.

19

§ 1395fff(b)(3)(D). NMSJ 10-15. CMS argues that Section 1395fff(d) bars review of that action. But nothing in the text of that provision precludes judicial review of CMS's actions across the board or shields from judicial review the establishment of a behavior-change adjustment under subsection (b)(3)(D).

As the Supreme Court has explained, "arguments against judicial review cannot override the text of the statute." *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 734 (2022). In subsection (d), Congress distinguished between determinations that should be left to the agency's sole discretion and those subject to judicial review. The jurisdiction-stripping provision singles out specific subsections, paragraphs, and even subparagraphs—and often only particular aspects of the agency actions authorized under those provisions. Under the provision, a court cannot review:

(1)     the establishment of a transition period under subsection (b)(1);

(2)     the definition and application of payment units under subsection (b)(2);

(3)     the computation of initial standard prospective payment amounts under subsection (b)(3)(A) (including the reduction described in clause (ii) of such subsection);

(4)     the establishment of the adjustment for outliers under subsection (b)(3)(C);

(5)     the establishment of case mix and area wage adjustments under subsection (b)(4); and

(6)     the establishment of any adjustments for outliers under subsection (b)(5).

42 U.S.C. § 1395fff(d).

The plain text should end the inquiry. Although the provision blocks review of certain discretionary actions, including particular adjustments—such as "the adjustment for outliers under subsection (b)(3)(C)"—it left intact review for the implementation of statutory commands, including the establishment of the adjustment for behavior changes under subsection (b)(3)(D). That choice should be respected. Had Congress wished to insulate behavior-change adjustments from judicial review, it would have said so. *See Lindahl v. OPM*, 470 U.S. 768, 779-80 (1985)

("[W]hen Congress intends to bar judicial review altogether, it typically employs language far more unambiguous and comprehensive."); *Brendsel v. Off. of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52, 65 (D.D.C. 2004) ("Where Congress knows how to say something but chooses not to, its silence is controlling (quoting *In re Griffith*, 206 F.3d 1389, 1394 (11th Cir. 2000)). Instead, it excluded subsection (b)(3)(D) from the list of judicial review bars, perhaps recognizing that it could not trust CMS to implement the statute faithfully.

Even though the provision's text does not cover the challenged action here, CMS makes two arguments why this Court should abstain from reviewing:

*First*, CMS contends that the statute's prohibition on review of "the computation of initial standard prospective payment amounts under subsection (b)(3)(A)" also bars this Court's review of CMS's later adjustments to the payment rate under subsection (b)(3)(D). Opp. 16. That is wrong. All sides agree that this litigation does not challenge CMS's computation of the initial standard prospective payment amount. *Id.* at 11 ("NAHC does not challenge [CMS's] approach to setting a budget-neutral payment rate for 2020."). In the words of CMS, "[w]hat NAHC does challenge is the method CMS used to determine the impact of differences between assumed and actual behavior changes in the 2023 Rule, pursuant to 42 U.S.C. § 1395fff(b)(3)(D)(i)." *Id.*

Moreover, it is not the case that the behavior-change-adjustment decision is "indispensable or integral to, or inextricably intertwined with the unreviewable agency action" of computing initial standard prospective payment amounts under subsection (b)(3)(A). *Am. Clinical Lab'y Ass'n v. Azar* (*ACLA*), 931 F.3d 1195, 1207 (D.C. Cir. 2019) (quoting *Fla. Health Scis. Ctr., Inc. v. HHS*, 830 F.3d 515, 519 (D.C. Cir. 2016)). As CMS admits, the initial computation of payment rates and the behavior-change adjustment are "distinct requirements." Opp. 28. Unlike in the cases CMS cites, there can be no argument that the behavior-change adjustment (calculated to go into

effect in 2023) is indispensable to or used to generate the computation of the initial payment rate that CMS completed years before. This Court accordingly "lack[s] a basis on which to infer that Congress, in eliminating jurisdiction over [the computation of initial standard prospective payment amounts] clearly mean[s] also to bar review of [the behavior-change adjustments to later prospective payment amounts]." *ACLA*, 931 F.3d at 1206; *see also Am. Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1239 (D.C. Cir. 2020) (judicial review bar of certain claims is inapplicable where "such claims are not before [the court] here").

