**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**NATIONAL ASSOCIATION FOR HOME CARE & HOSPICE**,

Plaintiff,

v.

**XAVIER BECERRA**, in his official capacity as Secretary of Health and Human Services,

Defendant.

Case No. 1:23-cv-01942 (TNM)

---

## MEMORANDUM OPINION

The National Association for Home Care & Hospice (NAHC) claims the Secretary of Health and Human Services (HHS) is under-reimbursing home health agencies for covered services. Those agencies, including NAHC's members, get reimbursed under Medicare's prospective payment system. Congress tweaked the payment system in 2018 but instructed that the new system remain "budget neutral" with the old one. Regulations followed and sparked this lawsuit. NAHC claims that an implementing regulation violates Congress's budget neutrality command. But the Secretary says his regulation faithfully executes it.

Both parties moved for summary judgment and those motions are now ripe. The motions raise three issues: jurisdiction, exhaustion, and merits. The Court concludes that it has jurisdiction over one aspect of NAHC's challenge. But it also finds that NAHC failed to exhaust its administrative remedies because it skipped the agency's process for seeking expedited judicial review. So the Court will grant the Secretary's motion for summary judgment.

**I.**

This Medicare reimbursement dispute turns on convoluted clauses and technical terms. So the Court starts by summarizing the relevant legal framework. Then it lays out the parties' disagreement.

**A.**

NAHC claims the Secretary has violated Medicare's budget neutrality requirement. That requirement impacts how the Secretary reimburses home health agencies under Medicare. To understand the scope of the impact, focus first on how Medicare reimbursements work.

When Medicare was unveiled in 1965, it reimbursed home health agencies the "reasonable costs" of services they provided to covered individuals. *See* Social Security Amendments of 1965 (Medicare), Pub. L. No. 89-97, §§ 1814(b), 1861(u), 79 Stat. 290, 296, 322. But that changed in 2000 when Congress shifted to a "prospective payment system established by the Secretary." 42 U.S.C. § 1395fff(a); *see also* Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4603(a), 111 Stat. 251, 467–68. Under this forward-looking system, home health agencies get reimbursed at a predetermined rate for every "unit of service" they provide, regardless of the actual services rendered during that period. 42 U.S.C. § 1395fff(b)(2)(A). This predetermined rate is called the "standard prospective payment amount." *Id.* § 1395fff(b)(4)(A). And it varies only for "case mix" and "area wage" adjustments. *Id.*

This forward-looking payment system came with a few problems. The Secretary identified two in 2017: the use of "therapy thresholds" as a significant case mix adjustment, and the use of a 60-day unit of service window. *See* CY 2018 Home Health Prospective Payment System Rate Update and Proposed CY 2019 Case-Mix Adjustment Methodology Refinements, 82 Fed. Reg. 35,270, 35,274 (July 28, 2017).

At the time, therapy visits served as a significant case-mix factor that could increase a home health agency's overall reimbursement.  But an agency's reimbursements went up at seemingly random intervals:  An agency got the same amount for 0 and 5 visits, but more for 6.  The reimbursement went up for 7 and plateaued until 9.  Up again for 10.  Then terraced increases followed:  More money for 11–13 visits; then 14–15; then 16–17; then 18–19.  Finally, reimbursements topped out for 20 or more visits.  *See id.*  Predictably, these thresholds "encouraged therapists to target the most profitable number of therapy visits, even when patient need alone may not have justified such patterns."  *Id.* at 35,276.  And studies backed this up, finding "sharp increases in the percentage of episodes just above payment thresholds."  *Id.*  Why stop at ten visits, the thinking went, when one more follow-up would trigger a bigger reimbursement?  The Secretary caught on to the gamesmanship and proposed "[e]liminating therapy as a payment factor" to refocus "home health payments solely on patient characteristics."  *Id.* at 35,277.

The Secretary also proposed switching the base unit of payment from a 60-day episode of care to a 30-day episode.  *Id.* at 35,301.  Several reasons justified the switch.  For starters, dropping to a lower unit of measurement would "more accurately apportion payments" because "episodes have more visits, on average, during the first 30 days compared to the last 30 days."  *Id.* (cleaned up).  It also would have been "needed to reduce the variation and improve the accuracy of . . . case-mix weights" in a world without therapy thresholds.  *Id.*  And finally, the switch to 30 days would have aligned "the billing cycle for Medicare home health services" with "other Medicare health settings" that "bill on a monthly basis."  *Id.*

Home health agencies objected to these changes.  They raised technical issues with "various aspects of the proposed case-mix adjustment methodology."  *See* CY 2018 Home

Health Prospective Payment System Rate Update and CY 2019 Case-Mix Adjustment Methodology Refinements, 82 Fed. Reg. 51,676, 51,699 (Nov. 7, 2017).  They worried the Secretary would implement the new payment model "in a non-budget neutral manner."  *Id.*  And they wanted time and data to analyze the effects of the proposed model on their businesses.  *See id.*  The Secretary relented and held the proposal back for further consideration.  *See id.*