*Second*, CMS argues that the provision barring review of "the establishment of case mix and area wage adjustments under subsection (b)(4)" applies to strip the Court of jurisdiction. Opp. 17. But that theory fails for the same reasons. As CMS concedes, this litigation does not dispute the establishment of case mix and area wage adjustments. *See id.* at 38. What NAHC argues is that CMS's establishment of the behavior-change adjustment, which ties expenditures to the provision of therapy, is unlawful because it flies in the face of Congress's express statutory instructions.

As a last resort, CMS contends that it would be good policy for Congress to allow CMS to make the behavior-change adjustments without the judiciary checking to see if the adjustments were lawful. *Id.* at 18-19. But it is also good policy to ensure that CMS stays within the limits of the law. *See Bowen*, 476 U.S. at 671 (explaining that Congress does not have a policy of giving agencies "blank checks" and free reign to independently decide the limits of their own authority in administering statutes). The Supreme Court "has long recognized a 'strong presumption' in favor of judicial review of final agency action," even when that agency action involves setting "reimbursement rates." *Am. Hosp. Ass'n*, 596 U.S. at 733 (quoting *Weyerhaeuser Co. v. United*

*States Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018)). Where, as here, the agency's "preclusion argument lacks any textual basis," the court should "turn … to the merits." *Id.* at 734.

In any event, even if a judicial review bar did apply, when "an agency exceeds 'its statutory bounds, judicial review remains available' to curb the rogue action." *ACLA*, 931 F.3d at 1203, 1208 (quoting *SAS Inst.*, 138 S. Ct. at 1359). That is true "[e]ven where Congress is understood generally to have precluded review." *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 492 (D.C. Cir. 1988); *see also Am. Hosp. Ass'n*, 964 F.3d at 1238 (interpreting a judicial-review bar to "preclude[] judicial review of any adjustment made by the Secretary pursuant to [his statutory] authority … but not of those for which such authority is lacking"). As the Supreme Court has explained, agencies' power to act is "authoritatively prescribed by Congress" and, therefore, when they act improperly or "beyond their jurisdiction, what they do is ultra vires." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). An agency action is ultra vires when the agency has exceeded its statutory authority, "disregarded a specific and unambiguous statutory directive," violated a statute's "specific command," or patently misconstrued the statute. *Griffith*, 842 F.2d at 493; *cf. Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 283-84 (1855) (due process ensures that the executive acts as "authorized by law").

CMS's decision here to reduce payments to home health agencies is ultra vires because it rewrites the statute's plain text and ignores the express limitations that Congress imposed on the agency's exercise of regulatory authority. "Where a statute's language carries a plain meaning, the duty of an administrative agency is to follow its commands as written, not to supplant those commands with others it may prefer." *SAS Inst.*, 138 S. Ct. at 1355; *see also Util. Air Regul. Grp.*, 573 U.S. at 328 (noting "core administrative law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate"). Because CMS has

23

supplanted Congress' statutory commands with its own preferred policy, this Court has both the authority and constitutional duty to enforce the law.

## II.     There Is No Other Jurisdictional Bar to this Court's Review.

CMS next recycles an argument it has made in past cases that "the Court lacks jurisdiction because Plaintiff[] failed to exhaust [its] administrative remedies prior to filing suit." *Am. Hosp. Ass'n v. Azar*, 348 F. Supp. 3d 62, 74 (D.D.C. 2018). This Court should reject that argument, as other courts have done. *See id.* at 76 (reviewing claims because "Plaintiffs' exhaustion of their administrative remedies would be futile"); *cf. Am. Hosp. Ass'n*, 596 U.S. at 733-34, 739 (agreeing with the district court and D.C. Circuit that judicial review was available).

NAHC asserts its claim under 42 U.S.C. § 405(g). That provision contains a jurisdictional "requirement that a claim for benefits shall have been presented to the Secretary." *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976). CMS concedes that this requirement has been satisfied: two of NAHC's members have presented a claim. Opp. 21; *see also* Decl. of Carrie Edwards, Dkt. 15-2 ("Edwards Decl.) ¶¶ 14-16; Decl. of Ken Albert, Dkt. 15-3("Albert Decl.") ¶¶ 15-18. The Court accordingly has jurisdiction over the claim.