Then Congress took matters into its own hands.  The very next year, Congress enacted the Bipartisan Budget Act of 2018, which eliminated therapy thresholds and shifted the payment unit from 60-day to 30-day episodes.  *See* Pub. L. No. 115-123, § 51001, 132 Stat. 64, 289–91 (classified to 42 U.S.C. § 1395fff).  Congress also instructed the Secretary to maintain budget neutrality when implementing these changes.  In a section titled "Budget Neutrality for 2020," Congress told the Secretary to calculate the standard prospective payment amount "in a manner such that the estimated aggregate amount of expenditures under the system during such period with application of [the 30-day unit] is equal to the estimated aggregate amount of expenditures that otherwise would have been made under the system during such period if [the 30-day unit] had not been enacted."  42 U.S.C. § 1395fff(b)(3)(A)(iv).

But maintaining budget neutrality within a *prospective* payment system requires some guesswork.  After all, the Secretary must predict the standard payment amount for future units of service.  So Congress instructed the Secretary to "make assumptions about behavior changes that could occur as a result of the implementation of the [30-day unit] and the" elimination of the therapy thresholds.  *Id.*  And Congress told the Secretary to check his homework by "annually determin[ing] the impact of differences between assumed behavior changes . . . and actual behavior changes on estimated aggregate expenditures."  *Id.* § 1395fff(b)(3)(D)(i).  If the Secretary guessed wrong and actual changes deviated from assumed changes, Congress

authorized the Secretary to "provide for one or more permanent increases or decreases to the standard prospective payment amount . . . to offset for such increases or decreases in estimated aggregate expenditures." *Id.* § 1395fff(b)(3)(D)(ii).

**B.**

That process played out here.  In response to the Bipartisan Budget Act, the Secretary developed the "Patient-Driven Groupings Model."  CY 2019 Home Health Prospective Payment System Rate Update and CY 2020 Case-Mix Adjustment Methodology Refinements, 83 Fed. Reg. 56,406, 56,446 (Nov. 13, 2018).  This new payment model "[u]ses 30-day periods of care rather than 60-day episodes of care as the unit of payment," and it "eliminates the use of the number of therapy visits provided to determine payment."  *Id.* at 56,447.

The Secretary also claims he implemented the Act's budget neutrality requirement—to set a standard prospective payment amount where "the estimated aggregate amount of expenditures under the" new model "is equal to the estimated aggregate amount of expenditures that otherwise would have been made under" the old model.  42 U.S.C. § 1395fff(b)(3)(A)(iv). To set a budget-neutral payment amount for the new model, the Secretary "first calculated the total, aggregate amount of expenditures that would occur under the" old model (the one with a 60-day payment unit and therapy thresholds).  CY 2020 Home Health Prospective Payment System Rate Update (CY 2020 Rule), 84 Fed. Reg. 60,478, 60,512 (Nov. 8, 2019).  And that produced a total aggregate expenditure target of $16.6 billion.  *See id.*  Then to hit that target under the new model—without any behavioral assumptions—the Secretary calculated that he would need to set a payment rate of $1908.18 per 30-day unit of service.  *See id.*

But the Secretary also had to follow Congress's instruction to factor in assumed behavioral changes in response to the new model.  *See* 42 U.S.C. § 1395fff(b)(3)(A)(iv).  So he

assumed that home health agencies would (1) apply higher-paying principal diagnosis codes; (2) list more secondary diagnosis codes; and (3) provide additional visits during a 30-day period to avoid a downward adjustment for low utilization.  *See* CY 2020 Rule, 84 Fed. Reg. at 60,512. The Secretary did not assume home health agencies would decrease therapy visits in response to the elimination of therapy thresholds.  *See id.* at 60,497.  He instead expected home health agencies to abide by Medicare's Conditions of Participation, which require home health agencies to provide only "care and services necessary to meet . . . patient-specific needs."  *Id.*

Factoring in these assumptions, the Secretary estimated that the prospective payment rate should be lowered to $1,748.11 per 30-day unit of service—a rate 8.389% less than the estimated payment rate without behavioral assumptions.  *Id.* at 60,513.  But many commenters argued he overestimated the "frequency of the assumed behaviors during the first year of the transition to" the new payment model.  *Id.* at 60,519.  So the Secretary finalized a new standard prospective payment amount of $1,824.99, which represented only a 4.36% decrease from the estimated amount without behavioral assumptions.  *Id.*  He warned, however, that more drastic decreases might become necessary "if CMS underestimate[d] the amount of the reductions to the 30-day payment rate necessary to offset behavior changes and maintain budget neutrality."  *Id.* at 60,518; *see also* 42 U.S.C. § 1395fff(b)(3)(D)(ii) ("The Secretary shall, at a time and in a manner determined appropriate, . . . provide for one or more permanent increases or decreases to the standard prospective payment amount . . . to offset for such increases or decreases in estimated aggregate expenditures[.]").