Section 405(g) also contains a non-jurisdictional exhaustion requirement that the court may waive. *Eldridge*, 424 U.S. at 328, 330. Waiver is appropriate when "(1) the issue raised is entirely collateral to a claim for payment; (2) plaintiffs show they would be irreparably injured were the exhaustion requirement enforced against them; or where (3) exhaustion would be futile." *Calderon v. Berryhill*, 2019 WL 4575605, at *5 (D.D.C. Sept. 20, 2019) (quotation marks omitted). All three of these circumstances are present here.

First, NAHC's legal claims are collateral to the claims for benefits that NAHC's members have presented administratively. Although NAHC presented claims for benefits to the Secretary and thus fulfilled its jurisdictional requirements, it "neither s[eeks] nor [will be] awarded benefits

in the District Court." *Bowen v. City of New York*, 476 U.S. 467, 483 (1986). Instead, it "challenge[s] the Secretary's failure to follow the applicable [law]." *Id.* As a result, if the Court rules in NAHC's favor, the proper remedy will be to vacate the rule. On remand, CMS will then be tasked with the separate question of determining benefits under a correct interpretation of the law. Perhaps because of that clear distinction, CMS does not contest that this challenge is collateral to the claim for benefits.

Second, NAHC has shown that its members are being irreparably injured and will continue to be so injured if they are forced to exhaust a futile administrative process. Member Mary Lanning Healthcare is facing "substantial and ongoing harm to [its] business and its ability to provide patients the home health services they need." Edwards Decl. ¶ 8. It has been "forced to reduce its service area, eliminate on-call availability after 4:30 p.m. on weekends and holidays, and reduce the number of staff employed." *Id.* ¶ 10. And the longer CMS's unlawful payment rates remain in place, the more likely it is that more jobs will be lost and more home care services will be slashed. *See id.* ¶ 13. Androscoggin Home Healthcare faces similar harms, including irreparable harm to its "reputation, goodwill, and relationships with patients and employees." *See* Albert Decl. ¶¶ 8, 10, 11, 12, 14. Neither these healthcare providers nor their patients can wait for CMS to spend months deciding what is already undisputed now: it can do nothing in light of CMS's unlawful rule.

CMS's response to this showing of serious ongoing harm is to suggest that being forced out of business is not an irreparable injury. Opp. 26. That brazen argument flies in the face of binding precedent, which explains that "[r]ecoverable monetary loss may constitute irreparable harm … where the loss threatens the very existence of the movant's business." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). And it ignores the full scope of harms

that NAHC's members are suffering and will continue to suffer if they must continue to jump through bureaucratic hoops without relief. *See Bayer HealthCare, LLC v. FDA*, 942 F. Supp. 2d 17, 26 (D.D.C. 2013) (concluding Bayer was likely to suffer irreparable harm because it "stands to lose good will among its customers"); *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 78 (D.D.C. 2001) (damage to relationships with customers is irreparable harm); *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1381 (Fed. Cir. 2006) ("potential lay-offs of Sanofi employees" constitutes irreparable harm). NAHC has shown irreparable harm.

Third, exhaustion of further administrative proceedings would be futile. The Medicare Administrative Contractor and all other administrative adjudicators within the Medicare claims appeal process are required by law to follow CMS's home health payment rates and, therefore, have no legal authority to set aside the payment rate cuts adopted by CMS. *See* 42 C.F.R. § 405.1063. CMS does not dispute this fact. *See* Opp. 22. So while CMS makes much of the exhaustion requirement's important purposes—to "prevent premature interference with agency processes," to allow an agency to "correct its own errors," and to give an agency a "chance to address the question"—it is clear that none of those purposes would be served by enforcing futile exhaustion efforts like the ones that CMS wants pursued here. *See Id.* at 20 (cleaned up) (citing *Weinberger v. Salfi*, 422 U.S. 749, 765 (1975) and *Smith v. Berryhill*, 139 S. Ct. 1765, 1779 (2019)).

CMS relies on the *National Home Infusion Association v. Becerra* decision to support its argument against waiver but fails to grapple with the way that case differs. Opp. at 23 (citing *Nat'l Home Infusion Ass'n v. Becerra*, 2021 WL 2439570, at *1, *7 (D.D.C. June 15, 2021)). To start, the plaintiff in that case "relie[d] only on futility," not on the presence of all three factors favoring waiver. *Nat'l Home Infusion Ass'n*, 2021 WL 2439570, at *5. Moreover, the court in *National*

*Home Infusion Association* appeared to believe that further review was not, in fact, futile. *Id.* at *7. According to the district court, requiring the plaintiff to undergo administrative review would "give[] the agency greater opportunity to revise policies [or] regulations." *Id.* (quotation marks omitted). This was especially true because the agency, in its final rule, specifically acknowledged the possibility of "engag[ing] in additional rulemaking or guidance regarding th[e] definition for temporary transitional payments." *Id.* (quoting 83 Fed. Reg. 56,406, 56,583 (Nov. 13, 2018)). That a district court found waiver to be inappropriate where administrative review was *not* futile has no bearing where, as here, further review *is* futile.