That warning became a reality in 2022 when the Secretary measured the assumed behavior changes against actual behavior changes.  *See* CY 2023 Home Health Prospective Payment System Rate Update (CY 2023 Rule), 87 Fed. Reg. 66,790, 66,798 (Nov. 4, 2022).

Using claims data from 2020 and 2021, the Secretary "determine[d] the impact of differences between what . . . estimate[d] aggregate expenditures would have been" under the old model "and what the expenditures actually were under the [new model]." *Id.* Although the Secretary set a target of $16.6 billion in aggregate expenditures (accounting for assumed behavioral changes), the real numbers (factoring in actual behavioral changes) came in much lower: $14.3 billion for 2020 and $15.8 billion for 2021. *See id.* at 66,805–06.

To correct for the overestimation, the Secretary said that "CMS would need to apply a -7.85 percent permanent adjustment to the CY 2023 base payment rate as well as a temporary adjustment of approximately $2.1 billion to reconcile retrospective overpayments in CYs 2020 and 2021." *Id.* at 66,806. But he recognized the "potential hardship" that could result from such a steep cut. So the Secretary halved the rate cut and finalized a 3.925% reduction for 2023. *See id.* at 66,608. He also punted on the temporary payment adjustment, saying he would consider it in a future rulemaking. *Id.*

### C.

NAHC is a nonprofit association of home health agencies. *See* Compl. ¶ 11. Two of its members—Mary Lanning Healthcare and Androscoggin Home Healthcare + Hospice—protested the Secretary's rate cut in HHS proceedings. They both filed Requests for Redetermination with CMS's Medicare Administrative Contractor (MAC), claiming the Secretary's downward adjustment to the standard payment amount violated 42 U.S.C. § 1395fff. *See* Decl. of Carrie Edwards ¶ 14, ECF No. 15-2; Decl. of Ken Albert ¶ 15, ECF No. 15-3. The MAC denied Androscoggin's request and did not respond to Mary Lanning's. *See* Decl. of Carrie Edwards ¶ 15; Decl. of Ken Albert ¶ 16.

So NAHC sued the Secretary on behalf of its members. *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (recognizing associational standing). It claims any further administrative process would be futile because "no administrative body has authority to rule in [its members'] favor." Pl.'s Mot. Summ. J. (Pl.'s MSJ) at 21, ECF No. 15-1. And it has moved for summary judgment, arguing the Secretary's 2023 rate cut violates the Bipartisan Budget Act; specifically, the Act's provisions on (1) budget neutrality, 42 U.S.C. § 1395fff(b)(3)(A)(iv); (2) therapy thresholds, *id.* § 1395fff(b)(4)(B)(ii); and (3) behavior assumptions and adjustments, *id.* § 1395fff(b)(3)(D).

The Secretary has cross-moved for summary judgment. He argues the Court lacks jurisdiction to hear NAHC's claims under the Bipartisan Budget Act's jurisdiction-stripping provision. *See id.* § 1395fff(d). Even if jurisdiction exists, the Secretary argues NAHC failed to exhaust its administrative remedies because it did not properly seek expedited judicial review. And finally, in the alternative, the Secretary urges the Court to reject NAHC's claims on the merits.

## II.

The Court must dismiss a case if it lacks subject-matter jurisdiction. *Ex parte McCardle*, 74 U.S. 506, 514 (1868). "A federal court's subject-matter jurisdiction" is "constitutionally limited by Article III," and "extends only so far as Congress provides by statute." *CFTC v. Nahas*, 738 F.2d 487, 492 (D.C. Cir. 1984) (cleaned up). Cases presumptively lie "outside this limited jurisdiction, . . . and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

If the Court has jurisdiction, summary judgment may be awarded when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  But this case arises under the Administrative Procedure Act (APA).

So the "APA's standards of review" apply in place of "Rule 56's standards." *Landmark Hosp. of

Salt Lake City v. Azar*, 442 F. Supp. 3d 327, 331 (D.D.C. 2020).  In this context, "summary

judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is

supported by the administrative record and otherwise consistent with the APA standard of

review." *Id.* (cleaned up).  The APA, in turn, requires the Court to "hold unlawful and set aside

agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  5 U.S.C. § 706(2)(A).

## III.

NAHC challenges the Secretary's decision to reduce the standard prospective payment

amount that home health agencies receive.  *See* CY 2023 Rule, 87 Fed. Reg. at 66,808.  NAHC

argues this decision violates three aspects of the Bipartisan Budget Act: (1) the budget neutrality

provision, 42 U.S.C. § 1395fff(b)(3)(A)(iv); (2) the provision eliminating therapy thresholds, *id.*

§ 1395fff(b)(4)(B)(ii); and (3) the provision on behavior assumptions and adjustments, *id.*

§ 1395fff(b)(3)(D).  According to NAHC, these provisions required the Secretary to "hold

aggregate expenditures neutral" when reimbursing home health agencies.  Pl.'s MSJ at 31.