Nor can CMS avoid futility by introducing rank speculation about the claims NAHC's members presented to the agency. CMS contends that there is no evidence about the individual adjudications that would allow for this Court's review, but the case on which CMS relies proves just the opposite. *See* Opp. 24 (citing *Cmty. Oncology All., Inc. v. Off. of Mgmt. & Budget*, 987 F.3d 1137, 1144 (D.C. Cir. 2021)). In *Community Oncology Alliance*, the D.C. Circuit held that the plaintiff did not satisfy its burden to establish the *presentment* requirement because it "provide[d] no claim numbers, claim amounts, agency dockets, agency findings, agency records, or agency decisions of any kind." 987 F.3d at 1144. Withholding this information prevented HHS from "determin[ing] whether these unspecified claims satisfy other requirements for review." *Id.* Here, of course, NAHC has satisfied its burden and provided claim numbers, service dates, and agency action on those claims. *See* Edwards Decl. ¶¶ 14-16; Albert Decl. ¶¶ 15-18. Despite having this information, CMS could only hypothesize about what it "might" find and could not, in fact, uncover anything that would bar this Court's review. *See* Opp. 24-25.

In sum, "[w]aiver is warranted" here because "the claim is (1) collateral to a substantive claim of entitlement (collaterality); (2) colorable in its showing that denial of relief will cause

irreparable harm (irreparability); and (3) one whose resolution would not serve the purpose of exhaustion (futility)." *Sensory Neurostimulation, Inc. v. Azar*, 977 F.3d 969, 981 (9th Cir. 2020).

Rather than seriously grapple with this standard, CMS appears to ask this Court to overturn binding appellate precedent establishing that courts can waive the exhaustion requirement. *See* Opp. 25 (arguing that "Congress … displaced earlier cases to the extent they suggest that courts could waive exhaustion requirements purely on futility grounds"); *see also id.* at 24 (appearing to argue that a court cannot address the lawfulness of an agency rule but instead can only "affirm, modify, or reverse individual adjudications" (cleaned up)). But this Court has no power to overturn binding precedent from the D.C. Circuit, let alone from the Supreme Court. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) (cautioning lower courts against concluding that earlier precedents have been overruled "by implication"). Moreover, the D.C. Circuit "imposes a substantial burden on a party advocating the abandonment of an established precedent." *Saad v. SEC*, 980 F.3d 103, 107 (D.C. Cir. 2020). CMS's theory that Congress's decision to ease the path to judicial review should, in fact, make review more difficult does not meet that substantial burden. *See Am. Hosp. Ass'n*, 348 F. Supp. 3d at 74 n.10 (noting the Secretary's exhaustion argument rested on the "abbreviated review process by which a claimant may request expedited judicial review" but explaining that "the Secretary does not explain why that provision would prevent a court from waiving 42 U.S.C. § 405(g)'s exhaustion requirement when appropriate" (quotation marks omitted)). Under binding precedent, there is no reason NAHC should be required to waste time and money going through a futile administrative process. The Court should review the agency's unlawful action.

## III.   Vacatur Is the Only Appropriate Remedy.

The APA provides that a "reviewing court shall … hold unlawful and set aside agency action … found to be … not in accordance with law." 5 U.S.C. § 706; *see also see Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016) (noting that "'shall'" usually "imposes a

mandatory duty"). Consistent with the statute, the D.C. Circuit has instructed that the ordinary practice is to vacate a rule that is contrary to law. *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 673 (D.C. Cir. 2019). "Because vacatur is the default remedy, … defendants bear the burden to prove that vacatur is unnecessary." *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 99 (D.D.C. 2019). CMS has not met that burden.