The Secretary disputes the merits of NAHC's claims.  Def.'s Cross-Mot. Summ. J.

(Def.'s X-MSJ) at 26–41, ECF No. 18-1.  But he also says the Court lacks jurisdiction to hear the

claims in the first place.  *Id.* at 14–19.  And even if the Court has jurisdiction, he argues NAHC

failed to exhaust its administrative remedies.  *Id.* at 20–26.  The Court addresses each of these

threshold arguments.  It concludes it has jurisdiction over one aspect of NAHC's challenge.  *See

Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (reinforcing "requirement that

jurisdiction be established as a threshold matter").  But it also determines that NAHC failed to

exhaust its administrative remedies. *See Fleming v. U.S. Dep't of Agric.*, 987 F.3d 1093, 1099 (D.C. Cir. 2021) ("[I]f the government raises [an] exhaustion requirement, the court must enforce it."). So it will grant summary judgment to the Secretary.

## A.

First up, jurisdiction. "Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider." *Bowles v. Russell*, 551 U.S. 205, 212 (2007). It can "determine when, and under what conditions, federal courts can hear" a case, or whether they can hear it "at all." *Id.* at 213. As the D.C. Circuit put it, "when it comes to jurisdiction, the Congress giveth and the Congress taketh away." *In re al-Nashiri*, 791 F.3d 71, 76 (D.C. Cir. 2015).

Jurisdiction-stripping provisions are one way Congress reins in federal court jurisdiction. And one appears prominently in the Bipartisan Budget Act. It says:

There shall be *no . . . judicial review . . .* of—

(1) the establishment of a transition period under subsection (b)(1);

(2) the definition and application of payment units under subsection (b)(2);

(3) the computation of initial standard prospective payment amounts under subsection (b)(3)(A) (including the reduction described in clause (ii) of such subsection);

(4) the establishment of the adjustment for outliers under subsection (b)(3)(C);

(5) the establishment of case mix and area wage adjustments under subsection (b)(4); and

(6) the establishment of any adjustments for outliers under subsection (b)(5).

42 U.S.C. § 1395fff(d) (emphasis added). This jurisdiction-stripping provision tees up the first question here: Does the Court possess "adjudicatory authority" over NAHC's claims? *Bowles*, 551 U.S. at 213 (cleaned up).

Well-established rules mark the way to the answer.  "When deciding whether a statute bars judicial review," the Court begins "with the strong presumption that Congress intends judicial review of administrative action."  *Am. Clinical Lab'y Ass'n v. Azar*, 931 F.3d 1195, 1204 (D.C. Cir. 2019) (cleaned up).  "Even where, as here, a statutory provision expressly prohibits judicial review, the presumption applies to dictate that such a provision be read narrowly."  *Id.* So "[w]hen a statute is *reasonably susceptible* to divergent interpretation," the Court must "adopt the reading that accords with traditional understandings and basic principles: that executive determinations are generally susceptible to judicial review."  *Id.* (quoting *Kucana v. Holder*, 558 U.S. 233, 251 (2010)) (emphasis added).

Still, the Court's adjudicatory power reaches its outermost edge when a statute "unequivocally precludes review" of a challenged action or decisions that are "inextricably intertwined" with that action.  *Texas All. for Home Care Servs. v. Sibelius*, 681 F.3d 402, 411 (D.C. Cir. 2012).  To inspect the scope of a particular provision, the Court looks to familiar interpretive tools like the "express language" and "structure of the statutory scheme."  *Am. Clinical Lab'y Ass'n*, 931 F.3d at 1204 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984)).

The Secretary argues § 1395fff(d) precludes review over all three facets of NAHC's lawsuit.  Again, NAHC claims the Secretary's CY 2023 Rule violates the Bipartisan Budget Act's (1) budget neutrality provision, 42 U.S.C. § 1395fff(b)(3)(A)(iv); (2) the provision eliminating therapy thresholds, *id.* § 1395fff(b)(4)(B)(ii); and (3) the provision on behavior assumptions and adjustments, *id.* § 1395fff(b)(3)(D).  The Court concludes it has jurisdiction to consider NAHC's final claim but lacks jurisdiction over the first two.