Vacatur is warranted because CMS's violations are serious. *Allied-Signal Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). CMS ignored the law's requirement to measure behavior change and measured something else entirely. Because CMS used the wrong equation with the wrong variables to calculate the wrong number, there is no possibility—and certainly no "serious possibility"—that the agency "will be able to substantiate its decision on remand." *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 84 (D.D.C. 2019). CMS cannot brush away the seriousness of its legal violation by framing it as a "failure[] to explain." Opp. 42. The problem with CMS's action is not that it lacked explanation but that it failed to measure what the statute required. *Cf. Am. Hosp. Ass'n v. Becerra*, 2022 WL 4534617, at *3 (D.D.C. Sept. 28, 2022) (a deficiency is serious where the agency "patently violated the [statute's] text").

Vacating CMS's rule would not be more disruptive than leaving the unlawful payment rates in place. CMS contends that vacating the 2023 payment rate would cause disruption as the agency would have to pay for services based on a different rate. Opp. at 43. But that is always true when a court holds a payment rate unlawful, and CMS does not explain why this situation would be any different. *See Am. Hosp. Ass'n*, 2022 WL 4534617, at *4 ("vacating the prospective portion of the 2022 OPPS Rule's 340B reimbursement rate does not rise to the level of justifying remand without vacatur").

CMS next hypothesizes that it might impose an interim rate that is higher than the rate it will lawfully calculate in the future and supposes that it could be difficult to recoup the difference between those two rates. Opp. 43-44. That is pure speculation. CMS has no evidence that its lawful rate would be lower than any interim rate. And the evidence in the administrative record indicates that the lawful rate would, in fact, be higher than the rate that applied before 2023. *See* AR2220 (relying on available data to determine that expenditures were approximately 2.5% below budget neutrality). There is also nothing disruptive about CMS recouping overpayment in this context. The statute directs CMS to make "one or more temporary increases or decreases" to offset for past underpayment or overpayment. *See* 42 U.S.C. § 1395fff(b)(3)(D)(iii). So even if vacatur were to cause temporary overpayment, CMS already has a statutory way to recover those payments.

CMS finally argues that any vacatur of the rule should be only vis-à-vis NAHC and its members. Opp. 44. CMS offers little support for this proposal, and the Court should decline to deviate from the APA's text to indulge it. The APA provides that a reviewing court *shall* set aside unlawful agency action. The challenged Rule is unlawful agency action. *See* 5 U.S.C. § 551(13). The Court should accordingly set the Rule aside by vacating it.

Underscoring the importance of adhering to the law, leaving the unlawful Rule in place will continue to have a devastating impact on home health care agencies and the populations they serve. As a result of CMS's unlawful payment cuts, home health agencies have been forced to reduce service areas, eliminate on-call availability, reduce the number of staff employed, and consider dropping certain provider services altogether. Edwards Decl. ¶ 10; Albert Decl. ¶¶ 11, 14. Americans in certain rural regions can no longer access home health services as a care option at all. Albert Decl. ¶ 10. These "consequences of vacatur, particularly for non-parties" are another "important consideration when deciding whether vacatur is warranted" and favor vacatur here

*Friends of Earth v. Haaland*, 583 F. Supp. 3d 113, 158 (D.D.C. 2022) (citing *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013)), *vacated on other grounds by* 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023) (per curiam).

In sum, this Court should not grant CMS "license to continue violating the law for the remainder of the year and make up for it later." *Am. Hosp. Ass'n*, 2022 WL 4534617, at *4 (quotation marks omitted); *cf. In re Core Commc'ns, Ins.*, 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring) ("[E]xperience suggests that [remand without vacatur] sometimes invites agency indifference"). Vacatur is the appropriate remedy.

## CONCLUSION

The Court should grant summary judgment in favor of NAHC and vacate the CY 2023 Rule.

Date: January 19, 2024

Respectfully submitted,

*/s/ Mark D. Polston*
Mark D. Polston
D.C. Bar No. 431233
Ashley C. Parrish
D.C. Bar No. 464683
Amy R. Upshaw
D.C. Bar No. 888156455
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, D.C. 20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737
mpolston@kslaw.com
aparrish@kslaw.com
aupshaw@kslaw.com

William A. Dombi
D.C. Bar No. 445832
Center for Health Care Law
228 Seventh Street SE
Washington, D.C. 20003

Telephone: (202) 547-5262
Facsimile: (202) 547-3140
wad@nahc.org

*Attorneys for Plaintiff National
Association for Home Care & Hospice*