The jurisdiction-stripping provision squarely encompasses NAHC's two initial claims. Start with its first one—that the CY 2023 Rule "runs afoul of the budget-neutrality provision" found in subsection (b)(3)(A).  Pl.'s MSJ at 30.  That subsection commands the Secretary to "calculate a standard prospective payment amount . . . in a manner such that the estimated aggregate amount of expenditures under the [new payment] system . . . is equal to the estimated aggregate amount of expenditures that otherwise would have been made under the [old payment] system."  42 U.S.C. § 1395fff(b)(3)(A)(iv).  But Congress also said:  "There shall be no . . . judicial review . . . of . . . the computation of initial standard prospective payment amounts under subsection (b)(3)(A)."  *Id.* § 1395fff(d)(3).  This jurisdiction-stripping clause accurately describes, and specifically cites to, the budget-neutrality provision in subsection (b)(3)(A).  So judicial review of that subsection is "unequivocally preclude[d]."  *Texas All. for Home Care Servs.*, 681 F.3d at 409.  NAHC does not dispute this.  In fact, it has expressly disclaimed any "challenge [to] CMS's computation of the initial standard prospective payment amount" under subsection (b)(3)(A).  Pl.'s Opp'n & Reply at 28, ECF No. 20.

A similar obstacle impedes NAHC's second claim—that the CY 2023 Rule "fails to comply with Congress's instruction that CMS eliminate the use of therapy thresholds as a factor for payment."  Pl.'s MSJ at 28.  That instruction appears in subsection (b)(4)(B)(ii), which requires "the Secretary [to] eliminate the use of therapy thresholds . . . in case mix adjustment factors . . . for calculating payments."  42 U.S.C. § 1395fff(b)(4)(B)(ii).  But again, Congress put this provision beyond the reach of judicial review when it said that "[t]here shall be no . . . judicial review . . . of . . . the establishment of case mix . . . adjustments under subsection (b)(4)." Once more, this jurisdiction-stripping clause accurately describes, and specifically cites to, the therapy threshold and case mix adjustment provision in subsection (b)(4).  So the Court cannot

review it.  *See Texas All. for Home Care Servs.*, 681 F.3d at 409.  And tellingly, NAHC has

backed away from its initial suggestion to do so.  *See* Pl.'s Opp'n & Reply at 29 ("[T]his

litigation does not dispute the establishment of case mix . . . adjustments.").

That leaves NAHC's final claim—that the CY 2023 Rule violates the behavior

assumptions and adjustments provision in subsection (b)(3)(D).  This subsection requires the

Secretary to "annually determine the impact of differences between assumed behavior changes

(as described in paragraph (3)(A)(iv)) and actual behavior changes on estimated aggregate

expenditures under this subsection" for six years.  42 U.S.C. § 1395fff(b)(3)(D)(i).  If a

difference is detected, the Secretary must "provide for one or more permanent increases or

decreases to the standard prospective payment amount (or amounts) for applicable years, on a

prospective basis, to offset for such increases or decreases in estimated aggregate expenditures

(as determined under clause (i))."  *Id.* § 1395fff(b)(3)(D)(ii).

The Secretary contends a challenge under this provision is off-limits, too.  Def.'s X-MSJ

at 25; Def.'s Reply at 8–9, ECF No. 22.  But unlike the provisions on budget neutrality and

therapy thresholds, subsection (b)(3)(D)—and its requirements for behavior assumptions and

adjustments—does not appear anywhere on subsection (d)'s jurisdiction-stripping menu.  *See* 42

U.S.C. § 1395fff(d).  No matter, says the Secretary, because the "internal cross-references"

within subsection (b)(3)(D) link it to subsection (b)(3)(A) which *is* on the menu of off-limits

items.  *See* 42 U.S.C. § 1395fff(b)(3)(D)(i)–(ii) ("The Secretary shall annually determine the

impact of differences between assumed behavior changes (*as described in paragraph

(3)(A)(iv)*) and actual behavior changes on estimated aggregate expenditures," and he must

"offset for such increases or decreases in estimated aggregated expenditures (*as determined

under clause (i)*)."  (emphases added)).  The Secretary argues these cross-references create a

"cohesive regulatory scheme," in which any adjustment to the standard prospective payment amount is "inextricably intertwined" with the unreviewable budget neutrality requirement. Def.'s Reply at 8–9.  Not so.

An agency decision left unmentioned in a jurisdiction-stripping provision only becomes unreviewable if it is "*indispensable* or *integral* to, or *inextricably intertwined* with, the unreviewable agency action."  *Am. Clinical Lab'y Ass'n*, 931 F.3d at 1207 (cleaned up) (emphasis added).  But again, if the statute is "reasonably susceptible to [a] divergent interpretation" in favor of jurisdiction, the Court must adopt that reading.  *Id.* at 1204.  So the bar for implicitly eliminating jurisdiction is high and hurdled in only rare circumstances.  The Secretary's citations drive this point home.

Take *Florida Health Sciences Center, Inc. v. Secretary of Health and Human Services*, for example.  830 F.3d 515 (D.C. Cir. 2016) (cited in Def.'s X-MSJ at 27).  That case centered on a hospital's challenge to the data HHS used to calculate treatment reimbursements for low-income patients.  *Id.* at 518.  The hospital admitted a jurisdiction-stripping provision barred review of the agency's final reimbursement estimates.  *Id.* at 519.  But it argued data underlying the estimate could be reviewed.  *Id.*  The D.C. Circuit said this thin distinction made no difference because "the data are the entire basis for the estimate."  *Id.*  So, it concluded, allowing "[a] challenge to the data would eviscerate the bar on judicial review."  *Id.* (cleaned up).

Similarly thin distinctions have produced similar results.  In *Mercy Hospital, Inc. v. Azar*, a review bar on prospective payment rates also covered the formula the Secretary used to calculate those rates.  *See* 891 F.3d 1062, 1067 (D.C. Cir. 2018) (cited in Def.'s Reply at 9). And in *DCH Regional Medical Center v. Azar*, a review bar on final reimbursement estimates covered "the methodology used to generate [the] estimates."  925 F.3d 503, 506 (D.C. Cir. 2019)

(cited in Def.'s X-MSJ at 27).  All these outcomes are driven by the same rule of decision:  If a court cannot review the challenged action "without also reviewing" the unreviewable action, review of both is precluded because the two are "inextricably intertwined." *Id.* at 507.  Put another way, when the challenged action "cannot be separated from the" unreviewable action, both are off-limits. *Id.* at 506.

But this case is different.  It involves two distinct agency actions: (1) setting an initial standard prospective payment amount and (2) adjusting that amount in subsequent years "to offset for . . . increases or decreases in estimated aggregate expenditures" based on "actual behavior changes."  42 U.S.C. § 1395fff(b)(3)(A), (b)(3)(D).  These two actions are mandated in different statutory subsections to perform different functions, at different times, through different rulemakings.

Recall what happened here.  In 2019, the Secretary carried out the mandate in subsection (b)(3)(A):  He promulgated a final rule, after notice and comment, setting an *initial* standard prospective payment amount for 30-day units of service beginning in 2020.  *See* CY 2020 Rule, 84 Fed. Reg. at 60,512; *see also* 42 U.S.C. § 1395fff(b)(3)(A)(iv) (requiring "notice and comment rulemaking . . . to implement this" mandate).  Then, in 2022, the Secretary discharged the mandate contained in subsection (b)(3)(D):  He promulgated a separate final rule, after notice and comment, lowering the standard prospective payment amount "to account for actual behavior changes."  CY 2023 Rule, 87 Fed. Reg. at 66,808; *see also* 42 U.S.C. § 1395fff(b)(3)(D)(ii) (authorizing behavior adjustments after "notice and comment rulemaking").

These distinct mandates mirror the statutory scheme at issue in *American Clinical Laboratory Association v. Azar*, 931 F.3d at 1204–06.  In that case, a jurisdiction-stripping

provision barred review of the Secretary's "establishment of payment amounts" for laboratory tests reimbursed by Medicare.  *Id.* at 1204 (quoting 42 U.S.C. § 1395m-1(h)(1)).  But the D.C. Circuit held that this bar did not reach a challenge to "the rule the Secretary promulgated to implement the statute's data-collection provision."  *Id.* at 1205.  "Several features of the statute" led the Circuit to this conclusion.  *Id.*  The text of the jurisdiction-stripping provision, coupled with the text of the substantive provisions on pricing and data collection, suggested that the two actions were "separate."  *Id.*  Structurally, the two actions appeared in different subsections, entailed different "obligations," and each required notice and comment rulemaking.  *Id.*  And finally, the "nature of the processes of data collection and establishment of payment rates" made it possible to review one action without reviewing the other.  *Id.* at 1208.

These same features exist here.  "Unlike the provisions at issue in" *Florida Health*, *Mercy Hospital*, and *DCH Regional*, "the statutory text here does not subsume" behavior change adjustments "within" the Secretary's computation of the initial standard prospective payment amount.  *Am. Clinical Lab'y Ass'n*, 931 F.3d at 1206.  For starters, the text of the jurisdiction-stripping provision says it only applies to the "*initial* standard prospective payment amounts under subsection (b)(3)(A)."  42 U.S.C. § 1395fff(d)(3).  That specific description (and citation) simply does not reach behavior change adjustments under subsection (b)(3)(D).  In fact, "Congress set out the process for [behavior change adjustments] in a separate and distinct subsection with its own set of rules."  *Am. Clinical Lab'y Ass'n*, 931 F.3d at 1206.  And "Congress also required that the parameters for [any behavior change adjustment] be established through notice and comment rulemaking," which underscores the unique considerations that accompany such adjustments.  *Id.*

In sum, the text and structure of the Bipartisan Budget Act reveal that initially setting standard prospective payment amounts, and subsequently adjusting those amounts to account for actual changes in behavior, are two different actions accompanied by two distinct processes. Because behavior change adjustments are not "inextricably intertwined" with the initial setting of standard prospective payment amounts, the Court "lack[s] a basis on which to infer that Congress, in eliminating jurisdiction over the latter, clearly meant also to bar review of the former." *Id.* The statute "is 'reasonably susceptible' to this reading," so the Court has jurisdiction to consider NAHC's challenge to the Secretary's behavior change adjustment in the CY 2023 Rule. *Id.*

## B.

On to NAHC's second threshold obstacle: exhaustion. Three statutes converge to provide NAHC an avenue for judicial review. *See* Compl. ¶ 14, ECF No. 1 (invoking jurisdiction under 42 U.S.C. § 405(g)). First, 42 U.S.C. § 405(h) generally strips federal courts of federal-question jurisdiction over "any claim arising under" Title II of the Social Security Act. And it specifically shields any "decision of the Commissioner of Social Security" from judicial review, "except as herein provided." Second, 42 U.S.C. § 405(g) provides an exception for judicial review of Social Security Act claims. But it permits review only after the Commissioner of Social Security has made a "*final decision*" on the claim. Third, 42 U.S.C. § 1395ii makes the judicial review provision in § 405(g) applicable to Medicare "to the same extent [it is] applicable with respect to" Title II. And it substitutes references to "the Commissioner of Social Security" for "the Secretary of Health and Human Services." *See Am. Hosp. Ass'n v. Azar*, 895 F.3d 822, 825 (D.C. Cir. 2018) (explaining statutory scheme).

Medicare also borrowed from the Social Security Act "two distinct preconditions for obtaining judicial review" under § 405(g): presentment and exhaustion. *Am. Hosp. Ass'n*, 895 F.3d at 825.  These are both nonjurisdictional claims-processing rules, *see M2Z Networks, Inc. v. FCC*, 558 F.3d 554, 558 (D.C. Cir. 2009), but one is mandatory and the other discretionary.  Under the presentment requirement, "the plaintiff must have 'presented'" a claim for payment "to the Secretary; this requirement is not waivable, because without presentment 'there can be no "decision" of any type,' which § 405(g) clearly requires." *Am. Hosp. Ass'n*, 895 F.3d at 825 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976)).  And under the exhaustion requirement, "the plaintiff must fully exhaust all available administrative remedies, though this more demanding requirement is waivable." *Id.* at 826.

All agree that two NAHC members have satisfied § 405(g)'s presentment requirement.  Mary Lanning Healthcare "presented its legal claims and objections to CMS's payment cuts in the form of a Request for Redetermination" before "CMS's Medicare Administrative Contractor."  Decl. of Carrie Edwards ¶ 14.  And Androscoggin Home Healthcare + Hospice took the same action.  *See* Decl. of Ken Albert ¶ 15.

But both parties also agree that NAHC has failed § 405(g)'s exhaustion requirement.  To exhaust their administrative remedies, NAHC's members had to walk through these steps:

1. Submit an individual claim for a benefit (here, home health services) to a MAC.  42 U.S.C. § 1395ff(a)(1).

2. Request redetermination from the MAC.  42 U.S.C. § 1395ff(a)(3); 42 C.F.R. §§ 405.904(a)(2), 405.940.

3. Request reconsideration of the redetermination by a qualified independent contractor (QIC), who can collect more evidence.  42 U.S.C. § 1395ff(b), (c); 42 C.F.R. §§ 405.904(a)(2), 405.960, 405.968(a).

4. Request a hearing before an Administrative Law Judge.  42 U.S.C. §§ 405(b), (g), 1395ff(b)(1)(A), (d)(1); 42 C.F.R. § 405.1000.

5.  Appeal to the Medicare Appeals Council.  42 U.S.C. §§ 405(b), (g), 1395ff(b)(1)(A), (d)(2); 42 C.F.R. § 405.1100.

NAHC's members sued after reaching step two; neither sought reconsideration by a QIC. Decl. of Carrie Edwards ¶ 14; Decl. of Ken Albert ¶ 15.  So while NAHC's members satisfied the presentment requirement, they failed the exhaustion requirement.

The exhaustion requirement is a creature of administrative law, which "normally requires channeling a legal challenge through the agency."  *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 12 (2000).  But this requirement comes with some exceptions.  For instance, under "ordinary administrative law principles," early review might be permitted when "the legal question is 'fit' for resolution and delay means hardship, or when exhaustion would prove 'futile.'"  *Id.* at 13.

NAHC invokes the futility exception to avoid the exhaustion requirement.  In its view, enforcing the exhaustion requirement would be pointless because agency actors lack the "legal authority to set aside the payment rate cuts adopted by CMS."  Pl.'s Opp'n & Reply at 33.  In response, the Secretary says HHS—at Congress's instruction—created an expedited judicial review process for challengers just like NAHC's members, who argue "that exhaustion of the usual procedures would be futile."  *Ryan v. Bentsen*, 12 F.3d 245, 248 (D.C. Cir. 1993).  Because the members "did not use the expedited [judicial review] process," the Secretary argues they "failed to exhaust [their] administrative remedies."  *Id.* at 249.

The Secretary is right.  Medicare's expedited judicial review process exists for cases like this, where the agency "*does not have the authority* to decide the question of law or regulation relevant to the matters in controversy and . . . there is no material issue of fact in dispute." 42 U.S.C. § 1395ff(b)(2)(A) (emphasis added).  But the agency—not the challenger—gets to decide the question of authority.  So before a challenger may rush to federal court, it must file a

request for expedited judicial review with the appropriate "review entity." *Id.*  In turn, the

"*review entity* shall make a determination on the request in writing within 60 days after the date

such review entity receives the request." *Id.* § 1395ff(b)(2)(B) (emphasis added).

NAHC's members never requested expedited judicial review, and they have not

explained why.  Instead, NAHC invokes a host of judicially created exceptions to the exhaustion

requirement.  It says its legal challenge is "collateral to the claims for benefits" presented to the

agency.  Pl.'s Opp'n & Reply at 31.  It says further agency proceedings would irreparably harm

its members.  *Id.* at 32.  And it says more agency process "would be futile" given the agency

adjudicators' lack of authority "to set aside the payment rate cuts."  *Id.* at 33.

Under "ordinary administrative law principles," NAHC may have a point.  *Ill. Council*,

529 U.S. at 12 (explaining how exhaustion exceptions normally work absent statutory

displacement).  But § 405(h) generally "prevents application" of these judicially created

"exceptions" because the statute "demands the 'channeling' of virtually all attacks through the

agency."  *Id.*  No doubt, reading § 405(h) to displace judicial exceptions to exhaustion "comes at

a price, namely, occasional individual, delay-related hardship."  *Id.*  But the Supreme Court

explained that "paying this price" is better than subjecting a "complex health and safety program

like Medicare" to the whim of "different individual courts applying" the "exhaustion exceptions

case by case."  *Id.* (cleaned up).

And the D.C. Circuit has held that a plaintiff "fail[s] to exhaust his administrative

remedies" when he skips an "expedited [judicial review] process" without justification.  *Ryan*, 12

F.3d at 249.  To be sure, seeking expedited review "is not part of the non-waivable presentment

requirement that is a predicate to judicial review."  *Id.*  Still, the Circuit teaches that courts

should "decline to waive the exhaustion requirement" when "the Secretary has expressly

provided [an expedited judicial review process] for a benefit claimant who argues that exhaustion of the usual procedures would be futile." *Id.*

This prudential rule "benefits both the parties and the court." *Id.* It allows the claimant to skip "full Department review," while ensuring that "the parties come to court in agreement as to the facts and the applicable law." *Id.* Full ventilation at the agency level obviates "question[s] regarding exhaustion of remedies or applicability of the futility doctrine." *Id.* And it focuses judicial resources. "Rather than expending judicial effort on the applicability of the futility doctrine, the court is able to pass on the validity of the allegedly [unlawful] statute." *Id.* at 249.

One court in this district has specifically applied *Ryan*'s prudential rule to Medicare's expedited judicial review process in the context of a statutory challenge. *See Nat'l Home Infusion Ass'n v. Becerra*, No. CV 19-393 (TJK), 2021 WL 2439570, at *5–7 (D.D.C. June 15, 2021). And it concluded that the plaintiff's failure to utilize this process could not be excused on futility grounds. *See id.* at *7.

NAHC's counterarguments are unpersuasive. Its briefs never cite *Ryan v. Bentsen*. And its attempt to distinguish *National Home Infusion v. Becerra* falls short. NAHC asserts that further agency proceedings in that case would not have been futile. *See* Pl.'s Opp'n & Reply at 33–34. Perhaps. *See Nat'l Home Infusion Ass'n*, 2021 WL 2439570, at *7 (explaining the agency might "reconsider its policies, interpretations, and regulations in light of [the plaintiff's] challenges"). But *Ryan* instructed courts to decide whether "resort to the *[expedited] procedure* would . . . have been futile." 12 F.3d at 248 (emphasis added). And the answer to *that* question, in *this* case, is no because expedited review "does not involve review of the merits of [a plaintiff's] claim to benefits." *Id.* at 249. NAHC's members could have utilized Medicare's expedited judicial review process, and they have "no justification" for their failure to do so. *Id.*

**IV.**

Based on the undisputed facts and controlling law, the Court concludes that NAHC's members failed to exhaust their administrative remedies.  So the Court will grant summary judgment to the Secretary.  A corresponding Order will issue today.


Dated:  April 26, 2024                                      _____
                                                                            TREVOR N. McFADDEN, U.S.D.J.